## 2020CV00018 FAIRMOUNT PROPERTIES LLC VS. COLLEGE TOWN KENT LLC OPEN

Case Type:
CIVIL (COMMON PLEAS)

Case Status:
OPEN

File Date:
01/09/2020

DCM Track:

Action:
OTHER CIVIL

Status Date:
01/09/2020

Case Judge:
DOHERTY, BECKY L

Next Event:



| All Information | Party | Docket | Financial | Receipt | Disposition |

**Party Information**

FAIRMOUNT PROPERTIES LLC
- PLAINTIFF

- DOB
- Disposition
- Disp Date

Address
200 PARK AVE SUITE 220
ORANGE VILLAGE, OH 44122

Alias

**Party Attorney**
Attorney
COOPER, CHAD D
Address
1660 W 2ND ST STE 1100
CLEVELAND, OH  44113
Phone
(216)583-7000
Attorney
SALTZ, ASHTYN N
Address
1660 W 2ND ST STE 1100
CLEVELAND, OH  44113
Phone
(216)583-7000

**More Party Information**

COLLEGE TOWN KENT LLC
- DEFENDANT

- DOB
- Disposition
- Disp Date

Address
C/O STAT AGT JEFFREY N STAATS
7997 CRILE RD
CONCORD TWP, OH 44077

Alias

**Party Attorney**
- Attorney
- MERICAL, JOSEPH
- Address
- 41 S HIGH ST STE 2495
  COLUMBUS, OH  43215
- Phone
- (614)340-5558
- Attorney
- TARNEY, TYLER
- Address
- 41 S HIGH ST STE 2495
  COLUMBUS, OH  43215
- Phone
- (614)340-5558

**More Party Information**

## Docket Information

| Date | Docket Text | Amount Owed | File Ref Nbr. | Amount Due | Image Avail. |
|---|---|---|---|---|---|
| 01/09/2020 | COMPLAINT FILED.  ACTION: OTHER CIVIL  Receipt: 430339  Date: 01/09/2020 | $261.50 | | $0.00 | Image |
| 01/09/2020 | DEPOSIT RECEIVED  Receipt: 430339  Date: 01/09/2020 | $58.50 | | $0.00 | |
| 01/09/2020 | INSTRUCTIONS FILED.  (SEE IMAGE) CHAD D COOPER (Attorney) on behalf of FAIRMOUNT PROPERTIES LLC (PLAINTIFF) | | | | Image |
| 01/13/2020 | SUMMONS AND COPY OF COMPLAINT  ISSUED TO DEFTS<br><br>CIVIL SUMMONS<br>Sent on: 01/13/2020  10:25:50.89  Receipt: 430557  Date: 01/13/2020 | $2.00 | | $0.00 | Image |
| 01/13/2020 | Issue Date:  01/13/2020<br>Service:  SUMMONS AND COMPLAINT ISSUED TO DEFENDANTS<br>Method:  (GEN DIV) E-CERTIFIED<br>Cost Per:  $12.00<br><br>    COLLEGE TOWN KENT LLC<br>    C/O STAT AGT  JEFFREY N STAATS<br>    7997 CRILE RD<br>    CONCORD TWP, OH  44077<br>    Tracking No: 9171900005566900581516<br><br>    Receipt: 430557  Date: 01/13/2020 | $12.00 | | $0.00 | |
| 01/13/2020 | CERTIFIED MAIL RECEIVED BY POST OFFICE USPS PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM  - Service Date: 01/13/2020 16:42<br>Tracking Number: 91 7190 0005 5669 0058 1516 | | | | |
| 01/15/2020 | SIGNATURE FILED<br>DFNDT    Signature File Attached<br>Tracking Number: 91 7190 0005 5669 0058 1516 | | | | Image |
| 02/11/2020 | CONSENT TO MOVE OR PLEAD FILED. TYLER TARNEY (Attorney) on behalf of COLLEGE TOWN KENT LLC (DEFENDANT) | | | | Image |
| 02/12/2020 | CLERKS FEES FOR FAX TRANSMISSION<br><br>FAXBILL<br>Sent on: 02/12/2020  10:26:08.46 | $3.00 | | $3.00 | Image |

## Financial Summary

| Cost Type | Amount Owed | Amount Paid | Amount Adjusted | Amount Outstanding |
|---|---|---|---|---|
| COST | $278.50 | $275.50 | $0.00 | $3.00 |
| Total | Total | Total $278.50 | Total $275.50 | Total $0.00 | $3.00 |

**Money on Hold with the Court**

| Account | Amount Owed | Amount Paid | Amount Adjusted | Amount Outstanding |
|---|---|---|---|---|
| DEPOSIT | $58.50 | $58.50 | $0.00 | $0.00 |
| Total | Total | Total $58.50 | Total $58.50 | Total $0.00 | $0.00 |

**Money on Deposit with the Court**

| Account | Deposit Amount | Applied Amount | Checks Paid | Balance |
|---|---|---|---|---|
| DEPOSIT RECEIVED (C) | $58.50 | $14.00 | $0.00 | $44.50 |
| Total | Total | Total $58.50 | Total $14.00 | Total $0.00 | $44.50 |

## Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 430339 | 01/09/2020 | ULMER & BERNE LLP | $320.00 |
| 430557 | 01/13/2020 | DEPOSIT APPLIED | $14.00 |
| Total | Total | Total | Total $334.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| UNDISPOSED | | DOHERTY, BECKY L |

FILED

COURT OF COMMON PLEAS

JAN 0 9 2020

JILL FANKHAUSER, Clerk
PORTAGE COUNTY, OH

**IN THE COURT OF COMMON PLEAS
PORTAGE COUNTY, OHIO**

| | |
|---|---|
| **FAIRMOUNT PROPERTIES, LLC**<br>200 Park Avenue, Suite 220<br>Orange Village, OH 44122 | )<br>)<br>) **CASE NO. 2020 CV00018** |
| | ) |
| | ) **JUDGE JUDGE BECKY L. DOHERTY** |
| Plaintiff, | ) |
| | ) **COMPLAINT FOR DECLARATORY** |
| | ) **JUDGMENT, SPECIFIC** |
| vs. | ) **PERFORMANCE, AND OTHER** |
| | ) **RELIEF** |
| **COLLEGE TOWN KENT, LLC**<br>c/o its Statutory Agent<br>Jeffrey N Staats<br>7997 Crile Road<br>Concord Township, OH 44077 | )<br>)<br>)<br>)<br>) |
| | ) |
| Defendant. | ) |

For its Complaint for Declaratory Judgment, Specific Performance, and Other Relief

against Defendant College Town Kent, LLC ("College Town"), Plaintiff Fairmount Properties,

LLC ("Fairmount") (Fairmount and College Town, collectively, the "Parties"), states as follows:

## NATURE OF THE ACTION

1.      Fairmount—a real estate development company specializing in mixed-use and

residential real estate development in urban, suburban, and college campus settings—was in the

process of developing a project on Franklin Avenue in Kent, Ohio, which was anticipated to

include a six-story multifamily apartment building ("Franklin Avenue Development"), but

decided to sell its interests in the development to Defendant, College Town.

2.      The economics of the deal were straightforward. Fairmount had incurred

liabilities and obligations in connection with the Franklin Avenue Development, some of which

it had paid, some of which it had not. As a part of the purchase College Town agreed to pay

Fairmount for the liabilities and obligations Fairmount had paid, along with an additional sum to

compensate Fairmount for its years of work to develop the project. As for the liabilities and

obligations that Fairmount had incurred, but not paid, College Town agreed to assume those liabilities and obligations and release Fairmount from all liabilities and obligations arising therefrom. In exchange for College Town's agreement to reimburse Fairmount, with a small premium for Fairmount's development efforts, and to assume the liabilities and obligations Fairmount had incurred in connection with its development efforts, Fairmount agreed to assign and transfer all of its interests in the Franklin Avenue Development to College Town.

3.     Fairmount fulfilled its end of the bargain and conveyed its interests in the Franklin Avenue development to College Town. However, Fairmount has come to learn through complaints received from many of the vendors it hired in connection with Franklin Avenue Development, whom College Town agreed to pay, that College Town deliberately and materially breached the Purchase Agreement by failing to assume and pay Fairmount's liabilities and obligations identified in the Purchase Agreement. While College Town executed the Purchase Agreement on March 27, 2019, to date **College Town has only satisfied one of the seven "Liabilities and Obligations" explicitly identified by the Purchase Agreement**. College Town's breaches have stiffed several local vendors out of hundreds of thousands of dollars they are owed, many of which Fairmount has, or had, good relationships with built over many years.

4.     College Town's deliberate and material breaches of the express terms of the Purchase Agreement have damaged Fairmount's reputation and exposed Fairmount to: liabilities and obligations that College Town is obligated to assume; and the risk of collection actions by vendors College Town failed to pay.

## PARTIES AND VENUE

5.     Plaintiff Fairmount Properties, LLC is a limited liability company duly organized and existing by virtue of the laws of the state of Ohio with its principal place of business located

-2-

at 200 Park Avenue, Suite 220, Orange Village, OH 44122.

6. Defendant College Town Kent, LLC is a limited liability company duly organized and existing by virtue of the laws of the state of Ohio with its principal place of business located at 12 Grandview Circle, Canonsburg, PA 15317-8533.

7. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in Portage County, Ohio.

8. An actual controversy exists regarding the legal rights and relationships between the parties in this action.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

9. Fairmount is a real estate development company specializing in mixed-use and residential real estate development in urban, suburban, and college campus settings. Fairmount develops projects nationally, but primarily in Ohio. Some of its notable projects in northeast Ohio include the Flats East Bank, a large urban mixed-use development in Cleveland, Ohio, and Pinecrest, a large suburban mixed-use development in Orange Village, Ohio.

10. Fairmount also develops mixed-use developments on or around college campuses, including in Rochester, New York, and Kent, Ohio. Fairmount participated in the development of multiple projects in Kent, Ohio, including a development referred to as College Town Kent, a mixed use development including the Kent State University hotel, offices retail, and public amenity space, which opened in 2012, and two additional buildings referred to as The Landmark and Avant220, which offer additional multifamily residences and restaurant offerings, which opened in 2014.

11. Fairmount spent several years in predevelopment for the Franklin Avenue Development, a project on Franklin Avenue in Kent, Ohio, which was anticipated to include a six-story multifamily apartment building.

12. In connection with Fairmount's work on the Franklin Avenue Development, it incurred liabilities to various vendors, including architects, engineers, and surveyors. Fairmount had already paid many expenses relating to the Franklin Avenue Development, including but not limited to ground lease payments and taxes, which totaled to approximately $515,000 through October of 2018.

13. In 2018 Fairmount offered to sell its interests in the Franklin Avenue Development to College Town.

14. By the end of 2018 the essential elements of the deal had been agreed to in principle; in exchange for Fairmount assigning to College Town its interest in the Franklin Avenue Development, College Town would assume Fairmount's liabilities and obligations identified in the Purchase Agreement and pay to Fairmount an additional $615,000.00, which was meant to compensate Fairmount for the project expenses it had already paid plus a small premium in recognition of Fairmount's' development efforts.

15. By the end of 2018 the parties were engaged in due diligence regarding the sale.

16. On or around December 3, 2018, Randy Ruttenberg, a Principal at Fairmount; John Slagter, an attorney representing Fairmount; Jeffrey Staats, a representative of College Town; and John Liekar, Jr., an attorney representing College Town, had a telephone conference to discuss College Town's acquisition of the Franklin Avenue Development. During this telephone conference, in acknowledgement of the obligation and liabilities College Town was

assuming, a College Town representative asked how much the architectural fees were, and Mr. Ruttenberg informed them the amount was over $200,000.

17.    Following the telephone conference, Mr. Liekar sent an email to Mr. Ruttenberg, Mr. Slagter, and Mr. Staats attaching a checklist entitled "Kent West End Acquisition Due Diligence Document/Information Request" (the "Due Diligence Checklist").

18.    Understandably, given College Town's agreement to assume Fairmount's liabilities and obligations as a part of the deal, counsel Mr. Liekar included an item on the Due Diligence Checklist that read "Recital ¶ C list of the liabilities and obligations being assumed."

19.    In response to the Due Diligence Checklist prepared by College Town's counsel, Mr. Liekar, on December 12, 2018, Brice Hamill, Vice President, Design and Planning for Fairmount, provided a document addressing the items in the Due Diligence Checklist ("Due Diligence Response"), and provided Mr. Liekar and Mr. Staats with a link to download "all of the necessary design documentation, pricing exercises, Contracts, VE logs, Reports, **Invoicing** and other backup files associated" with Mr. Hamill's Due Diligence Response. (emphasis added).

20.    One of the items included in Mr. Hamill's Due Diligence Response was the requested "List of Obligations and Liabilities being Assumed," which listed the following vendors and projects:

        a.  Dimit Architects Fee to date

        b.  Krill Construction PreCon Fee (only payable if project proceeds with another CM)

        c.  PSI Geotechnical Subsurface Analysis

        d.  Riverstone – Site Survey

       e.  Riverstone – ALTA Survey

       f.  Riverstone – Full Civil Services

21.     On January 8, 2019 Mr. Liekar sent to Mr. Ruttenberg and Mr. Slagter a spreadsheet **Mr. Liekar had prepared** detailing the outstanding liabilities and obligations entitled "Kent West End Vendor Costs," which included all of the vendors identified by Mr. Hamill in the Due Diligence Response:

### Kent West End
### Vendor Costs

| Vendor | Proposal/Invoice | Amount | Amout Paid | Balance Due |
|---|---|---|---|---|
| DIMIT Architects | Proposal dated 4/20/2018 | $293,000.00 | $0.00 | $293,000.00 |
| SE Blueprint | Invoice dated 7/31/2018 | $248.03 | $0.00 | $248.03 |
| SE Blueprint | Invoice dated 8/27/18 | $172.15 | $0.00 | $172.15 |
| PSI | Invoice dated 6/30/2018 | $5,995.00 | $0.00 | $5,995.00 |
| Riverstone | Invoice dated 8/13/2018 | $3,250.00 | $0.00 | $3,250.00 |
| Riverstone | Invoice dated 8/13/2018 | $4,675.00 | $0.00 | $4,675.00 |
| Krill Co | Invoice dated 11/20/2018; payment is contingent; due only if another contractor is used or project is abandoned | $25,000.00 | $0.00 | $25,000.00 |
| EMH&T | Proposal dated 9/4/2018 | $1,795.00 | $0.00 | $1,795.00 |
| PSI | Proposal dated 4/3/2018 | $5,995.00 | $0.00 | $5,995.00 |
| Riverstone | Proposal dated 4/19/2018 | $4,675.00 | $0.00 | $4,675.00 |
| Riverstone | Proposal dated 4/20/2018 | $15,850.00 | $0.00 | $15,850.00 |
| | TOTAL | $360,655.18 | $0.00 | $360,655.18 |

22.     Consistent with the Parties' understanding regarding the liabilities and obligations College Town was assuming as part of the deal, the chart prepared by Mr. Liekar includes an "Amount Paid" column, as apparent in the above chart, indicating that the amount paid to each of these vendors was "$0.00."

23.     Fairmount executed the Purchase Agreement on February 28, 2019 and College Town executed the Purchase Agreement on March 27, 2019. The Parties entered the Purchase

Agreement effective as of December 31, 2018. The Purchase Agreement is attached hereto as **Exhibit 1**.

24. The Purchase Agreement reflected the deal's essential terms whereby College Town would receive Fairmount's interests in the Franklin Avenue Development, including its interests in the property and leases, and assume Fairmount's liabilities and obligations identified in the Purchase Agreement concerning the same, and release Fairmount from all obligations and liabilities arising therefrom. These included liabilities and obligations stemming from, for example, architects, engineers, and surveyors Fairmount had engaged to do work in connection with the Franklin Avenue Development during the years it was managing the project. The Purchase Agreement also provided for a Purchase Price of $615,000.00 to be paid by College Town to Fairmount at Closing, which was originally contemplated to include $515,000.00 in expenses Fairmount had paid in connection with the project and a $100,000.00 premium to compensate Fairmount for its development services.

25. Section 1(iii) of the Purchase Agreement, providing for College Town's assumption of Fairmount's liabilities, states:

> Buyer is willing to assume [Fairmount's] liabilities and obligations, to the extent disclosed by [Fairmount] on **Exhibit F**, concerning the Properties and arising under the Leases and to release [Fairmount] from all obligations and liabilities arising therefrom.

(Exhibit 1, pg. 1).

26. Not surprisingly, Exhibit F to the Purchase Agreement, which includes "[Fairmount's] Disclosure of [Fairmount's] liabilities and obligations pursuant to Section 1(iii)," includes all of the vendors and projects that were identified in Mr. Hamill's Due Diligence Response, which were all included in Mr. Liekar's spreadsheet. The only addition to Mr. Hamill's original list were the ground lease payments that Fairmount had paid.

27.    The liabilities and obligations identified on Exhibit F included:

    1. Dimit Architects Fee to date

    2. Krill Construction PreCon Fee (only payable if project proceeds with another

CM)

    3. PSI Geotechnical Subsurface Analysis

    4. Riverstone – Site Survey

    5. Riverstone – ALTA Survey

    6. Riverstone – Full Civil Services

    7. All ground lease payments commencing December 1, 2018 of $5,541.67

28.    The Purchase Agreement further provided for a due diligence period that

permitted College Town to conduct due diligence regarding Exhibit F, the exhibit listing the

liabilities and obligations College Town was to assume:

> **Due Diligence Period.** Buyer has until the sixtieth (60th) calendar day after full
> execution, and delivery, of this Agreement to all Parties (the **"Due Diligence
> Period"**) to review, examine, inspect and test the Properties and any other system
> serving the Properties, borings, sampling and environmental testing and
> assessment, review and approval of zoning and other governmental requirements,
> environmental investigation, title search, title analysis, survey, **review and
> approve the documents and information described and itemized in Exhibits
> D, E and F,** and all other due diligence Buyer deems is necessary, in its sole
> discretion. All reviews, examinations, inspections and tests will be at the expense
> and risk of Buyer. If Buyer is satisfied with its review, it will provide written
> notice to Seller by the end of the Due Diligence Period and this contingency will
> be satisfied and the Earnest Money Deposit will become non-refundable except as
> to Seller's breach of this Agreement or the other conditions or contingencies to
> Closing set forth herein. **If Buyer is not satisfied, in its sole discretion, for any
> reason or no reason, Buyer may give written notice to Seller by the end of the
> Due Diligence Period and elect to either terminate this Agreement and
> receive its Earnest Money back or provide written notice of Buyer's
> objections,** and Seller, in its sole discretion, may elect to terminate this
> Agreement and receive its Earnest Money back or, Seller shall have 15 calendar
> days after receipt of the notice to remedy any objectionable condition to Buyer's
> satisfaction in Buyer's sole discretion. If any condition is then not satisfied within
> the 15 day time period, this Agreement will be terminated, and Buyer will receive

its Earnest Money back, unless otherwise agreed to by Buyer and Seller in writing. If Buyer fails to give written notice, then this contingency will be deemed unsatisfied and the Agreement will be terminated and Buyer will receive its Earnest Money back.

(Exhibit 1, Section 5(a)(1), pg. 3) (emphasis added).

29.  Accordingly, College Town had sixty (60) days to "review and approve the documents and information described and itemized in **Exhibits D, E and F,** and all other due diligence Buyer deems is necessary, in its sole discretion." (Exhibit 1, Section 5(a)(1), pg. 3).

30.  Furthermore, the Parties agreed in the Purchase Agreement that Fairmount has provided, or will provide, within the Due Diligence Period, College Town "with copies of relevant information, documents and/or materials, described and itemized in the attached Exhibits, including the documents provided to [College Town's] counsel as described in **Exhibit I,** in its possession relating to the Properties (the 'Due Diligence Materials')." (Exhibit 1, Section 5(a)(3), pg. 4).

31.  Thus, the Due Diligence Materials as defined in Section 5(a)(3) of the Purchase Agreement **explicitly include** the documents described in Exhibit I.

32.  Exhibit I to the Purchase Agreement provides that Fairmount transmitted all documents supporting Exhibit F to College Town: "All Documents sent via link: https.//we.t1/L-EDpLXeArsH on 12/12/18 and Acknowledgment of Receipt of Same by Buyer's Counsel on 12/17/18." These are the **same documents**, discussed *supra*, that Mr. Hamill sent to Mr. Liekar, via link in an email, on December 12, 2018.

33.  Accordingly, the Due Diligence Materials include the invoices detailing the amounts owed to each of the vendors identified on Exhibit F.

34.  The Parties agreed that College Town had sixty (60) days after the full execution of the contract to review and approve the obligations and liabilities described and itemized in

Exhibit F, which were fully supported and detailed in the Due Diligence Materials, which specifically included the documents described by Exhibit I to the Purchase Agreement.

35.     At no time during that sixty (60) day period, which ended on May 26, 2019, did College Town request any additional information regarding "[Fairmount's] Disclosure of [Fairmount's] liabilities and obligations pursuant to Section 1(iii)" as identified in Exhibit F.

36.     At no time during the negotiation process through the sixty (60) day due diligence period, which ended on May 26, 2019, did College Town question its responsibility for the liabilities and obligations identified on Exhibit F.

37.     At no time during the negotiation process through the sixty (60) day due diligence period, which ended on May 26, 2019, did College Town question any of the vendor invoices included in the Due Diligence Materials.

38.     College Town never gave written notice that it was terminating the Purchase Agreement.

39.     College Town never gave written notice of any objections within the due diligence period.

40.     On August 12, 2019 the Parties executed the First Amendment to Purchase and Sale Agreement ("First Amendment," attached hereto as **Exhibit 2**), which: (1) increased the Purchase Price set forth in the Purchase Agreement from $615,000.00 to $680,524.58 to account for additional project related expenses Fairmount had paid; and (2) **provided the "written notice pursuant to Section 5(a)(1) of the Agreement that the Due Diligence contingency has been satisfied."**

41.     As of the execution of the First Amendment College Town had not provided to Fairmount any written objection regarding its responsibility to pay the liabilities and obligations

disclosed on Exhibit F or provided any written objection to any of the vendor invoices included in the Purchase Agreement's defined Due Diligence Materials.

42.    In fact, the first time College Town expressed to Fairmount any objection regarding its responsibility to pay the liabilities and obligations disclosed on Exhibit F was **after** College Town and Fairmount had closed on the Purchase Agreement, and **after** College Town had provided written notice to Fairmount, through the First Amendment, **that the Due Diligence contingency had been satisfied**.

43.    In complete contravention of the clear terms of the Purchase Agreement and the Parties' clear understanding as reflected during the course of the negotiations, College Town claimed, for the first time—**after the deal had closed and it had obtained all of Fairmount's interests in the Franklin Avenue Development**—that it was not responsible for the liabilities and obligations disclosed on Exhibit F.

44.    Several of the vendors identified on Exhibit F have contacted Fairmount regarding payment, and College Town has refused to pay the vendors identified on Exhibit F.

45.    At least one of the vendors identified on Exhibit F has threatened collection proceedings against Fairmount.

46.    The Purchase Agreement provides that "[t]ime is of the essence in the fulfillment of each Party's respective covenants and obligations." (Exhibit 1, Section 21, pg. 11).

47.    The Purchase Agreement provides that "[e]ach Party must cooperate with the other and sign and deliver all other instruments and take **all other actions as it may be reasonably requested to take, in order to effectuate this Agreement.**" (Exhibit 1, Section 26, pg. 13) (emphasis added).

48.     Fairmount has reasonably requested that College Town pay the vendors identified on Exhibit F of the Purchase Agreement, but College Town has refused.

49.     College Town's failure to assume Fairmount's liabilities and obligations identified in the Purchase Agreement has potentially caused Fairmount to be in breach of its contracts with the vendors identified on Exhibit F of the Purchase Agreement, which has damaged Fairmount's reputation and has put it at imminent risk of suit relating to the liabilities and obligations College Town agreed to assume.

50.     The Purchase Agreement provides that "If a lawsuit is filed with respect to this Agreement, the prevailing party will be entitled to collect all reasonable attorney's fees and costs." (Exhibit 1, Section 29, pg. 14).

### FIRST CLAIM FOR RELIEF
### DECLARATORY JUDGMENT

51.     Plaintiff hereby incorporates by reference the preceding paragraphs as if fully restated herein.

52.     A real controversy now exists between the parties regarding whether College Town has breached the Purchase Agreement by, among other things: (1) failing to assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement; (2) failing to release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; (3) failing to fulfill its obligations in a timely fashion in violation of Parties' agreement that time was of the essence; and (4) failing to all other actions as it may be reasonably requested to take, in order to effectuate the Purchase Agreement, including, but not limited to, by failing to pay the vendors identified on Exhibit F.

53.     The controversy is justiciable because the parties have adverse legal interests regarding their respective rights and obligations under the Purchase Agreement, there is a genuine dispute regarding such rights, and the controversy is of sufficient immediacy and reality, especially given College Town's continuing failure to pay vendors, to warrant issuance of declaratory judgment, as evidenced by the facts set forth above.

54.     This dispute constitutes an actual case and justiciable controversy in which the Court may declare the rights of the parties.

55.     Given College Town's continuing failure to pay vendors, and the resulting threats by at least one of those vendors to proceed with collection actions against Fairmount, speedy relief is necessary to preserve the rights of the Parties under the Purchase Agreement, which included Fairmount's right to College Town's assumption of Fairmount's liabilities and obligations, and Fairmount's right to a release from College Town from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F.

56.     Speedy relief is also necessary to preserve the Parties' rights pursuant to the "Time Is of the Essence" provision of the Purchase Agreement.

57.     As a result, Fairmount is entitled to a declaration from this Court that: (1) College Town must assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement; (2) College Town must release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; (3) College Town must take all actions as may be reasonably requested to take, in order to effectuate the Purchase Agreement, including, but not limited to, by immediately paying in full the vendors identified on Exhibit F to the Purchase Agreement; (4) College Town is responsible for resolving any claims—whether asserted informally or in arbitration or

litigation—related to the Franklin Avenue Development made by vendors identified in Exhibit F to the Purchase Agreement against Fairmount, including by indemnifying Fairmount for any judgments against Fairmount obtained by any of the vendors disclosed on Exhibit F to the Purchase Agreement, and paying for the costs and/or legal fees incurred by Fairmount to defend any such claims; and (5) College Town must pay to Fairmount all reasonable attorney's fees and costs relating to its enforcement of the Purchase Agreement.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT

58.     Plaintiff hereby incorporates by reference the preceding paragraphs as if fully restated herein.

59.     The Purchase Agreement constitutes a valid and enforceable express contract between Fairmount and College Town.

60.     Fairmount has satisfied all conditions precedent and has at all times performed its obligations under the Purchase Agreement, except to the extent that Fairmount's performance has been excused, prevented, hindered, frustrated, and/or rendered useless by acts and omissions of College Town.

61.     College Town has without legal excuse materially breached the terms of the Purchase Agreement by, among other things: (1) failing to assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement; (2) failing to release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; (3) failing to fulfill its obligations in a timely fashion in violation of Parties' agreement that time was of the essence; and (4) failing to take all other actions as it may be reasonably requested to take, in order to effectuate the

-14-

Purchase Agreement, including, but not limited to, by failing to pay the vendors identified on Exhibit F.

62.    As a direct and proximate result of College Town's breaches, Fairmount has suffered damages in an amount to be proven at trial, including, but not limited to: exposing Fairmount to liabilities and obligations that College Town is obligated to assume; exposing Fairmount to the risk of suit for unpaid invoices related to the liabilities and obligations College Town is obligated to assume; and legal fees and costs, which Fairmount is entitled to under the Purchase Agreement.

## THIRD CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT

63.    Plaintiff hereby incorporates by reference the preceding paragraphs as if fully restated herein.

64.    Contracts exist between Fairmount and the vendors identified on Exhibit F to the Purchase Agreement.

65.    College Town had knowledge of the contracts and liabilities between Fairmount and the vendors identified on Exhibit F to the Purchase Agreement.

66.    To the extent Fairmount is in breach of any of the contracts between Fairmount and the vendors identified on Exhibit F to the Purchase Agreement, College Town intentionally procured the breaches by, among other things: (1) failing to assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement; (2) failing to release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; (3) failing to fulfill its obligations in a timely fashion in violation of Parties' agreement that time was of the essence; and (4) failing to take all other actions as it may be reasonably requested to take, in order to effectuate the

Purchase Agreement, including, but not limited to, by failing to pay the vendors identified on Exhibit F.

67.     To the extent Fairmount is in breach of any of the contracts between Fairmount and the vendors identified on Exhibit F to the Purchase Agreement, College Town had no proper justification to intentionally procure said breaches.

68.     College Town either acted with the improper purpose or desire to interfere with the performance of the contracts between Fairmount and the vendors identified on Exhibit F to the Purchase Agreement or College Town knew that interference was certain or substantially certain to occur as a result of its actions.

69.     As a direct and proximate result of College Town's tortious interference, Fairmount has suffered damages in an amount to be proven at trial, including, but not limited to: exposing Fairmount to liabilities and obligations that College Town is obligated to assume; exposing Fairmount to the risk of suit for unpaid invoices related to the liabilities and obligations College Town is obligated to assume; damages to Fairmount's reputation, including, but not limited to, with Fairmount's vendors and with the City of Kent, Ohio; and legal fees and costs, which Fairmount is entitled to under the Purchase Agreement.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.     As to the First Claim for Relief, a declaratory judgment that: (1) College Town must assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement; (2) College Town must release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; (3) College Town must take all actions as may be reasonably requested to take, in order to effectuate the Purchase Agreement, including, but not limited to, by immediately paying in full the vendors identified on Exhibit F to the Purchase Agreement; (4) College Town is responsible for resolving any claims—whether asserted informally or in arbitration or litigation—related to the Franklin Avenue Development made by vendors identified in Exhibit F to the Purchase

-16-

Agreement against Fairmount, including by indemnifying Fairmount for any judgments against Fairmount obtained by any of the vendors disclosed on Exhibit F to the Purchase Agreement, and paying for the costs and/or legal fees incurred by Fairmount to defend any such claims; and (5) College Town must pay to Fairmount all reasonable attorney's fees and costs relating to its enforcement of the Purchase Agreement.

B.    As to the Second Claim for Relief: damages in an amount in excess of $25,000 to be proven at trial; an order specifically enforcing the terms of the Purchase Agreement, including College Town's obligations to assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement, concerning the Properties and arising under the Leases, and specifically enforcing College Town's Obligation to release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; the cost of this action and interest; legal fees and costs, which Fairmount is entitled to under the Agreement; and for such other relief as the Court may deem appropriate.

C.    As to the Third Claim for Relief: damages in an amount in excess of $25,000 to be proven at trial, including, but not limited to, damages to Fairmount's reputation; an order specifically enforcing the terms of the Purchase Agreement, including College Town's obligations to assume Fairmount's liabilities and obligations, to the extent disclosed by Fairmount on Exhibit F to the Purchase Agreement, concerning the Properties and arising under the Leases, and specifically enforcing College Town's Obligation to release Fairmount from all obligations and liabilities arising from the liabilities and obligations identified on Exhibit F to the Purchase Agreement; the cost of this action and interest; legal fees and costs, which Fairmount is entitled to under the Purchase Agreement; and for such other relief as the Court may deem appropriate.

Respectfully submitted,

Chad D. Cooper (0074322)
*ccooper@ulmer.com*
Ashtyn N. Saltz (0089548)
*asaltz@ulmer.com*
**Ulmer & Berne LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
PH: 216.583.7000
FX: 216.583.7379

*Attorneys for Plaintiff Fairmount Properties, LLC*

## PURCHASE AGREEMENT

THIS Purchase Agreement ("Agreement") is entered into effective as of December 31, 2018

(the "Effective Date") between FAIRMOUNT PROPERTIES, LLC, an Ohio limited liability company, ("Seller") and COLLEGE TOWN KENT, LLC, an Ohio limited liability company ( "Buyer"). (Individually a "Party" and collectively "Parties")

In consideration of the mutual promises of the Parties in this Agreement, the Parties agree as follows:

1.    **Sale and Purchase.**

Seller owns a leasehold interest in real property in the City of Kent, Ohio consisting of:

i.    Ground Lease between BEBS, LTD, as landlord, for an initial term of 30 years, with 4 options to renew for an additional 5 years each as provided in said Ground Lease for the property known as parcels 17-025-40-00-023-000, 17-025-40-00-024-000 and 17-025-40-00-025-000, located at 227-229 Franklin Avenue, Kent, Ohio (a true and accurate copy of the Ground Lease is attached hereto and made a part hereof as **Exhibit A)**; and

ii.    Ground Lease between Franklin Lot, LLC, successor to Aida Mandalari, as landlord, for an initial term of 30 years, with 6 options to renew for an additional 5 years each as provided in said Ground Lease for the property known as parcel 17-025-40-00-026-000 and consisting of approximately 0.1435 acres, located at 225 Franklin Avenue, Kent, Ohio (a true and accurate copy of the Ground Lease is attached hereto and made a part hereof as **Exhibit B)**

A legal description of the real estate subject to the above leases ("Leases") is attached as **Exhibit C.** Seller will sell and convey to Buyer the interests of Seller in the Leases, together with all improvements, buildings, fixtures, privileges, approved leases, easements and appurtenant rights (collectively, the "**Properties**"), and Buyer will pay for the Properties, as set forth below. The Properties are more fully described and itemized in the attached **Exhibit D.**

iii.    Seller and Buyer further agree to the assignment and transfer, to Buyer, of Seller's opportunity and work in potential development of the Properties, including, all work product in redevelopment of the Properties, contracts, approvals, permits, licenses, project plans, designs, entitlements and intellectual property relating thereto ("**Project Opportunities**"). The Project Opportunities are more fully described and itemized in the attached **Exhibit E.** Buyer is willing to assume Seller's liabilities and obligations, to the extent disclosed by Seller on **Exhibit F**, concerning the Properties and arising under the Leases and to release Seller from all obligations and liabilities arising therefrom.

**EXHIBIT 1**

2. **Conditional Sale.**

This Agreement is conditioned upon:

    a)    the respective Landlords under the Leases consenting to: (i) amending the Leases so that the Buyer is granted additional options to renew the Leases so that the BEBS Lease will provide for a total of eleven (11) five (5) year options to renew the Lease and the Franklin Lot Lease will provide for a total of eleven (11) five (5) year options to renew the Lease and (ii) assignments and amendment of the Leases to Buyer, and executing an assignment and amendment of the Leases in form and substance consistent with the assignments and amendments attached hereto as **Exhibit G** including a release of Seller of all obligations under said Leases, and assumptions pursuant to the assignment and assumption provision in the respective Leases; and,

    b)    the respective Landlords under the Leases executing an estoppel certificate in form and substance consistent with the estoppel certificate attached hereto as **Exhibit H**; and,

    c)    the parties to the Properties and Project Opportunities consenting to the transfer and/or assignment of the Properties and Project Opportunities, and any associated and/or documents and/or intellectual property to Buyer; and,

    d)    Seller consenting to, and executing, the transfers, assignments and certificates identified in Sections 2(a), (b) and (c) above.

3. **Purchase Price.**

The Purchase Price for the Properties and the Project Opportunities shall be Six Hundred Fifteen Thousand Dollars ($615,000.00) The Purchase Price shall be paid from Buyer to Seller at Closing (defined below)

Buyer must pay Seller the Purchase Price as follows:

    (a)    **Deposit**. An initial deposit of Ten Thousand Dollars ($10,000.00) ("**Earnest Money Deposit**") must be paid by Buyer to the Escrow Agent (defined below) upon execution of this Agreement by both Seller and Buyer. The Escrow Agent must place the Earnest Money Deposit in an interest-bearing account, with all interest credited to Buyer. The Earnest Money Deposit (including interest) will be delivered to Seller at the Closing (as defined below).

    (b)    **Balance**. The balance of the Purchase Price, less the Earnest Money Deposit and any interest accrued thereon, is due and payable in immediately available funds at the Closing.

4. **Conveyance.**

Seller must convey to Buyer its interests in the Properties and the Project Opportunities by execution of the transfers, amendments and assignments described in Sections 2(a) and (c) above which leasehold interests, Properties and Project Opportunities interest will be free and clear of all liens and encumbrances except:

2

**EXHIBIT 1**

(a)     real estate taxes and assessments, both general and special, which are a lien but not yet due and payable;

(b)     all legal highways; and

(c)     reservations, restrictions, and conditions of record approved by Buyer.

5.     **Conditions Precedent to Buyer's Performance.**

(a)     **Conditions**. Buyer's obligation to buy the Properties is contingent upon the following:

(1)     **Due Diligence Period**. Buyer has until the sixtieth (60th) calendar day after full execution, and delivery, of this Agreement to all Parties (the **"Due Diligence Period"**) to review, examine, inspect and test the Properties and any other system serving the Properties, borings, sampling and environmental testing and assessment, review and approval of zoning and other governmental requirements, environmental investigation, title search, title analysis, survey, review and approve the documents and information described and itemized in **Exhibits D, E and F**, and all other due diligence Buyer deems is necessary, in its sole discretion. All reviews, examinations, inspections and tests will be at the expense and risk of Buyer. If Buyer is satisfied with its review, it will provide written notice to Seller by the end of the Due Diligence Period and this contingency will be satisfied and the Earnest Money Deposit will become non-refundable except as to Seller's breach of this Agreement or the other conditions or contingencies to Closing set forth herein. If Buyer is not satisfied, in its sole discretion, for any reason or no reason, Buyer may give written notice to Seller by the end of the Due Diligence Period and elect to either terminate this Agreement and receive its Earnest Money back or provide written notice of Buyer's objections, and Seller, in its sole discretion, may elect to terminate this Agreement and receive its Earnest Money back or, Seller shall have 15 calendar days after receipt of the notice to remedy any objectionable condition to Buyer's satisfaction in Buyer's sole discretion. If any condition is then not satisfied within the 15 day time period, this Agreement will be terminated, and Buyer will receive its Earnest Money back, unless otherwise agreed to by Buyer and Seller in writing. If Buyer fails to give written notice, then this contingency will be deemed unsatisfied and the Agreement will be terminated and Buyer will receive its Earnest Money back.

(2)     **Indemnity/Restoration**. Buyer must defend and indemnify Seller against all loss, liability, harm, cost, or expense incurred, including responsibility for death, personal injury, or property damage incident to any Buyer's inspection or environmental testing. Buyer must leave the Property in comparable condition as existed before its inspection. Buyer must dispose of, in compliance with all applicable laws and regulations, any debris or samples generated by the inspections.

3

**EXHIBIT 1**

(3) **Due Diligence Information.** Seller has provided, or will provide, within the Due Diligence Period, Buyer with copies of relevant information, documents and/or materials, described and itemized in the attached Exhibits, including the documents provided to Buyer's counsel as described in **Exhibit I**, in its possession relating to the Properties (the "Due Diligence Materials"). If Buyer terminates this transaction or the transaction is not closed for any reason other than Seller's default, Buyer must return to Seller all Due Diligence Materials provided by Seller to Buyer and all Due Diligence Materials regarding the Properties received by Buyer.

(4) **Title.** Title to the Properties must be free from all liens and encumbrances, except those permitted in this Agreement, and the Title Company (as defined below) must be prepared to issue its title policy as required.

(5) **Survey.** At Buyer's cost, Buyer may obtain an ALTA/ACSM or similar survey ("Survey"), and the results of the Survey must be acceptable to Buyer.

(6) **Estoppel Certificates.** Prior to Closing, Seller must provide Buyer with estoppel certificates from Landlord under the Leases in a form satisfactory to Buyer or as set forth in **Exhibit H**.

(7) **Assignments and Amendments.** Prior to Closing, Seller must deliver to Buyer a Consent to Assignment and Amendment of Leases as set forth in **Exhibit G.**

(8) **Other Documents    Prior to Closing, Seller must provide Buyer with the documents more fully described in Section 3, above.**

(9) **No Changes.** There are no material adverse changes to the Properties.

(10) **Truth of Representations.** The representations and warranties of Seller are true and correct at Closing.

(11) **Due Diligence Period Extension**  If Seller fails to provide the documents and/or information to Buyer, within the Due Diligence Period, the said Period shall be extended until Seller provides the said documents and/or information to Buyer.

(b) **Option to Terminate.** If any matter above in subsection (a) is not satisfied within the appropriate time period, if any, or prior to Closing, Buyer may terminate this Agreement by written notice to Seller and receive back the Earnest Money Deposit (including interest), and any other money paid or deposited.

6.   **Mutual Obligations.**

Each Party's obligation to complete the Closing is expressly conditioned upon performance by the other Party of its obligations.

7.   **Conduct Pending Closing.**

Without the prior written consent of Buyer, Seller shall not sign any new leases, assign the Leases, convey or encumber any part of the Properties or its interest in the Properties, grant easements on the Properties, or commit waste or allow to be done any act or thing

4

**EXHIBIT 1**

that would adversely affect the Properties or title to the Properties, or otherwise limit or restrict the interests to be acquired by Buyer, including the removal of trees from the Properties.

8. **Possession.**

Seller must deliver to Buyer exclusive possession of the Properties on the Closing Date, subject to the Leases, in substantially the same physical condition existing as of the date of this Agreement.

9. **Title Insurance.**

First American Title will act as the Title Company and the Escrow Agent in closing this transaction.

(a) **Commitment**. No later than thirty (30) calendar days after commencement of the Due Diligence Period, Seller, through the Title Company, must deliver to Buyer a commitment to issue to Buyer an ALTA Leasehold Policy of Title Insurance from the Title Company in the amount of the Purchase Price ("**Commitment**"). The Commitment must include readable copies of all documents referred to in the Commitment and must specifically provide for deletion of the pre-printed Schedule B exceptions and the issuance of a lender's policy. Buyer must notify Seller of any objection to the Commitment within the Due Diligence Period as described in **Section 5(a)**, except that, if Seller delivers the Commitment after the thirty (30) day period above, Buyer's objection period will be extended by the number of additional days after the thirty (30) period expires and until delivery of the Commitment. Buyer may grant Seller 15 calendar days from receipt of Buyer's objection to cure such objection to Buyer's satisfaction.

(b) **Revised Commitment**.

(1) **With Objections Removed**. If within or at the expiration of Seller's cure period described above, the Title Company will issue a revised Commitment without showing the items to which Buyer has objected, then this transaction will be completed in accordance with this Agreement, so long as a later examination of title at the Closing discloses no further exceptions.

(2) **Failure to Remove Objections**. If the Title Company will not issue a revised Commitment, then Buyer may:

(A) terminate this Agreement by written notice to Seller and receive back the Earnest Money Deposit (including interest), and any other money paid or deposited;

(B) accept title to the Properties in its reported condition, with an appropriate reduction in the Purchase Price equal to either (i) the

5

**EXHIBIT 1**

cost to cure the objections to the title, or (ii) the reduction in value of the Properties because of the existence of the objectionable matter;

(C)    cause the Title Company to issue an endorsement at Seller's cost, insuring against damage caused by the title objections.

(c)    **Title Policy**. At Closing (or as soon as possible thereafter), the Title Company must furnish to Buyer an ALTA Leasehold Policy of Title Insurance in the amount of the Purchase Price, insuring its leasehold interest to the Properties to be vested in Buyer as of the filing of the Assignment for record, subject only to the exceptions permitted in this Agreement, and specifically deleting the pre-printed Schedule B standard exceptions.

10.    **Closing.**

(a)    **Closing Date**. The Properties and Project Opportunities will be transferred to Buyer no later than 10 calendar days from the latter of the satisfaction of Buyer's contingencies herein or the end of the Due Diligence Period, except as otherwise provided herein. This Agreement will serve as escrow instructions and will be subject to the usual conditions of acceptance of the Escrow Agent insofar as they do not conflict with this Agreement, but either Party may submit escrow instructions consistent with this Agreement.

(b)    **Procedure**. The Escrow Agent will close ("**Close**" or "**Closing**") this transaction by recording the Assignment with the proper governmental office, and delivering to Seller and Buyer all documents and money to which each Party is entitled.

(c)    **Deliveries**. On or before the Closing, Buyer must deliver the Purchase Price, and Seller must deliver (i) the Assignment, (ii) affidavits to remove certain standard exceptions and stating Seller's taxpayer identification number and that Seller is not a foreign entity, sufficient to satisfy the exemption from withholding tax provisions of Internal Revenue Code § 1445(b)(2), (iii) Estoppel Certificates and executed Consent to Assignments, (iv) such other information and documentation as called for in this Agreement and (v) as described in Sections 4(a)(5), (vi) all other documents required.

11.    **Taxes and Utilities.**

(a)    **Taxes and Assessments**. Seller must pay all taxes and assessments due and payable, both general and special, on the Properties up to the Closing Date. The real estate taxes and assessments, both general and special, will be prorated to the Closing Date based upon the last available tax duplicate, and the amount not yet due and payable will be credited to Buyer at Closing, such determination shall be final and there will be no re-proration.

6

**EXHIBIT 1**

(b) **Utilities.** Buyer will be responsible for all utility charges relating to the Property not already reimbursed to Seller.

12. **Assignment and Assumption of Leases.**

At the time of the Closing hereunder, Seller will assign to Buyer, and Buyer will assume from Seller, all of Seller's right, title, and interest in and to the Leases and all of Seller's obligations accruing or occurring under the Lease from the Closing Date forward, pursuant to an assignment and assumption agreement in a form reasonably acceptable to Buyer.

13. **Costs.**

(a) **Seller's Costs.** Seller must pay the following costs:

　　(1)　　proration of real estate taxes and assessments chargeable to Seller;

　　(2)　　transfer fee and conveyance tax;

　　(3)　　title examination fee;

　　(4)　　one-half of the escrow fee;

　　(5)　　one-half of the premium for a leasehold title insurance policy in the amount of the Purchase Price;

　　(6)　　cost of canceling all liens and encumbrances required to be canceled;

　　(7)　　cost of preparing the Assignment; and

　　(8)　　other costs specifically set forth in this Agreement.

(b) **Buyer's Costs.** Buyer must pay the following costs:

　　(1)　　recording the Assignment;

　　(2)　　one-half of the escrow fee;

　　(3)　　title commitment;

　　(4)　　financing costs and lender's policy fees;

　　(5)　　one-half of the premium for a leasehold title insurance policy in the amount of the Purchase Price; and

　　(6)　　other costs specifically set forth in this Agreement.

**EXHIBIT 1**

14.  **Seller's Representations and Warranties.**

Seller represents and warrants to Buyer that:

(a)  **Authority.** Seller has the authority and power to enter into this Agreement and to complete the Closing. Neither the execution nor delivery of this Agreement, nor Seller's performance of this Agreement, are restricted by, or violate, any contractual or other obligations of Seller except that such Closing and Assignment is subject to consent of the respective Landlords of the Properties.

(b)  **No Suits.** There is no litigation, action, suit, proceeding or investigation pending, or to Seller's knowledge, threatened, before any agency, court, or other governmental authority that relates to Seller or to the Properties.

(c)  **Government Notices.** Seller has not received any notice of any failure to comply with any applicable governmental requirements in respect of the use, occupation or construction of the Properties, including but not limited to, environmental, zoning, platting, and other land use requirements, which have not been corrected to the satisfaction of the appropriate governmental authority. Seller has not received any notice of, and has no knowledge of, any violations or investigations relating to any such governmental requirement. Seller must promptly notify Buyer if Seller receives any such notice.

(d)  **Restrictions.** To the best of Seller's knowledge, there are no restrictions affecting the Properties, except for zoning ordinances and building codes. Seller has not received any notice of any default or breach by Seller of any covenants, conditions, restrictions, rights-of-way, or easements that may affect Seller in respect to the Properties or that may affect the Properties, and no default or breach now exists. The Seller has received governmental approvals and/or permits to allow it, and therefore Buyer, to redevelop the Properties in accordance with the information and/or documentation described and itemized in **Exhibits D, E and F.**

(e)  **Leases.** There is/are no lease(s) affecting the Properties except as listed on **Exhibits A and B** ("Lease(s)").

(f)  **Improvements.** To the best of Seller's knowledge, there is no outstanding assessment for local improvements that has or may become a lien against the Properties. Seller knows of no public improvements that have been ordered to be made or that have not been completed, assessed and paid for.

(g)  **Condition of Building.** To the best of Seller's knowledge, there are no environmental hazards in the building, such as asbestos and asbestos containing materials, except to the extent identified in any documents or environmental reports provided to Buyer.

8

**EXHIBIT 1**

(h) **Compliance with Laws.** To the best of Seller's knowledge, with respect to the Properties, Seller has not violated any federal, state, county or local statutes, laws, regulations, rules, ordinances, codes, licenses or permits, including, without limitation, all federal, state and local laws relating in any way to the protection of the environment. There are no statutes, orders, rules or regulations relating to environmental matters requiring any work, repairs, remediation, construction or capital expenditures with respect to the Properties, nor has Seller received any notice of any such matters.

(i) **Waste Disposal.** To the best of Seller's knowledge, no hazardous or toxic materials, substances, pollutants, contaminants, petroleum products or byproducts, or wastes of any kind have been deposited, discharged, placed, stored, treated or disposed of on the Properties except to the extent identified in any documents or environmental reports provided to Buyer,.

(j) **Waste Transportation.** Seller has not transported any hazardous wastes to or from the Properties, or entered into a contract, agreement, or otherwise arranged for the transportation of any such hazardous waste to or from the Properties, for disposal or treatment at an off-site treatment, storage or disposal facility.

(k) **Tanks.** To the best of Seller's knowledge, there are no underground storage tanks on the Properties, except to the extent identified in any documents or environmental reports provided to Buyer.

(l) **Utilities.** To the best of Seller's knowledge, all utilities serving the Properties are available for connection or extension into the Properties and all utilities enter the Properties through adjoining public streets, or if they pass through adjoining private land, do so in accordance with valid public easements or private easements that will inure to the benefit of Buyer at Closing.

(m) **Condemnation.** To the best of Seller's knowledge, there are no plans for condemnation or taking by eminent domain of the Properties or any part of the Properties, and Seller has received no written notice nor official notice of such proceedings against the Properties.

(n) **Wetlands.** To the best of Seller's knowledge, none of the Properties are a wetlands within the meaning of applicable federal and state law and regulations.

(o) **Flood Zone.** To the best of Seller's knowledge, none of the Properties is located in an area identified by an agency or department of federal, state or local government as having special flood hazards.

(p) **No Other Transfers.** There are no other sales contracts pending, or concluded within the last 12 months, with respect to the Properties or any part of the Properties. Except as contemplated by this Agreement, within the last 12 months no part of the Properties has been, or will be, conveyed or transferred to any other party.

9

**EXHIBIT 1**

(q)     There shall be no Material error, misstatement or omission in either the representations or warranties made by Seller, or in any documents produced to Buyer, all of which shall be true and correct as of the Closing as though made on and as of the Closing. No representation or warranty of Seller contained in, referred to, incorporated in or attached to this Purchase Agreement, or information or document provided to Buyer, contains, or will contain, any untrue statement of Material fact or omit to state any Material fact required to make the statements contained and/or incorporated herein not misleading or false. Seller will immediately provide verbal and written notice, to Buyer, if any of the said representations or warranties becomes untrue, inaccurate or misleading either before the Closing or at any time after Closing; and,

15.    **As Is, Where Is.**

Buyer acknowledges that it has had an unimpeded right to inspect the Properties. Buyer accepts the Properties "AS IS, WHERE IS," with all faults and without warranty of any kind from Seller except as otherwise specifically set forth in this Agreement.

16.    **Buyer's Representations and Warranties.**

Buyer represents and warrants to Seller that Buyer has the authority and power to enter into this Agreement and to complete the Closing, and that neither the execution and delivery of this Agreement, nor Buyer's performance of this Agreement, are restricted by or violate any contractual or other obligations of Buyer.

17.    **Reliance; Survival.**

Each Party is relying on the representations and warranties made by the other Party, and they are a material inducement to the relying Party's entering into this Agreement. Each Party must indemnify and defend the other Party against all liability, loss and expense arising out of any breach of any representation in this Agreement. All statements contained in any certificate or other instrument signed at any time by or on behalf of Seller and delivered to Buyer will constitute representations under this Agreement. The representations and warranties and obligations in this Agreement will survive closing for a period of two (2) years.

18.    **Liens.**

Seller must pay the claim and discharge the lien if: (a) any claim is made by any party for the payment of any amount due for the furnishing of labor or materials, or both, to the Properties or to Seller before Closing, or (b) any lien is filed against the Properties after Closing as a result of the furnishing of such materials or labor or both before Closing.

10

**EXHIBIT 1**

19.  **Risk of Loss.**

Until the Assignment is recorded Seller bears the risk of loss. Seller must notify Buyer no later than 48 hours after any damage to the Properties occurs. If the Properties are damaged before Closing, Buyer may receive the proceeds of any insurance policy payable in connection with the damage, together with a credit against the Purchase Price equal to any deductible, and complete the Closing, or Buyer may terminate this Agreement by written notice to Seller and receive back the Earnest Money Deposit (including interest), and any other money paid or deposited.

20.  **Condemnation and Eminent Domain.**

(a)  **Risk.** Seller bears the risk of condemnation or eminent domain until the Closing Date. At any time before the Closing, if any authority having the right of eminent domain or condemnation begins negotiations with Seller or begins legal action against Seller for the taking or acquiring of all or any part of the Properties, either temporarily or permanently, in condemnation proceeding or by right of eminent domain or otherwise, Seller immediately must give notice to Buyer.

(b)  **Event.** If a condemnation or eminent domain event occurs, Buyer may:

(1)  terminate this Agreement by written notice to Seller and receive back the Earnest Money Deposit (and Additional Deposit if applicable), and any other money paid or deposited, or

(2)  reduce the Purchase Price by the total of any awards, settlement proceeds, or other proceeds received by Seller before the Closing Date. If Buyer elects to close, then on the Closing Date, Seller must assign to Buyer all rights of Seller in and to any future awards, settlement proceeds, or other proceeds payable by reason of the condemnation event.

21.  **Time Is of the Essence.**

Time is of the essence in the fulfillment of each Party's respective covenants and obligations.

22.  **Remedy upon Default.**

(a)  **Buyer Default.** If Buyer defaults under any term or condition of this Agreement, Seller must provide Buyer with written notice and a three (3) calendar day cure period. If the cure requires more than three (3) calendar days, and Buyer immediately initiates steps which Buyer deems in Buyer's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical, there shall be no default. If Buyer fails to cure the default within said

11

**EXHIBIT 1**

three day, or extended, cure period, Seller's sole remedy will be to terminate this Agreement and retain as liquidated damages all of the Earnest Money Deposit. The Parties agree that Seller's right to terminate and retain the Earnest Money Deposit is reasonable, that actual damages accruing to Seller as a result of Buyer's failure to close are difficult if not impossible to ascertain and quantify, and that Seller's retention of the Earnest Money Deposit is not a penalty.

(b)  **Seller Default.** In the event Seller is unable or refuses to convey title to the Properties as required by this Agreement, or otherwise defaults under any terms or condition of this Agreement, Buyer must provide Seller with written notice and a three day cure period. If the cure requires more than three (3) calendar days, and Seller immediately initiates steps which Seller deems in Seller's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical, there shall be no default.  If Seller fails to cure the default within said three day, or extended, cure period, Buyer may, at its option, either: (i) receive a refund of the Earnest Money Deposit and terminate this Agreement, or (ii) specifically enforce the terms and conditions of this Agreement. Buyer waives any action for damages but may recover its attorney's fees and expenses incurred in enforcing the terms and conditions of this Agreement

23.  **Successors.**

This Agreement will inure to the benefit of and will bind the successors and assigns of the respective Parties. Buyer reserves the right to assign this Agreement to a nominee or assignee without Seller's consent, with the understanding that such assignment will not release Buyer from its obligations hereunder.

24.  **Counterparts.**

This Agreement may be executed in multiple counterparts, and by the Parties hereto on separate counterparts, and each counterpart, when so executed and delivered, shall constitute an original agreement, and all such separate counterparts shall constitute one and the same Agreement. Each Party (i) has agreed to permit the use, from time to time, of facsimile signatures in order to expedite the transaction contemplated by this Agreement, (ii) intends to be bound by its facsimile signature, (iii) is aware that the other will rely on the facsimile signature, and (iv) acknowledges such reliance and waives any defenses (other than fraud) to the enforcement of any document based on the fact that a signature was sent by facsimile is waived. As used herein, the term "facsimile signature" shall include any signature sent via pdf or other electronic means.

25.  **Brokers.**

Each Party represents and warrants to the other Party that no real estate broker or agent has been involved in this transaction. Each Party must indemnify and defend the other Party from responsibility for payment of any other real estate commission for which the indemnifying Party is responsible.

12

**EXHIBIT 1**

26. **Further Cooperation.**

Each Party must cooperate with the other and sign and deliver all other instruments and take all other actions as it may be reasonably requested to take, in order to effectuate this Agreement.

27. **Notices.**

Any notices required to be given pursuant to the provisions of this Agreement, or necessary to carry out its provisions, must be in writing, and delivered personally to the party to whom said notice is to be given, or mailed Certified Mail or by facsimile addressed, or overnight delivery service such as Federal Express or UPS, and via email, to such person.

Seller's address for notice purposes:

Randy Ruttenberg     rruttenberg@fairmountproperties.com
Fairmount Properties
1138 W. 9th Street, 2nd Floor
Cleveland, Ohio 44113

**AND WITH A COPY TO**

John P. Slagter     jslagter@bdblaw.com
1375 East 9th Street, Suite 1700
Cleveland, Ohio 44114

Buyer's address for notice purposes:

Edward B. Dunla  ebd@centimark.com
12 Grandview Circle, Fourth Floor
Canonsburg, PA 15317-8533

**AND WITH A COPY TO**

John P. Liekar, Jr.,     john.liekar@centimark.com
12 Grandview Circle, Third Floor
Canonsburg, PA 15317-8533

28. **Date of Performance.**

If the date for performance of any act under this Agreement falls on a Saturday, Sunday,

13

**EXHIBIT 1**

or Ohio state or federal holiday, the date for such performance shall automatically be extended to the next succeeding business day.

29. **Miscellaneous.**

This Agreement supersedes all prior agreements between the Parties with respect to the subject matter hereof. Headings are for convenience only and are not a part of this Agreement. Any failure by any of the Parties to comply with any of the obligations, agreements, or conditions set forth in this Agreement may be waived by the other Party, but any such waiver will not be deemed a waiver of any other obligations or conditions contained in this Agreement. This Agreement must be construed and governed under the laws and jurisdiction of Ohio. In interpreting this Agreement, the presumption that contracts are to be construed against the drafter will not be applicable. If any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision will be severable and the remaining provisions of this Agreement will remain in full force and effect. If a lawsuit is filed with respect to this Agreement, the prevailing party will be entitled to collect all reasonable attorney's fees and costs. This Agreement may not be altered, amended, or modified except by written instrument signed by all parties.

The parties have signed this Agreement on the dates below. The effective date will be the later of the dates below, and this date is the date referred to on page one.

Signed effective as of the date first written above:

SELLER:

FAIRMOUNT PROPERTIES, LLC

By: _____

Its: _____

STATE OF OHIO          )
                       ) SS
COUNTY OF CUYAHOGA      )

BEFORE ME, a notary public in and for said county and state, personally appeared the above-named Randy Ruttenberg , as Member of Fairmount Properties, LLC, who acknowledged that he did sign the foregoing instrument on behalf of the company and that the same is his free act and deed and the free act and deed of the company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Cleveland , Ohio this 28th day of January , 2019.

Notary Public

JOHN P. SLAGTER, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date
Section 147.03 R. C.

14

**EXHIBIT 1**

BUYER:

COLLEGE TOWN KENT, LLC

By: _____

Its: _____

STATE OF _Pennsylvania_ )
                                          ) SS
COUNTY OF _Washington_ )


BEFORE ME, a notary public in and for said county and state, personally appeared the above-named _Donald Dunlap_ as _Buyer_ of College Town Kent, LLC who acknowledged that he/she did sign the foregoing instrument on behalf of said municipal corporation and that the same is his/her free act and deed and the free act and deed of said municipal corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _Canonsburg_ , Ohio this _27_ day of _March_ , 2019.

_Barbara A. Watt_
Notary Public

CL2:489258_v8

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Barbara A. Watt, Notary Public
Cecil Twp., Washington County
My Commission Expires March 21, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

15

**EXHIBIT 1**

EXHIBIT A

GROUND LEASE BETWEEN BEBS, LTD AND SELLER

**EXHIBIT 1**

## GROUND LEASE

## KEY PROVISIONS SUMMARY

| | |
|---|---|
| Lease Date: | October 1, 2013 |
| Landlord: | BEBS, LTD., an Ohio limited liability company |
| Tenant: | FAIRMOUNT PROPERTIES, LLC, an Ohio limited liability company |
| Premises: | That certain parcel of land at 225-229 Franklin Avenue, together with the improvements thereon, in the City of Kent, County of Portage, State of Ohio, being more particularly shown on the "Premises Site Plan" attached to this Lease as Exhibit A. |
| Notice Addresses (Section 34): | Landlord:<br><br>BEBS, LTD.<br>2188 Chatfield Drive,<br>Cleveland Heights, Ohio 44106<br><br>**Address for Rent Payment:**<br><br>BEBS, LTD.<br>2188 Chatfield Drive,<br>Cleveland Heights, Ohio 44106 | Tenant:<br><br>FAIRMOUNT PROPERTIES, LLC<br>1138 W. 9th Street<br>Cleveland, Ohio 44113<br>Attn: Randy Ruttenberg<br><br><br><br>N/A |
| Lease Commencement Date: | The date exclusive possession of the Premises is delivered to Tenant as provided in this Lease, which the parties agree occurred on the Lease Date (sometimes "Delivery Date") (Section 3.1) |
| Rent Commencement Date: | The Lease Commencement Date |
| Expiration Date: | The last day of the calendar month in which the thirtieth (30th) anniversary of the Rent Commencement Date occurs (Section 3.1) |
| Lease Term: | Initial Term: Thirty (30) years (Section 3.1)<br>Renewal Term(s): Four (4) terms of Five (5) years each (Section 3.2) |
| Minimum Rent: | Year   Minimum Annual Rent   Minimum Monthly Rent<br>1-5   $42,500.00   $3,541.67<br><br>Minimum Rent to be increased thereafter as described in Section 6 |
| Permitted Use: | Any lawful commercial purpose or purposes (Section 8.1) |
| Broker(s): | Creative Realty Group, whose commission(s) to be paid by Landlord (Section 33) |
| Exhibits: | Exhibit A – Premises Site Plan<br>Exhibit B   Premises Legal Description<br>Exhibit C – Commencement Date Agreement<br>Exhibit D – Construction Requirements |

THIS GROUND LEASE (this "Lease") is made and entered into and is effective as of the Lease Date set forth in the Key Provisions Summary by and between Landlord and Tenant.

### Recitals

    A.    Landlord is the owner of the Premises. The Premises, as the same now exists, is depicted on the Premises Site Plan.

**EXHIBIT 1**

B.     Landlord desires to lease the Premises to Tenant, and Tenant desires to take and lease the Premises from Landlord.

NOW, **THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties mutually covenant and agree as follows:

1.     **Key Provisions Summary; Enumeration of Exhibits.**

1.1 **Significance of Key Provisions Summary.** References in the body of this Lease to a portion of the Key Provisions Summary (e.g., the defined terms in the left-hand column of the Key Provisions Summary) shall be deemed and construed to incorporate all the terms provided under each such referenced portion of the Key Provisions Summary. References in the Key Provisions Summary to a portion of the body of this Lease (e.g., Section references in the right-hand column of the Key Provisions Summary) shall be deemed and construed to incorporate all the terms provided under each such referenced portion of the body of the Lease.

1.2 **Enumeration of Exhibits.** The Exhibits enumerated in the Key Provisions Summary and attached to this Lease are incorporated in this Lease by reference and are to be construed as a part of this Lease.

2.     **Premises.**

Subject to the terms of this Lease, Landlord hereby leases, rents, and demises to Tenant and Tenant hereby takes and leases from Landlord the Premises as described in the Key Provisions Summary. Tenant agrees to take possession of the Premises as is, but in broom clean condition. The Premises are depicted on the Premises Site Plan. TENANT ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, NEITHER LANDLORD NOR ANY THIRD PARTY ON LANDLORD'S BEHALF HAS MADE, AND LANDLORD SPECIFICALLY DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, OR AGREEMENTS, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE NATURE, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES. TENANT FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PREMISES, TENANT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND HEREBY LEASES THE PREMISES IN THEIR PRESENT "AS IS, WHERE IS" CONDITION "WITH ALL FAULTS."

3.     **Lease Term; Options to Extend.**

3.1 **Lease Commencement Date; Rent Commencement Date.** This Lease shall be for the Lease Term set forth in the Key Provisions Summary and shall commence on the Lease Commencement Date specified in the Key Provisions Summary and shall end at midnight on the Expiration Date set forth in the Key Provisions Summary (unless the Lease Term is extended as provided in Section 3.2 below, in which case the Expiration Date shall be the last date of the then current Renewal Term). Tenant's rental obligations under this Lease shall commence as of the Rent Commencement Date set forth in the Key Provisions Summary. If the term of this Lease is extended pursuant to Section 3.2 below, the term "Lease Term" shall include each and every exercised Renewal Term. The parties shall execute a "Commencement Date Agreement" in a form substantially similar to Exhibit C attached hereto within fifteen (15) business days after receipt of written request therefor.

**EXHIBIT 1**

**3.2 Option(s) to Extend.** Tenant may renew this Lease for the number of Renewal Term(s) set forth in the Key Provisions Summary if Tenant gives written notice of renewal to Landlord at least one hundred eighty (180) days prior to the end of the then-current Lease Term. Each Renewal Term shall be subject to the same terms and conditions as the Initial Term (except for Minimum Rent which shall be at the applicable amount set forth in the Key Provisions Summary). The terms and conditions of this Lease shall remain in effect unchanged during any such renewal terms, except that upon the termination of the last Renewal Term, there shall be no additional option to renew.

### 4. Landlord's Covenants.

Landlord hereby represents and warrants to Tenant that as of the Lease Date and the Delivery Date, and except as otherwise disclosed to Tenant: (i) Landlord has good, indefeasible, and marketable fee simple title to the Premises (subject to the existing state of title, all matters of record, matters that would be disclosed by an accurate survey, and zoning and other laws and regulations); (ii) Landlord has full right and authority to make and execute this Lease; (iii) Landlord possesses full power and authority to deal with the Premises in all respects and no other party has any right or option thereto or in connection therewith; (iv) there are no pending or, to Landlord's knowledge, threatened condemnation proceedings or other governmental, municipal, administrative or judicial proceedings affecting the Premises; (v) there are no pending or, to Landlord's knowledge, threatened actions or legal proceedings affecting the Premises; (vi) there are no unpaid special assessments or installments thereof (which are currently due and payable) for sewer, sidewalk, water, paving, gas, electrical or power improvements or other capital expenditures or improvements affecting the Premises; (vii) this Lease and the consummation of the transaction contemplated in this Lease are the valid and binding obligations of Landlord and do not constitute a default under, nor are they inconsistent with, any contract to which Landlord is party or by which it is bound; and (viii) Landlord has not received any written notices of any violations of any law, regulation, ordinance, order or other requirements of any Governmental Authority having jurisdiction over or affecting any part of the Premises.

### 5. Due Diligence; Right to Terminate

(a)    If Tenant, in Tenant's sole discretion, is not satisfied with the Premises, including, without limitation, any title report, survey, environmental study, zoning review or engineering study, and/or Tenant's feasibility studies concerning Tenant's intended use of the Premises, then Tenant shall have the sole and unreviewable right, exercisable by delivering written notice (the "Termination Notice") to Landlord on or before December 31, 2013 (the "Outside Date"), to terminate this Lease, in which event this Lease shall terminate as of the date Landlord receives the Termination Notice and neither party shall have any further obligations hereunder except for any obligations that expressly survive termination of this Lease, and Landlord shall be entitled to keep any and all prepaid rents and other amounts under this Lease. If Landlord does not receive the Termination Notice on or before the Outside Date (time being of the essence), then Tenant's right to terminate this Lease pursuant to this Section 5(a) shall expire and be null and void, and this Lease shall continue in full force and effect. Notwithstanding anything to the contrary in this Lease, Tenant shall not perform any work (other than due diligence inspections) at the Premises prior to the earlier of (i) Landlord's receipt of a written waiver of Tenant's right to terminate pursuant to this Section 5(a), or (ii) January 1, 2014 (without Tenant terminating this Lease).

(b)    Tenant agrees to hold the contents of its due diligence, including, without limitation, any environmental reports or assessments with respect to the Premises in strict confidence, and will not disclose same to any person or entity other than (i) to Tenant's directors, officers, employees, and partners who need to know such information, (ii) to brokers, consultants, lenders, or other professional advisors working with Landlord in connection with this Lease who need to know such information for the pur-

**EXHIBIT 1**

pose of consummating this transaction or a future related transaction, and (iii) as required by applicable Governmental Regulations.

### 6. Minimum Rent.

Beginning as of the Rent Commencement Date set forth in the Key Provisions Summary, and during the Lease Term, Tenant shall pay to Landlord the Minimum Rent set forth in the Key Provisions Summary. Minimum Monthly Rent shall be payable in advance not later than the first day of each calendar month of the Lease Term; provided, however, that if the Rent Commencement Date as set forth in the Key Provisions Summary falls on a day other than the first day of a calendar month, the Minimum Monthly Rent for such month shall be a pro-rated portion of the Minimum Monthly Rent based upon the number of days in the applicable month. Notwithstanding the foregoing, Tenant shall pay three (3) months of Minimum Rent to Landlord upon the execution of this Lease. All rent payments shall be mailed or delivered to Landlord's office at the address set forth in the Key Provisions Summary (or to such other address or pursuant to such other instructions that Landlord may give thirty (30) days' prior written notice thereof to Tenant, which may include wire instructions or directions for regular electronic deposits). The amount of Minimum Rent payable under this Lease shall be adjusted as of the first day of the sixth (6th) year of the Lease Term, and on the first day of each year of the Lease Term (and any Renewal Term) thereafter so that the Minimum Rent is an amount equal to the greater of (i) the Minimum Rent payable for the immediately preceding year of the Lease Term, or (ii) the Minimum Rent payable for the immediately preceding year of the Lease Term multiplied by a percentage equal to one percent (1%) plus the percentage increase in the Consumer Price Index, published by the U.S. Department of Labor, Bureau of Labor Statistics, U.S. City Average, All Items For All Urban Consumers (1982-1984 = 100) (the "CPI") published for the month immediately preceding the date designated for any such increase over the base CPI figure published for the month immediately preceding the (a) Lease Commencement Date with respect to Minimum Rent for the sixth (6th) year of the Lease Term, and (b) the date on which Minimum Rent was last adjusted, with respect Minimum Rent for each year following the sixty (6th) year of the Lease Term. In the event that the CPI is no longer published, Landlord and Tenant shall work cooperatively in good faith to select another index or standard which accomplishes the purposes herein intended.

### 7. Taxes & Licenses.

**7.1 Initial Payment by Landlord.** Subject to Section 7.2 below, Landlord shall pay and discharge, prior to delinquency, all real estate taxes and assessments, general and special, water taxes and all other impositions, ordinary and extraordinary of every kind and nature, which during the Lease Term may be levied or assessed against the Premises during the Lease Term ("Taxes"). Notwithstanding the foregoing, Taxes shall not include any inheritance, estate, succession, transfer, franchise, corporation, net income or profit tax or capital levy imposed upon Landlord.

**7.2 Reimbursement by Tenant.** From and after the Rent Commencement Date, Tenant shall reimburse Landlord for any Taxes paid by Landlord with respect to the Premises during the Lease Term. Any sum payable to Landlord under this Section shall be paid by Tenant within fifteen (15) days after receipt from Landlord of demand therefor, accompanied by copies of the tax bills, which demand and tax bills may be delivered by email to the following email address: kstetter@fairmountproperties.com, or such other email address as Landlord may designate from time to time (the "Demand Email Address"). Tenant's reimbursement obligations under this Section shall survive the expiration or sooner termination of this Lease.

**7.3 Personal Property Taxes.** Tenant shall pay, or cause to be paid, before delinquency, any and all taxes which are levied or assessed and/or which become payable during the Lease Term upon all or any part of Tenant's leasehold improvements, equipment, furniture, fixtures, and other personal property located in the Premises.

**EXHIBIT 1**

7.4 **Licenses.** Tenant shall be liable for, and shall pay throughout the Lease Term, all license and excise fees and occupation taxes covering the business conducted on the Premises. If any Governmental Authority or unit under any present or future law effective at any time during the Lease Term shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Premises or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of the Premises in lieu of or in addition to ad valorem real estate taxes, such tax shall be paid by Tenant, either directly or through Landlord. It is understood and agreed, however, that Tenant shall not be liable to pay any municipal, county, state, or federal income or franchise taxes of Landlord, or any municipal, county, state, or federal estate, succession, inheritance, or transfer taxes of Landlord.

8. **Use.**

8.1 **Permitted Use.** Tenant may use the Premises only for the business or purpose as set forth in the Key Provisions Summary. Notwithstanding the foregoing, nothing contained in this Lease shall be deemed to impose upon Tenant, either directly, indirectly, constructively or implicitly, an obligation to open for business, conduct any specific form or type of commercial business, or remain open and operating for any period or in accordance with any operating schedule, procedure or method; provided, however, that Tenant shall remain obligated to perform all of its obligations under this Lease (including, without limitation, repairs and maintenance) at all times during the Lease Term.

8.2 **Prohibited Uses.** Notwithstanding anything to the contrary contained in this Lease, Tenant shall not use the Premises for any of the following noxious uses:          (a) a mobile home park or trailer court; (b) a fire, bankruptcy or auction sale; (c) a laundry or dry cleaning operation; (d) mortuary; (e) any establishment selling or exhibiting pornographic materials; (f) a gas or service station; (g) a "head" shop or any establishment displaying or selling drug paraphernalia; (h) a massage parlor, topless bar or club or restaurant which provides striptease entertainment; (i) a landfill, garbage dump or for the dumping, disposal, incineration or storage of garbage or any business storing or handling hazardous materials; (j) any carnival or amusement park; (k) a drug or alcohol recovery or treatment facility; or (l) an off track betting facility or betting club or any other type of gambling establishment.

8.3 **No Waste.** Tenant shall take good care of the Premises and keep the same free from waste. Tenant shall keep the Premises neat, clean and free from dirt, rubbish, insects and pests, shall not cause rubbish or debris to be placed on the sidewalks, yards, driveways or parking areas and shall store all cooking oil waste, trash and garbage in appropriate receptacles.

9. **Compliance with Laws.**

9.1 The term **"Governmental Regulations"** means all federal, state, county, or municipal laws, ordinances, rules, regulations, directives, orders, and/or requirements now in force or which may hereafter be in force. During the Lease Term, Tenant shall, at its sole cost and expense, comply promptly with all Governmental Regulations applicable to the Premises and Tenant's use thereof.

10. **Right of First Opportunity.**

Landlord hereby grants to Tenant an ongoing right of first opportunity to purchase all or any portion of the Premises on the following terms and conditions (the "Right of First Opportunity"):

10.1      If Landlord should at any time during the Lease Term decide to market all or a portion of the Premises to the general public for sale, Landlord shall deliver to Tenant a notice (the "Marketing Notice") setting forth the proposed purchase price, and any other material terms and conditions under which Landlord proposes to market the Premises (or a portion thereof) to the general public for sale (the "Marketing Terms").

**EXHIBIT 1**

**10.2** Landlord and Tenant shall have thirty (30) days from Tenant's receipt of the Marketing Notice to negotiate in good faith the terms and conditions for the purchase and sale of the Premises (or the applicable portion thereof). In the event the parties are successful in doing so, Tenant shall purchase the Premises (or the applicable portion thereof) won the date which is sixty (60) days thereafter (or any earlier date requested by Tenant) on the terms and conditions agreed upon by the parties. In the event the parties are unable to agree upon the terms and conditions for the purchase and sale of the Premises (or the applicable portion thereof) within such thirty (30) day period, Tenant shall provide written notice to Landlord of Tenant's highest and best offer ("Best Offer"), and Landlord may thereupon proceed to sell the Premises (or the applicable portion thereof) on terms and conditions no less favorable to Landlord than those specified in Tenant's Best Offer. If Landlord desires to sell the Premises (or the applicable portion thereof) to a third party (other than affiliates or family members of Landlord or its owners) on terms and conditions less favorable to Landlord than those specified in Tenant's Best Offer, then Landlord shall deliver to Tenant a notice setting forth the material terms and conditions of such proposed sale (the "ROFR Terms"). Tenant shall have fifteen (15) days after receipt of the ROFR Terms to notify Landlord that Tenant elects and agrees to purchase the Premises (or the applicable portion thereof) on the ROFR Terms (the "Election Notice"). Delivery of the Election Notice shall obligate Tenant to purchase the Premises (or the applicable portion thereof) on the date which is sixty (60) days after Tenant's receipt of the ROFR Terms (or any earlier date requested by Tenant) on the ROFR Terms and such other terms and conditions in connection with such transfer as the parties may negotiate. If Landlord does not receive the Election Notice within such fifteen (15) day period, Tenant shall conclusively be deemed to have waived its rights under this Section 10 as to the transaction described in the ROFR Terms and Landlord may thereupon proceed to sell the Premises (or the applicable portion thereof) on terms and conditions no less favorable to Landlord than the ROFR Terms. In the event the Premises (or the applicable portion thereof) is sold (subject to the procedure(s) set forth above), Tenant's rights under this Section 10 shall continue to be in full force and effect and shall be applicable to any future sales (or proposed sales) to the general public, and this Lease shall remain in full force and effect.

**10.3** Notwithstanding anything to the contrary herein, Tenant shall have no rights under this Section 10 if a Tenant Default exists at the time Landlord decides to market and/or sell the Premises (or a portion thereof).

11. **Maintenance & Liens.**

**11.1 Maintenance by Tenant.** Landlord shall not be required to furnish any services or facilities or to maintain, repair, replace or alter the Premises, and Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, and maintenance of the entire Premises, except for any such repairs, necessitated by the willful acts of Landlord, its employees, agents or contractors. To this end, Tenant shall, at all times during the Lease Term, and at its sole cost and expense, (i) keep and maintain the Premises and all improvements thereon in good order and repair and in a clean and safe condition, and (ii) make any additions or alterations to the Premises that may be required by applicable Governmental Regulations.

**11.2 Tenant Liens.** Tenant will not permit the Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished to Tenant or claimed to have been furnished to Tenant in connection with work of any character performed or claimed to have been performed on the Premises by or at the direction or sufferance of Tenant. If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises, Tenant shall, within fifteen (15) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord (as determined in Landlord's sole discretion) for discharge of such lien.

**EXHIBIT 1**

12.   **Absolute Net Lease.**

This is an absolutely net lease. Accordingly, Landlord shall receive a net return from the Premises equal to the Minimum Rent, without deduction for any expense or charge for the Premises. Tenant shall be responsible for (whether paid directly or as reimbursement to Landlord) all expenses, of every kind and nature, relating to or arising from the Premises, including Taxes, insurance and expenses arising from Tenant's leasing, management, operation, maintenance, repair, use, or occupancy of the Premises and all construction relating to the Premises.

13.   **Utilities.**

To the extent not existing as of the Delivery Date, Tenant shall, at its sole cost and expense, cause to be installed and maintained within the Premises all facilities necessary to supply to the Premises all water, storm sewer, sanitary sewer, gas, electricity, telephone and other utility facilities and drainage facilities required in furtherance of Tenant's use of the Premises. Beginning as of the Delivery Date, and during the Lease Term, Tenant shall be solely responsible for and shall promptly pay all charges and expenses for all utilities used or consumed on the Premises. It is understood that the use by Tenant of the Premises may require that the parties enter into contracts or agreements with local, county, state or other governmental agencies or bodies or with public utilities with reference to storm sewer, sanitary sewer, gas, water, electric, telephone or other utility lines or connections, stormwater management or easement agreements. Landlord agrees to execute such written contracts, agreements, easement agreements, and consents as are reasonably required for Tenant's use of the Premises, provided the same are in form and substance acceptable to Landlord, acting reasonably. Notwithstanding anything in this Section 13 to the contrary, Tenant shall be entitled, at no cost, to the use of any and all utility capacity allocable to the Premises and heretofore reserved by or assigned to Landlord. Landlord agrees to execute all such written contracts, agreements, license agreements, and consents as are reasonably required for Tenant's use of such capacity, provided same are in form and substance acceptable to Landlord, acting reasonably.

14.   **Intentionally Omitted.**

15.   **Alterations; Construction of Improvements.**

15.1   Tenant Site Plan. As of the Delivery Date, the Premises consists of a building of approximately 4,000 square feet, together with a patio area (the **"Building"**). Landlord acknowledges that Tenant may desire to demolish all of part of the Building or any improvements located on the Property, at its sole cost and expense. Landlord hereby consents to such demolition, subject to Landlord's right to approve the Tenant's Plans pursuant to Exhibit D.

15.2   Alterations. In addition to the rights set forth in subsection 15.1 above, during the Lease Term Tenant shall have the right to make, at its sole cost and expense, such alterations and changes in or to the Premises and/or the Building as Tenant may deem desirable, in its reasonable discretion. However, Tenant shall not make any material alterations to the Premises (including, without limitation, the Building), without Landlord's prior written consent, which consent will not be unreasonably withheld. In the event Landlord fails to respond to Tenant's request for consent to the proposed alterations within thirty (30) days, Landlord shall be deemed to have consented to Tenant's performance of said alterations. All alterations and changes to the Premises shall be performed in accordance with Exhibit D and promptly completed.

15.3   Tenant Permits. Tenant shall be responsible for (or shall cause an applicable subtenant to obtain) all required building and other permits and approvals, whether governmental or otherwise (including any tap-in fees required for the Premises), required for the construction of any improvements on the Premises and for the operation of any business on the Premises. If, in Tenant's reasonable judgment, it is necessary

**EXHIBIT 1**

for Landlord to join in any application for a building or other permit or approval, Landlord agrees to do so, but at no expense to Landlord and without assuming any liability with respect thereto. Construction of any improvements on the Premises shall comply with all applicable Governmental Regulations.

16.     **Ownership of Improvements.**

Tenant shall own all improvements on the Premises constructed by or for Tenant until the expiration or earlier termination of this Lease, and Tenant alone shall be entitled to deduct all depreciation on Tenant's income tax return for the improvements constructed by Tenant. Upon the expiration or earlier termination of the Lease Term, Tenant shall peaceably and quietly leave, surrender and yield up unto Landlord the Premises in broom clean condition, reasonable wear and tear excepted, and any and all improvements then located on the Premises, without the payment of compensation or consideration of any kind to Tenant, shall become Landlord's sole property, free and clear of any and all claims of Tenant or any Tenant mortgagee. At the expiration or earlier termination of the Lease Term, Tenant, if requested by Landlord, shall execute any and all documents necessary to evidence that title to the improvements is in Landlord and to extinguish and remove any cloud or potential cloud on the title to the Premises and/or the improvements created by Tenant. It is understood and agreed that Landlord will accept the return of the Premises as altered or improved or with such improvements thereon as Tenant shall have made pursuant to provisions hereof without any obligation upon Tenant to restore the Premises to their former condition.

17.     **Intentionally Omitted.**

18.     **Intentionally Omitted.**

19.     **Assignment and Subletting.**

19.1  **Landlord's Consent.** Except as otherwise provided in this Section 19, Tenant shall not assign this Lease or sublet the whole or any part of the Premises (collectively, **"Transfer"**) without the prior written consent of Landlord, which shall not be unreasonably withheld or conditioned. If Tenant elects to initiate a Transfer of this Lease, Tenant shall provide Landlord with a written notice setting forth the reasonable details of such Transfer. Landlord shall notify Tenant whether the proposed Transfer is approved or rejected not later than fifteen (15) Business Days (**"Transfer Deadline"**) after receipt of written notice thereof from Tenant. If Landlord does not consent to a proposed Transfer, Landlord shall provide Tenant with a reasonably detailed written explanation as to the reasons for withholding such consent. If Landlord does not respond by the Transfer Deadline, such lack of response shall be deemed an approval by Landlord of such proposed Transfer. No Transfer shall relieve Tenant from its obligation as primary obligor under this Lease, except as otherwise agreed to by Landlord and Tenant in writing. Each and every assignee, whether as assignee or as successor in interest of any assignee of Tenant herein named, shall immediately be and become and remain liable jointly and severally with Tenant for all payments and performance due under this Lease. Notwithstanding anything to the contrary set forth above, Landlord acknowledges that the originally-named Tenant intends to assign this Lease to an affiliated entity of Tenant's choosing (the **"Intended Assignee"**) following the execution of this Lease. Upon notice to Landlord of the transfer to the Intended Assignee (together with copies of the transfer documents), and provided (i) the Intended Assignee is the owner of the Adjacent Parcels and all other property and improvements related to the project of which the Premises and the Adjacent Parcel are a part and (ii) the Intended Assignee assumes all of the Tenant's obligations under this Lease, then the original-named Tenant (i.e., Fairmount Properties, LLC) shall be relieved of all further obligations of Tenant under this Lease as of the date of such transfer to the Intended Assignee.

19.2  **No Consent Required.** Notwithstanding the foregoing, the following Transfers shall not require Landlord's consent under this Section 19: (i) a change in ownership of Tenant as a result of a merger, consolidation, reorganization, or joint venture; (ii) the sale of all of Tenant's assets; (iii) the sale, ex-

**EXHIBIT 1**

change, issuance, or other transfer of Tenant's stock on a national exchange or between Tenant's parent company, if any, and any subsidiary, affiliate, related entity, or other entity that controls, is controlled by, or is under common control with Tenant; (iv) the Transfer of this Lease to Tenant's parent entity, if any, or any subsidiary, affiliate, related entity, an entity that controls, is controlled by, or is under common control with Tenant, or an entity that purchases all or substantially all of Tenant's assets; and (v)  a collateral assignment of Tenant's interest in this Lease to a lender as security for any indebtedness of Tenant to the lender.

19.3  **Conditions of Transfer.**  It shall be a condition of the validity of any Transfer that Tenant deliver to Landlord a fully executed copy of the assignment or sublease or other transfer documentation, and, in the case of an assignment, an instrument, in recordable form and satisfactory in form and substance to Landlord, wherein the assignee or other transferee shall assume all obligations of Tenant under this Lease and shall agree to be liable jointly and severally with Tenant for the payment of Minimum Rent, Additional Rent and other amounts due hereunder, and for the performance of all the terms, covenants, conditions and agreements to be performed by Tenant hereunder.

19.4  **Leasehold Mortgage.**

(a) Tenant shall at all times and from time to time have the right to encumber by mortgage, deed of trust, or security agreement (the "**Tenant Mortgage**") Tenant's leasehold estate in the Premises, together with Tenant's rights and interests in all buildings, fixtures, equipment, and improvements situated thereon, and all rents, issues, profits, revenues, and other income to be derived by Tenant therefrom, to secure such loans from time to time made by any person, firm or corporation ("**Tenant Mortgagee**") to Tenant; provided, however, that such Tenant Mortgage shall in no event encumber Landlord's fee title and interest in the Premises.

(b) Tenant shall, promptly upon receipt of any notice of default under or acceleration of the maturity of the Tenant Mortgage, deliver a copy thereof to Landlord.

19.5  **Transfer of Landlord's Interest.**

It is expressly understood and agreed that the term "Landlord", as used in this Lease, means only the owner for the time being of the Premises, and all covenants and obligations of Landlord contained in this Lease shall be binding upon Landlord and its successors in interest only with respect to breaches occurring during its or their respective ownership of Landlord's interest hereunder. Notwithstanding the foregoing, in the event of an assignment or transfer of this Lease by Landlord for other than purposes of financing in the ordinary course of business, Landlord shall cause its assignee or transferee to assume the provisions of this Lease in writing and Landlord shall promptly deliver notice of such assignment or transfer and a copy of the effective instrument of transfer to Tenant, and Tenant shall be entitled to continue to pay rent and give all notices to Landlord until Tenant has received such notice from Landlord.  Nothing herein shall be deemed to relieve Landlord of any liability for its acts, omissions or obligations occurring or accruing during its ownership of Landlord's interest under this Lease.

20.  **Indemnification.**

20.1  **Mutual Indemnification.** Subject to the waiver of subrogation provisions in Section 21 below, Tenant agrees to indemnify and hold Landlord harmless from any and all losses, damages, liability, or expenses (including reasonable attorneys' fees) actually incurred by Landlord, arising from, caused by or resulting from, in whole or in part, (i) any occurrence on or about the Premises, (ii) any negligent act or omission or intentional misconduct of Tenant, its agents, employees or contractors, (iii) Tenant's use or occupancy of the Premises, and/or (iv) Tenant's breach of its obligations or covenants under this Lease. Subject to the waiver of subrogation provisions in Section 21 below, Landlord agrees to indemnify and hold Tenant harm-

**EXHIBIT 1**

less from any and all losses, damages, liability, or expenses (including reasonably attorneys' fees) actually incurred by Tenant, arising from loss of life, personal injury and/or property damage, caused by or resulting from, in whole or in part, any negligent act or omission or intentional misconduct of Landlord, its agents, employees, or contractors, in connection with the use of or activities on the Premises by such parties.

**20.2 Concurrent Negligence.** Notwithstanding the provisions of Section 20.1 above, in the event of the concurrent negligence or intentional misconduct of Tenant, its agents, employees, or contractors on the one hand and that of Landlord, its agents, employees, or contractors on the other hand, a party's (the **"Indemnifying Party"**) obligation to indemnify the other as set forth in this Section 20 shall be limited to the extent of the Indemnifying Party's negligence and/or intentional misconduct, and that of its agents, employees, or contractors.

**20.3 Survival.** The obligations of Tenant and Landlord under this Section 20 shall survive the expiration or earlier termination of this Lease.

### 21.   Insurance.

**21.1 Property Insurance.** During the Lease Term, Tenant shall maintain, or cause to be maintained, special form commercial property insurance (**"CP Insurance"**) that covers all trade fixtures, inventory, personal property, and Tenant's betterments in and about the Premises, if any, and all improvements made by or for Tenant on the Premises, if any, all in an amount equal to the full replacement cost thereof.

**21.2 Waiver of Subrogation (Property).** Tenant and Landlord hereby waive and release each other of and from any and all rights of recovery, claims, actions, or causes of action against each other, by way of subrogation or otherwise, including their respective employees, officers, directors, subsidiaries, affiliates, agents, representatives, and assigns, for any loss or damage that may occur to the Premises, any improvements thereon (including any alterations or additions thereto), Landlord's personal property and Tenant's personal property by reason of fire, casualty or any other cause covered or coverable by CP Insurance, regardless of cause or origin. Landlord and Tenant shall obtain a waiver of subrogation from their respective insurers and shall endorse their CP Insurance policies to reflect the waiver of subrogation. The above waiver of subrogation applies whether or not there are any deductibles or self-insurance and in the absence of any CP Insurance.

**21.3 Liability and Other Insurance.** During the Lease Term, Tenant shall maintain: (i) Commercial General Liability insurance (**"CGL Insurance"**) for damages to persons or property or for loss of life or property occurring upon, in or about the Premises in an amount equal to the greater of $2,000,000 or the amount customarily carried by owners of similar property, (ii) workmen's compensation insurance covering all persons employed by Tenant in connection with any work done on or about the Premises in connection with claims for death or bodily injury, and (iii) Builders Risk Insurance during any construction on the Premises in with customary limits (collectively, the **"Other Insurance"**). Notwithstanding the foregoing, if the Premises are used for any purposes other than a parking lot, then the amount of Tenant's required CGL Insurance shall be increased to an amount customarily carried by owners/ground lessees/operators of properties used for such purposes, which amount is subject to Landlord's approval, which shall not be unreasonably withheld. Further, notwithstanding the foregoing, Tenant may elect, at its own risk, to not carry the CGL Insurance during the period from the Lease Date through the earlier to occur of (x) the date Tenant or its employees, agents or contractors first enter, access or go onto the Premises, or (y) the Outside Date, and Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all claims, liabilities, losses, damages, penalties and fines (civil and criminal) and costs, including, without limitation, reasonable attorney, engineering, and other professional or expert fees, which Landlord may incur, arising out of or resulting from or related to Tenant's failure to carry the CGL Insurance during such period.

**EXHIBIT 1**

**21.4 Policy Requirements.** All insurance policies required hereunder of Tenant shall (i) be primary to any overlapping coverage maintained by Landlord, (ii) name Landlord as an additional insured, and (iii) be effected under standard form policies issued by insurers authorized to do business in the State of Ohio and having an AM Best rating of A-VII or better. Notwithstanding anything to the contrary in this Lease, neither Tenant nor any of its employees, agents or contractors shall have the right to enter, access or go onto the Premises prior to Landlord's receipt of certified copies of all insurance policies required of Tenant hereunder, including, without limitation, the CGL Insurance (or certificates of insurance therefor), accompanied by evidence satisfactory to Landlord of payment therefor; provided, however, that Tenant shall be deemed to have sole possession and control of the Premises and shall remain responsible for all of its obligations under this Lease, including, without limitation, repair, maintenance and indemnification obligations, notwithstanding that Tenant has no right to access the Premises prior to the satisfaction of the foregoing. Thereafter, within three (3) Business Days after request by Landlord, Tenant shall provide Landlord with certified copies of all policies required of Tenant hereunder (or certificates of insurance therefor), accompanied by evidence satisfactory to Landlord of payment therefor. Tenant shall endeavor to cause the applicable insurer for each policy required of Tenant hereunder to agree that such policy shall not be changed and/or canceled without at least thirty (30) days prior written notice to Landlord.

**21.5 Failure to Maintain Insurance.** Should Tenant fail to effect, maintain or renew any insurance provided for in this Article 21, or to pay the premium therefor, or to deliver to Landlord any of such policies or certificates, then and in any of said events Landlord, at its option, but without obligation so to do, may with reasonable notice to Tenant procure such insurance, and any sums expended by it to procure any such insurance shall be additional rent hereunder and shall be repaid by Tenant within five (5) days after receipt of bills therefor from Landlord.

**21.6 Landlord's Insurance; Reimbursement by Tenant.** During the Lease Term, until such time as Tenant demolishes the Building and all of Landlord's other improvements located on the Premises, Landlord shall maintain, or cause to be maintained, CP insurance that covers the Premises and the improvements thereon (excluding the items Tenant is required to insure pursuant to Section 21.1 above) in an amount equal to the replacement cost thereof (excluding foundations). If any alterations or improvements on the Premises are made by or for Tenant, then Tenant shall promptly deliver to Landlord sufficient information to enable Landlord (at Landlord's option) to include such alterations or improvements in the property covered by Landlord's CP Insurance; provided, however, that Landlord is not obligated to include any such alterations or improvements in the property covered by Landlord's CP Insurance unless Landlord expressly assumes such obligation in a written notice to Tenant, prior to which Tenant shall insure such alterations and improvements. In addition to the CP Insurance, Landlord shall have the right, in Landlord's reasonable discretion, to obtain and maintain such other insurance (whether property, liability or otherwise) in such amounts and against such other insurable events as Landlord may from time to time reasonably deem necessary to protect Landlord, Tenant and/or the Premises. The insurance Landlord carries with respect to the Premises from time to time is referred to herein as "**Landlord's Insurance**". From and after the Rent Commencement Date, Tenant shall reimburse Landlord for the costs paid by Landlord in connection with Landlord's Insurance within fifteen (15) days after Landlord's request therefor (together with a copy of the insurance bill/invoice), which request and bill/invoice may be delivered by email to the Demand Email Address. Upon request, Landlord will provide Tenant with reasonable evidence of the costs of Landlord's Insurance. Tenant's reimbursement obligations under this Section shall survive the expiration or sooner termination of this Lease.

22. **Default by Tenant.**

**22.1 Failure to Perform.** The occurrence of any one or more of the following events shall constitute a default of this Lease by Tenant (a "**Tenant Default**"): (a) the failure by Tenant to make any payment of Rent, or any other payment required to be made by Tenant under this Lease, as and when due, where such failure continues for more than seven (7) days after Tenant's receipt of written notice of non-payment

**EXHIBIT 1**

from Landlord; and (b) the failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than as described in subsection (a) above, where such failure continues for more than thirty (30) days after Tenant's receipt of written notice of default from Landlord (provided, that if the cure of such Tenant Default reasonably requires more than thirty (30) days to complete, then Tenant shall not be in default if Tenant shall commence the cure of such Tenant Default within thirty (30) days of receipt of notice and diligently pursues such cure to completion).

22.2. **Remedies in Default.** On the occurrence of a Tenant Default, Landlord may, in addition to any and all rights and remedies available at law or in equity:

(a)     Without waiving such Tenant Default, to pay any sum required to be paid by Tenant to other than Landlord and which Tenant has failed to pay and to perform any obligation required to be performed by Tenant for the account of Tenant, and any amount so paid by Landlord shall bear interest thereon at the Default Rate from date of payment. Any amount or amounts paid by Landlord for the account of Tenant for the performance of any obligations required to be performed by Tenant shall be treated as Additional Rent due hereunder and Landlord may exercise concurrently or successively any one or more of the rights and remedies contained in this Lease for the enforcement of the payment of Rent.

(b)     To enjoin any breach or threatened breach by Tenant of the covenants hereof.

(c)     To bring suit for the collection of the Minimum Rent, Additional Rent, or other amounts due hereunder, or for the performance of any other covenant devolving upon Tenant for performance, or damages therefor, plus, to the extent permitted by law, costs and reasonable attorney fees, all without entering into possession or terminating this Lease.

(d)     To reenter the Premises by summary proceedings or otherwise, and take possession thereof, without thereby terminating this Lease, and thereupon, to expel all persons and remove all property therefrom, either peaceably or by force, without becoming liable to prosecution therefor, and relet the Premises for such periods and upon such terms according to Landlord's sole discretion, and receive the rent therefrom, applying the same first to the payment of the reasonable expenses of such reentry and the cost of such reletting, then to costs and, to the extent permitted by law, reasonable attorney fees, and then to the payment of the Minimum Rent, Additional Rent and other amounts due hereunder, the balance, if any, to be retained by Landlord and applied against Tenant's defaults during the remainder of the Term of this Lease, and Tenant, whether or not the Demised Premises are relet, shall remain liable for any deficiency, which deficiency shall be paid by Tenant to Landlord, periodically, upon the successive days upon which the Minimum Rent hereunder is payable.

It is agreed that the commencement and prosecution of any action by Landlord in forcible entry and detainer, ejectment or otherwise, or the appointment of a receiver, or any execution of any decree obtained in any action to recover possession of the Premises, or any reentry, shall not be construed as an election to terminate this Lease unless Landlord shall, in writing, expressly exercise its election to declare the Lease Term hereunder ended and to terminate this Lease, and such reentry or entry by Landlord, whether taken under summary proceedings, or otherwise, shall not be deemed to have absolved or discharged Tenant from any of its obligations and liabilities for the remainder of the Term of this Lease.

(e)     To terminate this Lease, reenter the Premises and take possession thereof, wholly discharged from this Lease. In the event Landlord shall elect to terminate this Lease, as aforesaid, all rights and obligations of Tenant shall cease and terminate except that Landlord shall have

**EXHIBIT 1**

and retain full right to sue for and collect all Minimum Rent, Additional Rent and other amounts for the payment of which Tenant shall then be in default and all damages to Landlord by reason of such breach, including lost future rent, costs and, to the extent permitted by law, reasonable attorney fees. Tenant shall surrender and deliver up the Premises to Landlord, together with all improvements and additions thereto, and upon any default by Tenant in so doing Landlord shall have the right to recover possession by summary proceedings or otherwise, and to obtain a receiver and other ancillary relief in such action, and again to have and enjoy the Premises, fully and completely, as if this Lease had never been made. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of the breach or violation by Tenant of any of the covenants and conditions in this Lease contained or otherwise.

All rights and remedies granted Landlord herein and any other rights or remedies which Landlord may have at law or in equity are hereby declared to be cumulative and not exclusive, and the fact that Landlord may have exercised any remedy without terminating this Lease shall not impair Landlord's rights thereafter to terminate or to exercise any other remedy herein granted or to which it otherwise may be entitled.

**22.3 Lien Waiver. LANDLORD HEREBY WAIVES AND DISCLAIMS ALL STATUTORY AND CONTRACTUAL LIEN RIGHTS IN TENANT'S FURNITURE, FIXTURES, TRADE FIXTURES, EQUIPMENT, MERCHANDISE, AND OTHER PROPERTY OF TENANT NOW OR HEREAFTER PLACED AT THE PREMISES.**

**23.** **Default by Landlord.**

**23.1 Failure to Perform.** Landlord's failure to perform or observe any of its obligations under this Lease after a period of thirty (30) days or the additional time, if any, that is reasonably necessary to promptly and diligently cure the failure after receiving notice thereof from Tenant, is a **"Landlord Default"**. The notice from Tenant shall give in reasonable detail the nature and extent of the failure and identify the Lease provisions containing the obligations. If Landlord commits a Landlord Default specifically with respect to the Premises, Tenant, in addition to any remedies available under the law, may, without being obligated and without waiving the Landlord Default, cure the Landlord Default. Landlord shall pay Tenant, within thirty (30) days after Landlord's receipt of an invoice and reasonable supporting documentation therefor, the reasonable costs incurred by Tenant to cure the Landlord Default. If such payment is not rendered within such thirty (30) day period, then Tenant may offset such costs from the Minimum Rent next coming due. The reimbursement provisions of this Section shall survive the expiration or sooner termination of this Lease.

**23.2 Remedies.** It is understood and agreed that Tenant's exercise of any right or remedy due to a Landlord Default shall not be deemed a waiver of or to alter, affect, or prejudice any right or remedy which Tenant may have under this Lease or at law or in equity. Neither the payment of Minimum Rent or Additional Rent nor any other acts or omissions of Tenant at any time or times after the happening of any event authorizing the cancellation or termination of this Lease, or other remedy, shall operate as a waiver of any past or future violation, breach, or failure to keep or perform any covenant, agreement, term, or condition of this Lease or to deprive Tenant of any right to cancel or terminate this Lease, or pursue other available remedies, upon the written notice provided for in this Section at any time that cause for cancellation or termination may exist, or be construed so as at any time to stop Tenant from promptly exercising any other option, right, or remedy that it may have under any term or provision of this Lease, at law, or in equity.

**EXHIBIT 1**

### 24.  Damage by Fire or Other Casualty.

24.1  Tenant to Repair Improvements.  If during the Lease Term any improvements on the Premises shall be damaged or destroyed by fire or other casualty, Tenant shall immediately give Landlord notice thereof, and this Lease shall continue in full force and effect. Neither party shall have any obligation to repair or restore such improvements; provided, however, that to the extent Tenant does not repair or restore the improvements, then Tenant shall demolish the damaged improvements, clean up the Premises, and continue to maintain the Premises in accordance with this Lease (including, without limitation Section 11).

### 25.  Condemnation/Eminent Domain.

25.1  Premises.  If all or any portion of Premises shall be acquired for any public or quasi-public use through taking by condemnation, eminent domain or any like proceeding, or purchase in lieu thereof (a "Taking"), such that the Premises cannot, at reasonable cost, continue to be operated for its then current use, with sufficient parking for such use, then Tenant may terminate the Lease with prior notice to Landlord given within thirty (30) days prior to the actual physical taking and the Lease Term shall cease and terminate as of the date the condemning authority takes title or possession, whichever first occurs, and all rentals shall be paid up to that date.  Further, in the event of any Taking, this Lease shall cease and terminate as to the portion of the Premises so taken as of the date the condemning authority takes title or possession, whichever first occurs.

25.2  Continuation of Lease.  If there is a Taking and this Lease is not terminated as provided in Section 25.1 above, then this Lease shall remain in full force and effect without reduction or abatement of Minimum Rent and Additional Rent.

25.3  Apportionment of Award.  If there occurs a Taking, whether whole or partial, Landlord and Tenant shall be entitled to receive and retain such separate awards and portions of lump sum awards as may be allocated to their respective interests in any condemnation proceedings, or as may be otherwise agreed.  If the condemning authority does not make separate awards and the parties are unable to agree as to amounts that are to be allocated to the respective interests of Landlord and Tenant, then each party shall select an independent M.A.I. real estate appraiser (an "Appraiser").  Each Appraiser shall separately determine the amount of the condemnation award that is to be allocated to the interests of Landlord and Tenant.  If the percentages of the total award each Appraiser allocates to Landlord and Tenant (a) are within ten percent (10%) of each other, the two (2) allocations shall be averaged and such average shall be the final allocation of the award, or (b) are not within ten percent (10%) of each other, the two Appraisers shall then select a third Appraiser who shall independently allocate the award between Landlord and Tenant, and the middle of such three (3) allocations shall be the final allocation of the award. Each party shall bear the cost of its Appraiser as well as one-half the cost of the third Appraiser.

### 26.  Late Payment.

In the event any sums required hereunder to be paid are not received by Landlord on or before the date the same are due, then, at Landlord's option, Tenant shall pay, as Additional Rent, interest on all past due sums from the due date thereof at the Default Rate.  Notwithstanding this interest charge and collection fee, Tenant shall be in violation of this Lease if all payments required to be made by Tenant are not made at or before the times herein stipulated.

**EXHIBIT 1**

27.    **Environmental/Hazardous Substances.**

27.1 **Definitions.**

(a) **Discharge.** "Discharge" means the releasing, spilling, leaking, leaching, disposing, pumping, pouring, emitting, emptying, dumping, presence, use, handling, treatment, manufacture, transportation, generation, storage or sale of a Hazardous Substance.

(b) **Environmental Law or Laws.** "Environmental Law" means each and every applicable federal, state, regional, county, or municipal environmental or health and safety statute, ordinance, rule, regulation, order, code, directive, or requirement relating to the environment, Hazardous Substances, or health and safety, including without limitation the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §9601 et seq., the Federal Water Pollution and Control Act, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., and the Tank Laws (as defined below), now or hereafter existing, together with all successor statutes, ordinances, rules, regulations, orders, directives, or requirements now or hereafter existing.

(c) **Governmental Authority.** "Governmental Authority" means the federal, state, regional, county, or municipal government, or any department, agency, bureau, or other similar type body obtaining authority therefrom or created pursuant to any applicable statute, ordinance, rule, regulation, order, code, directive, or requirement thereof, now or hereafter existing.

(d) **Hazardous Substances.** "Hazardous Substance" means any substance, material, waste, toxic substance, hazardous substance, hazardous waste, solid waste, pollutant, irritant, or contaminant, including without limitation petroleum, petroleum byproducts or derivatives, asbestos, polychlorinated biphenyls, mold or other bacterial matter, all as defined, listed, or referred to in any Environmental Law. The term Hazardous Substance shall not include a Hazardous Substance used in Tenant's customary business operations in quantities allowable under applicable Environmental Law.

(e) **Remediate or Remediation.** "Remediate" or "Remediation" means all necessary actions to investigate and clean up or respond to any known, suspected, or threatened Discharge, including without limitation: environmental investigation, monitoring, and sampling; installation, maintenance, and removal of monitoring wells; removal, treatment, neutralization, or containment of any Hazardous Substance; storage of excavated materials; and installation, maintenance, storage, and removal of machinery and equipment used in connection with a Remediation.

(f) **Tank Laws.** "Tank Laws" means all federal, state, regional, county, or municipal statutes, ordinances, rules, or regulations relating to underground storage tanks, including, without limitation, the Federal Underground Storage Law, Subtitle I of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq., together with any amendments thereto, regulations promulgated thereunder, all substitutions thereof, and any successor legislation and regulations.

(g) **Underground Storage Tanks.** "Underground Storage Tanks" shall have the meaning ascribed to such term under the Tank Laws, and shall also include unregulated underground storage tanks used to store Hazardous Substances.

27.2 **Environmental Compliance.**

(a) **Studies.** If Tenant undertakes any environmental investigation of the Premises, then a copy of the investigation report shall be provided to Landlord upon request.

**EXHIBIT 1**

**(b)** **Landlord's Representation.** As of the date of this Lease, Landlord represents and warrants to Tenant that to its knowledge the Premises is in full compliance with all Environmental Laws.

**(c)** **Tenant's Compliance.** Tenant shall not permit anyone, without Landlord's prior written consent, which may be withheld in Landlord's sole and absolute discretion, to use, store or keep any Hazardous Substances on or about the Premises. In addition, Tenant shall, at its expense, comply with all applicable Environmental Laws with respect to the Premises and Tenant's use thereof; provided, however, that Tenant shall not be responsible for Remediating a Discharge that was not caused, in whole or in part, by Tenant, its agents, employees, contractors, subtenants, licensees or anyone else for whom Tenant may legally be responsible.

**(d)** **Reserved.**

**(e)** **Information, Burden, Notice.** Landlord will promptly provide all information in Landlord's actual possession requested by Tenant or any applicable Governmental Authority with respect to Tenant's obligations under this Section 27. If there is a dispute between Landlord and Tenant with respect to liability for a Discharge at the Premises, Tenant shall have the burden of proof with respect to proving that Tenant did not discharge the Hazardous Substances. To the extent either party has any notice thereof, such party shall notify the other party in advance of all meetings with any Governmental Authority with respect to a Discharge at the Premises. Both Landlord and Tenant shall have the right to attend and participate in all such meetings.

27.3 **Indemnification & Survival.** Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all claims, liabilities, losses, damages, penalties and fines (civil and criminal) and costs, including, without limitation, reasonable attorney, engineering, and other professional or expert fees, which Landlord may actually incur, arising out of or resulting from: (i) a Discharge by Tenant, its agents, employees, contractors, subtenants, licensees or anyone else for whom Tenant is legally responsible; or (ii) a breach by Tenant of Tenant's obligations under this Section 27. Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all claims, liabilities, losses, damages, penalties and fines (civil and criminal) and costs, including without limitation, reasonable attorney, engineering, and other professional or expert fees, which Tenant may actually incur, arising out of or resulting from: (i) a Discharge at the Premises during the Term of the Lease by Landlord, its employees, agents or contractors or anyone else for whom Landlord is legally responsible; or (ii) a breach by Landlord of Landlord's obligations or representations under this Section 27. This Section 27 shall survive the expiration or earlier termination of this Lease. Either party's failure to abide by the terms of this Section 27 shall be restrainable, or enforceable, as the case may be, by injunction.

**28.** **Subordination; Attornment.**

This Lease and Tenant's tenancy hereunder (including, without limitation, any Tenant financing) shall be subject and subordinate at all times to the lien of any mortgage or deed of trust now or hereafter placed upon the interest of Landlord and the Premises. With respect to any mortgage or deed of trust placed upon the interest of Landlord and the Premises after the date hereof, Landlord will arrange for the holder of such encumbrance to enter into a subordination, non-disturbance and attornment agreement ("SNDA") with Tenant on such holder's standard form of SNDA, but the failure of Tenant and such holder to agree on the terms thereof or to execute such an SNDA shall not affect the subordination set forth above. Notwithstanding the foregoing, Landlord shall not be required to obtain an SNDA with respect to the line of credit secured by the Premises as of the date of this Lease. Tenant also agrees that any mortgagee or trustee may elect to have this Lease prior to the lien of its mortgage or deed of trust, and in the event of such election, and upon notification by such mortgagee or trustee to Tenant to that effect, this Lease shall be deemed prior in lien to the said mort-

**EXHIBIT 1**

gage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. Tenant agrees to execute and deliver such instruments (in a form and substance acceptable to Tenant, acting reasonably) as may be reasonably desired by Landlord or by any mortgagee or trustee to confirm the subordinate nature of this Lease to the lien of any present or future mortgage or deed of trust, or as may be otherwise required to carry out the intent of this Section. Tenant agrees to attorn to any mortgagee, trustee or purchaser in a foreclosure sale as Landlord under this Lease. Tenant agrees that in the event Landlord is in default under this Lease, any mortgagee or trustee under a deed of trust of Landlord's interest in the Premises shall be permitted (but not required) to enter the Premises for the purpose of correcting or remedying such default, and Tenant agrees to accept performance by such mortgagee or trustee in lieu of performance by Landlord. Notwithstanding anything to the contrary in this Lease, no actions or financing by Tenant shall encumber Landlord's interest in the Premises.

29.     **Estoppel Certificate.**

Landlord and Tenant agree that they will from time to time upon request from each other, within fifteen (15) days after notice from the other, execute and deliver to such persons as the requesting party shall request, a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates which rent and other charges payable under this Lease have been paid, stating the commencement and termination dates of the current term of this Lease and stating whatever options to extend there may be in this Lease, stating that Landlord and Tenant are not in default under this Lease to such party's knowledge (or if Landlord or Tenant, as applicable, have alleged a default, stating the nature of such alleged default), and further stating such other factual matters relating to this Lease as the requesting party shall reasonably require.

30.     **Access to Premises.**

Landlord, its agents, servants, or employees may enter the Premises at reasonable times with reasonable advance notice to Tenant (or an authorized employee of Tenant at the Premises), and at any time if an emergency, to do the following; inspect the Premises, perform work on the Premises, show the Premises to prospective lenders, or purchasers and, during the the three hundred sixty-five (365) days immediately prior to the expiration of this Lease, to prospective tenants, and Tenant shall have the right to be present during such showings if so requested by Tenant; or post on the Premises (but not within or at the entrance of the Premises in the event a building exists on the Premises) for sale or for lease signs; provided, however, that Landlord shall use commercially reasonable efforts to cause the least practical interference to Tenant's business and Tenant's use of the Premises.

31.     **Holding Over.**

If Tenant holds over without Landlord's written consent, Tenant shall pay Minimum Monthly Rent and Additional Rent equal to one hundred fifty percent (150%) of the then applicable Minimum Monthly Rent and Additional Rent. Possession by Tenant after the expiration of this Lease shall not be construed to extend the Lease Term. The remedy set forth in this Section shall be in addition to any and all other rights and remedies Landlord may have at law, in equity or under this Lease.

32.     **Quiet Enjoyment.**

During the Lease Term, Landlord covenants and agrees, provided Tenant pays all Minimum Rent and Additional Rent and performs the terms and conditions of this Lease as and when required, that Tenant shall enjoy the quiet enjoyment of the Premises without disturbance, hindrance, or molestation by Landlord or any other person claiming by, through or under Landlord, subject to terms of this Lease.

**EXHIBIT 1**

### 33.    Brokerage Commissions.

Landlord and Tenant warrant and represent that they have not dealt with any real estate broker or salesman in connection with this Lease except the Broker(s) set forth in the Key Provisions Summary, and Tenant shall be responsible for the payment of any fees or commissions due to such Broker(s) pursuant to a separate agreement. Landlord and Tenant each further represent and warrant they have dealt with no other person that would create any liability for the payment of a commission by the other party. The party who breaches this representation and warranty shall defend, hold harmless, and indemnify the non-breaching party from any claims or liability arising from the breach.

### 34.    Notice.

34.1  Written Notice; Delivery Methods. Each party giving or making any notice, request, demand, consent, approval, or other communication (each, a "Notice" (but sometimes "notice")) pursuant to this Lease shall: (i) give the Notice in writing; (ii) cause the Notice to be signed by an authorized representative of the sending party; and (iii) use one of the following methods of delivery, each of which for purposes of this Lease is a writing: (a) personal delivery (provided a receipt is obtained); (b) Registered or Certified Mail, in each case, return receipt requested and postage prepaid; or (c) nationally recognized overnight courier, with all fees prepaid.

34.2  Addresses. Each party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "Addressee") at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 34.

34.3  Effectiveness of a Notice. Except as provided elsewhere in this Lease, a Notice is effective only if the party giving the Notice has complied with Sections 34.1 and 34.2 above. A notice sent to the Premises is not a valid notice. A Notice is deemed to have been received upon receipt as indicated by the date on the signed receipt; or (iii) if the Addressee rejects or otherwise refuses to accept the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then upon the rejection, refusal, or inability to deliver the Notice.

34.4  Delivery Time of Notice. Notwithstanding the foregoing, if any Notice is received after 5:00 p.m. on a Business Day where the Addressee is located, or on a day that is not a Business Day where the Addressee is located, then the Notice is deemed received at 9:00 a.m. on the next Business Day where the Addressee is located. Each party's attorney is authorized to give any Notice pursuant to this Lease on behalf of such attorney's client.

### 35.    Force Majeure.

35.1  Definition. "*Force Majeure* Event" means any act or event, whether foreseen or unforeseen, that meets all three of the following tests: (a) the act or event prevents a party (the "Non-Performing Party"), in whole or in part, from (i) performing its obligations under this Lease; or (ii) satisfying any conditions to the obligations of the other party (the "Performing Party") under this Lease; (b) the act or event is beyond the reasonable control of and not the fault of the Non-Performing Party; and (c) the Non-Performing Party has been unable to avoid or overcome the act or event by the exercise of due diligence. In furtherance of the definition of *Force Majeure* Event and not in limitation of that definition, each of the following acts or events is an example of an act or event that could be a *Force Majeure* Event if the act or event meets each of the above requirements of this Section 35.1: accident, fire, act of God, act of a public enemy, injunction, riot, strike, lockout, insurrection, war, terrorist attack, court order, requisition or order of govern-

**EXHIBIT 1**

mental body or authority. Notwithstanding the preceding definition of a *Force Majeure* Event, a *Force Majeure* Event excludes economic hardship, changes in market conditions, and insufficiency of funds.

35.2 **Suspension of Performance.** If a *Force Majeure* Event occurs, the Non-Performing Party is temporarily excused from (i) whatever performance is prevented by the *Force Majeure* Event to the extent prevented, and (ii) satisfying whatever conditions precedent to the Performing Party's obligations that cannot be satisfied, but only to the extent they cannot be satisfied due to the *Force Majeure* Event. Notwithstanding the preceding sentence, a *Force Majeure* Event does not excuse any obligation by either the Performing Party or the Non-Performing Party to make any payment required under this Lease.

35.3 **Resumption of Performance.** When a *Force Majeure* Event no longer prevents the Non-Performing Party from (i) resuming performance of its obligations under this Lease, or (ii) satisfying the conditions precedent to the Performing Party's obligations, it shall immediately give the Performing Party written notice to that effect and shall immediately resume performance under this Lease.

36. **Additional Terms.**

36.1 **Default Rate of Interest.** The **"Default Rate"** of interest shall be the lesser of ten percent (10%) per annum or the maximum rate per annum allowed by applicable law.

36.2 **Successors or Assigns.** The terms, conditions, covenants, and agreements of this Lease extend to and are binding upon Landlord, Tenant, and their respective heirs, administrators, executors, legal representatives and permitted successors, subtenants, and assigns, if any, and upon any person or entity coming into ownership or possession of any interest in the Premises by operation of law or otherwise.

36.3 **Severability.** If any term, covenant, or condition of this Lease or the application thereof to any person or circumstance is, to any extent, invalid, illegal, or unenforceable, the remainder of this Lease, or the application of such term, covenant, or condition to parties or circumstances other than those to which it is held invalid, illegal, or unenforceable, is not affected thereby and each term, covenant, and condition of this Lease remains valid and enforceable to the fullest extent permitted by law, but only if the essential terms and conditions of this Lease for each party remain valid, binding, and enforceable.

36.4 **Memorandum of Lease.** Neither Landlord nor Tenant shall permit, allow or cause this Lease, or any amendment to this Lease, to be recorded in any public registry or office of register of deeds; provided, however, at the request of either party, Landlord and Tenant agree to execute a recordable memorandum of this Lease setting forth the names and addresses of the parties, a reference to this Lease with its date of execution, specific legal descriptions of the Premises, the actual Lease Commencement Date, the term of the Lease and any Renewal Term(s), and all other information that may be required by statute, which memorandum may be recorded by Tenant at Tenant's expense or by Landlord at Landlord's expense in the appropriate public records of the jurisdiction in which the Premises are situated.

36.5 **Waiver.** The parties may waive any provision of this Lease only by a writing executed by the party or parties against whom the waiver is sought to be enforced. No failure or delay in exercising any right or remedy or in requiring the satisfaction of any condition under this Lease, and no act, omission or course of dealing between the parties, operates as a waiver or estoppel of any right, remedy, or condition. A waiver once given is not to be construed as a waiver on any future occasion or against any other person or entity.

36.6 **Amendment.** The parties may amend this Lease only by a written agreement executed by the parties.

Page 19

**EXHIBIT 1**

**36.7 Headings/Captions.** The descriptive headings/captions of the sections and subsections of this Lease are for convenience only, do not constitute a part of this Lease, and do not affect this Lease's construction or interpretation. The words "herein", "hereof", and "hereto" when used in this Agreement refer to this Agreement in its entirety and not solely to any specific sentence, paragraph, or section.

**36.8 Choice of Law.** The laws of the state, commonwealth, or jurisdiction where the Premises are located (without giving effect to its conflict of laws principles) govern all matters arising out of or relating to this Lease and the transactions it contemplates, including, without limitation, its interpretation, construction, performance, and enforcement.

**36.9 Acceptance of Keys.** The acceptance of keys to the Premises by Landlord, its agents, employees, contractors, or any other person on Landlord's behalf shall not be deemed or constitute an early termination of this Lease unless such early termination is evidenced in writing and signed by Landlord.

**36.10 Authority to Execute.** Tenant represents and warrants that this Lease has been duly authorized, executed and delivered by and on behalf of Tenant and constitutes the valid, binding, and enforceable agreement of Tenant in accordance with the terms of this Lease. Landlord represents and warrants that this Lease has been duly authorized, executed, and delivered by and on behalf of Landlord, and constitutes the valid, binding and enforceable agreement of Landlord in accordance with the terms of this Lease.

**36.11 No Construction Against Drafting Party.** Landlord and Tenant acknowledge that each of them and their respective counsel have had an opportunity to review this Lease and that this Lease shall not be construed for or against either party merely because such party prepared or drafted this Lease or any particular provision thereof.

**36.12 Counterparts.** The parties may execute this Lease in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by email, facsimile or other electronic means is as effective as executing and delivering this Lease in the presence of the other parties to this Lease. This Lease is effective upon delivery of one executed counterpart from each party to the other party. Any party delivering an executed counterpart of this Lease by email or facsimile shall also deliver a manually executed counterpart of this Lease, but the failure to do so does not affect the validity, enforceability, or binding effect of this Lease.

**36.13 Merger/Prior Agreements. THIS LEASE CONSTITUTES THE FINAL AGREEMENT BETWEEN THE PARTIES. IT IS THE COMPLETE AND EXCLUSIVE EXPRESSION OF THE PARTIES' AGREEMENT ON THE MATTERS CONTAINED IN THIS LEASE. ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS AND AGREEMENTS BETWEEN THE PARTIES ON THE MATTERS CONTAINED IN THIS LEASE ARE EXPRESSLY MERGED INTO AND SUPERSEDED BY THIS LEASE. THE PROVISIONS OF THIS LEASE MAY NOT BE EXPLAINED, SUPPLEMENTED, OR QUALIFIED THROUGH EVIDENCE OF TRADE USAGE OR A PRIOR COURSE OF DEALINGS. IN ENTERING INTO THIS LEASE, THE PARTIES HAVE NOT RELIED UPON ANY STATEMENT, REPRESENTATION, WARRANTY, OR AGREEMENT OF THE OTHER PARTY EXCEPT FOR THOSE EXPRESSLY CONTAINED IN THIS LEASE. THERE IS NO CONDITION PRECEDENT TO THE EFFECTIVENESS OF THIS LEASE OTHER THAN THOSE EXPRESSLY STATED IN THIS LEASE.**

**36.14 Acceptance.** The submission of this Lease to Landlord by Tenant or to Tenant by Landlord does not constitute an offer to lease. This Lease shall become effective only upon the execution and delivery thereof by both Landlord and Tenant

**EXHIBIT 1**

**36.15**  **Consent.** Except where otherwise expressly provided for in this Lease, any consent or approval required under this Lease shall not be unreasonably withheld, delayed or conditioned.

**36.16**  **Business Days.** "Business Day" (or "business day") means, as to any party, any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close in the state, commonwealth, or jurisdiction where the Premises are located. If the last day of any time period under this Lease (other than the Lease Term), or the last day for performance of any obligation, or for giving any notice, or for taking any other action under this Lease falls on a day that is not a Business Day, then the last day of such time period shall be extended to the first day thereafter that is a Business Day.

**36.17**  **Attorneys' Fees.** In the event of any litigation related to this Lease, whether to enforce its terms, recover for default, or otherwise, if either party receives a judgment, settlement, or award in its favor (the "Receiving Party") against the other party (the "Paying Party") in such litigation, the Paying Party will pay upon demand all of the Receiving Party's costs, charges, and expenses (including but not limited to reasonable attorneys' fees, court costs, and expert witness fees) arising out of such litigation (including the costs of any appeal related thereto) (but equitably allocated to each issue in such litigation if the judgment, settlement or award is not entirely in favor of one party).

**36.18**  **Confidentiality.** Landlord agrees to hold the terms of this Lease in strict confidence, and will not disclose same to any person other than to (i) Landlord's directors, officers, employees, and partners, and (ii) those brokers, consultants, lenders, or other third parties working with Landlord in connection with this Lease and who need to know such information for the purpose of consummating this transaction or a future related transaction. This confidentiality obligation will not be applicable to disclosure of information required by applicable Governmental Regulations.

**36.19**  **Landlord's Limited Liability.** Notwithstanding anything to the contrary contained in this Lease, it is specifically agreed that the monetary liability of any Landlord hereunder in the event of a breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord and in the event of any other claim by Tenant against Landlord, whether under this Lease, imposed by statute or existing at common law, in respect of any matter related to, arising out of or occurring in connection with this Lease, the Premises, or their relationship to each other as landlord and tenant, shall be limited to and enforceable solely against Landlord's interest in the Premises and that no personal or other money judgment shall be sought or obtained against Landlord or any members, partners or shareholders thereof.

37.  **Waiver of Jury Trial.**

EACH PARTY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LEASE AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. EACH PARTY ACKNOWLEDGES THAT IT HAS RECEIVED THE ADVICE OF COMPETENT COUNSEL PRIOR TO MAKING SUCH WAIVER.

[SIGNATURES ON FOLLOWING PAGE]

**EXHIBIT 1**

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the Lease Date.

Tenant:

**Fairmount Properties, LLC,**
an Ohio limited liability company

By: _____

Print Name: Frederly Rottenberg

Title: Member

Date: 10/11/13

Landlord:

**BEBS, LTD.,**
an Ohio limited liability company

By: _____

Print Name: _____

Title: _____

Date: _____

**EXHIBIT 1**

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the Lease Date.

Tenant:

**Fairmount Properties, LLC,**
an Ohio limited liability company

By: _____

Print Name: _____

Title: _____

Date: _____

Landlord:

**BEBS, LTD.,**
an Ohio limited liability company

By: _Kim Thomas_____

Print Name: _Kim Thomas_____

Title: _Owner_____

Date: _10 · 1 · 13_____

**EXHIBIT 1**

STATE OF OHIO )
) ss:
COUNTY OF CUYAHOGA )

On October 11, 2013, before me, Terri Ann Pezzente, Notary Public, personally appeared Barry and Ruttenberg, proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument, the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____ (SEAL)
Notary Public Signature

TERRI ANN PEZZENTE
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
March 06, 2018


STATE OF OHIO )
) ss:
COUNTY OF CUYAHOGA )

On _____, before me, _____, Notary Public, personally appeared _____ and _____, proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument, the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____ (SEAL)
Notary Public Signature

**EXHIBIT 1**

STATE OF OHIO        )
                     ) ss:
COUNTY OF CUYAHOGA   )

On _____, before me, _____, Notary Public, person-
ally appeared _____ and _____, proved to me on the basis of satisfactory evi-
dence to be the persons whose names are subscribed to the within instrument and acknowledged to me
that they executed the same in their authorized capacities, and that by their signatures on the instrument,
the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph
is true and correct.

WITNESS my hand and official seal.

_____ (SEAL)
       Notary Public Signature


STATE OF OHIO        )
                     ) ss:
COUNTY OF CUYAHOGA   )

On Oct 1ST 2013, before me, Patience Jarba_____, Notary Public, person-
ally appeared _Emmany Thompand_____, proved to me on the basis of satisfactory evi-
dence to be the persons whose names are subscribed to the within instrument and acknowledged to me
that they executed the same in their authorized capacities, and that by their signatures on the instrument,
the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph
is true and correct.

WITNESS my hand and official seal.

_____ (SEAL)
       Notary Public Signature
     Commission expires Aug 1ST 2017


**EXHIBIT 1**

**EXHIBIT A**

SITE PLAN OF PREMISES

[Attached]

**EXHIBIT 1**

Map                                                    Page 1 of 1

# EXHIBIT "A"

**Map**        (Leased Premises Shown in Blue)
              *(AND HATCHED)*



Tax Parcels          Addresses         Jurisdictions
                        ○
Miscellaneous Parcel Lines   Landmarks      2011 Ortho Photos
                        ⊙              Red: Band_1
Tax Parcels          Streets            Green: Band_2
                                        Blue: Band_3

**EXHIBIT 1**

## EXHIBIT B

### LEGAL DESCRIPTION OF PREMISES

The following described piece(s) or parcel(s) of land, situated in the City of Kent, County of Portage and State of Ohio:

Parcel #1:

Known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in deed Vol. 25, Page 132, in the Village of Franklin (now city of Kent) and bounded and described as follows: Beginning at an iron bolt on the East line of Franklin Ave., and at the northwest corner of Alley No. Eight (8); Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe; Thence South 89 deg. 17' East 77.12 feet to an iron pipe; Thence South 0 deg. 46' West 44.97 feet to an iron pipe on the north line of Alley Number Eight (8); Thence North 89 deg. 14' West 91.54 feet to the place of beginning and containing 0.086 acres of land. Surveyed by Marvin F. Stevens, Reg. Sur. No. 260.

Parcel #2:

Known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, and the north half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village (now City) of Kent as surveyed by Samuel D. Harris, Esq.

Parcel #3:

And being known as a part of Lots No. 19 and 20 of Normal View Allotment Addition to the City of Kent as recorded in Plat Book 4, Page 36, Portage County Plat Records, and being more particularly described as follows:  Commencing at an iron pin at the southeast corner of Lot No. 18 in said allotment on Crain Avenue and owned by R. and J. Rhodes and running thence easterly for a distance of 45 feet; Thence northerly 116 feet to the southerly line of Crain Avenue; Thence Westerly along said south line of Crain Avenue a distance of 59 feet; Thence southerly along the easterly line of said Lot No. 18, 133 feet to the point of beginning.

**EXHIBIT 1**

## EXHIBIT C

## COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT (this "Agreement") is executed as of the _____ day of _____ 20__ by and between BEBS, LTD. ("Landlord") and FAIRMOUNT PROPER-TIES, LLC ("Tenant") pursuant to the terms of that certain Ground Lease between Landlord and Tenant dated _____ ("Lease") for certain premises commonly known as 225-229 Franklin Avenue, in Kent, Ohio, as more particularly described in the Lease ("Premises").

IN CONSIDERATION of the premises and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, as a supplement to the Lease, Landlord and Tenant mutually covenant and agree as follows:

1.   The Lease Date is _____.

2.   The Lease Commencement Date is _____.

3.   The Rent Commencement Date is _____.

4.   The Expiration Date of the Initial Term of the Lease is _____, subject to _____ Renewal Terms of _____ years each.

5.   The Minimum Annual Rent payable by Tenant during the Initial Term of the Lease is initially $42,500.00, which amount is subject to increases as provided in the Lease.

7.   All terms with an initial capital letter and not otherwise defined herein shall have the meaning ascribed to such term in the Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Landlord:                                    Tenant:

By: _____                          By: _____

Print Name: _____                  Print Name: _____

Title: _____                       Title: _____

**EXHIBIT 1**

## EXHIBIT D

### CONSTRUCTION REQUIREMENTS

As more fully described in the Lease, Tenant is fully responsible for all construction and/or demolition at the Premises, and all future alterations of the Premises and the improvements thereon, at its sole cost and expense in accordance with the following requirements:

1. Tenant shall deliver to Landlord plans and specifications ("Tenant's Plans") for any material construction, build-out, work or alterations Tenant desires to perform on or to the Premises (in any event, "Tenant's Work"), including proposed signage. Tenant shall submit one (1) set of black line prints to Landlord for approval and coordination. Landlord's approval of Tenant's Plans shall not be unreasonably withheld, delayed or conditioned. All Tenant's Work shall be in accordance with the Landlord approved Tenant's Plans, and there shall be no material change in Tenant's Plans without the prior written approval of Landlord in accordance with this Exhibit D.

2. Tenant shall be responsible for obtaining all required construction documents reviews with all governing authorities to obtain all required building permits, inspections, occupancy permits, operating licenses, etc., pertaining to Tenant's Work and Tenant's business.

4. Tenant's Work shall not commence until all governmental and Landlord approvals have been granted and until Tenant delivers to Landlord policies or certificates evidencing the policies of insurance required under this Lease.

5. All work shall be done in a first-class workmanlike manner in accordance with all applicable building codes, laws, and ordinances. Tenant shall be held liable for any damage caused by the Tenant or Tenant's employees, agents and contractors in the performance of work at the Premises.

6. Tenant shall be responsible for the cost and receipt of all deliveries and unloading of all materials pertaining to Tenant's Work.

7. Tenant shall pay all connection, tap, system development, and other related fees for any utilities serving the Premises.

8. Tenant shall pay for all utilities to the Premises for Tenant's Work.

9. Tenant shall keep the Premises free from accumulations of rubbish and debris and arrange for the prompt removal of all debris caused by Tenant's Work.

**EXHIBIT 1**

## EXHIBIT B

## GROUND LEASE BETWEEN FRANKLIN LOT, LLC AND SELLER

**EXHIBIT 1**

## GROUND LEASE

### KEY PROVISIONS SUMMARY

| | |
|---|---|
| Lease Date: | September 15, 2013 |
| Landlord: | Aida Mandalari, an individual |
| Tenant: | Fairmount Properties LLC |
| Property : | That certain parcel of land known as Parcel Number 17-025-40-00-026-000 and consisting of approximately 0.1435 acres, located at 225 Franklin Avenue ((he "Property"), in the City of Kent, County of Portage, State of Ohio; the Property being identified as Parcel "E" on the "Property Site Plan" attached to this Lease as Exhibit A. |

| Notice Addresses (Section 31): | Landlord: | Tenant: |
|---|---|---|
| | Aida Mandalari c/o Mary Mandalari 1202 Shady Lakes Drive Kent, Ohio 44240 | Fairmount Properties LLC 1138 W. 9th Street Cleveland, Ohio 44113 Attn: Randy Ruttenberg |
| | Address for Rent Payment: 1202 Shady Lakes Drive Kent, Ohio 44240 | |

| | |
|---|---|
| Contingency Period: | From the Lease Date until the satisfaction of the Tenant Contingency (Section 4) |
| Lease Commencement Date: | The date of satisfaction of the Tenant Contingency |
| Rent Commencement Date: | September 15, 2013 |
| Expiration Date: | The last day of the calendar month Thirty (30) years after the Lease Commencement Date (Section 3.1) |
| Lease Term: | Initial Term: Thirty (30) years (Section 3.1) Renewal Term(s): Six (6) terms of Five (5) years each (Section 3.2) |

| Minimum Rent: | Year | Minimum Annual Rent | Minimum Monthly Rent |
|---|---|---|---|
| | 1-5 | $24,000.00 | $2,000.00 |
| | Minimum Rent to be increased thereafter as described in Section 6 | | |

| | |
|---|---|
| Title Company: | First American Title Insurance Company |
| Permitted Use: | The Property shall be used only as a surface parking lot (Section 8.1) |
| Broker(s): | Creative Realty Group, whose commission(s) to be paid by Tenant (Section 33) |
| Exhibits: | Exhibit A – Property Site Plan Exhibit B – Lease Commencement Date Agreement |

THIS GROUND LEASE (this "Lease") is made and entered into and is effective as of the Lease Date set forth in the Key Provisions Summary by and between Landlord and Tenant.

### Recitals

A.   Landlord is the owner of the Property. The Property, as the same now exists is depicted on the Property Site Plan.

B.   Landlord desires to lease the Property to Tenant, and Tenant desires to take and lease the Property from Landlord.

{01502443 -7}

**EXHIBIT 1**

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties mutually covenant and agree as follows:

1. **Key Provisions Summary; Enumeration of Exhibits.**

1.1 **Significance of Key Provisions Summary.** References in the body of this Lease to a portion of the Key Provisions Summary (e.g., the defined terms in the left-hand column of the Key Provisions Summary) shall be deemed and construed to incorporate all the terms provided under each such referenced portion of the Key Provisions Summary. References in the Key Provisions Summary to a portion of the body of this Lease (e.g., Section references in the right-hand column of the Key Provisions Summary) shall be deemed and construed to incorporate all the terms provided under each such referenced portion of the Lease. Notwithstanding the foregoing, if there is any inconsistency between the Key Provisions Summary and another portion of this Lease, the terms of the Key Provisions Summary shall control.

1.2 **Enumeration of Exhibits.** The Exhibits enumerated in the Key Provisions Summary and attached to this Lease are incorporated in this Lease by reference and are to be construed as a part of this Lease. Each party agrees to perform any obligations on its part as set forth in any and all such Exhibits.

2. **Property.**

2.1 **Property.** Subject to the terms of this Lease, Landlord hereby leases, rents, and demises to Tenant and Tenant hereby takes and leases from Landlord the Property as described in the Key Provisions Summary. Tenant agrees to take possession of the Property in its as-is, broom clean condition.

3. **Lease Term; Options to Extend.**

3.1 **Lease Commencement Date; Rent Commencement Date.** This Lease shall be for the Lease Term set forth in the Key Provisions Summary and shall commence on the Lease Commencement Date specified in the Key Provisions Summary and shall end at midnight on the Expiration Date set forth in the Key Provisions Summary (unless the Lease Term is extended as provided in Section 3.2, in which case the Expiration Date shall be the last date of the then current Renewal Term). Tenant's obligations for payment of Minimum Rent under this Lease shall commence as of the Rent Commencement Date set forth in the Key Provisions Summary. If the term of this Lease is extended pursuant to Section 3.2, the term "Lease Term" shall include each and every exercised Renewal Term. Landlord shall execute a "Commencement Date Agreement" in a form substantially similar to Exhibit B attached hereto within fifteen (15) business days after receipt of written request therefor from Tenant.

3.2 **Option(s) to Extend.** Tenant may renew this Lease for the number of Renewal Term(s) set forth in the Key Provisions Summary if Tenant gives written notice of renewal to Landlord at least ninety (90) days prior to the end of the then current Lease Term. Each Renewal Term shall be subject to the same terms and conditions as the Initial Term (except for Minimum Rent which shall be at the applicable amount set forth in the Key Provisions Summary). Notwithstanding anything to the contrary contained herein, if Tenant shall fail to exercise any of it extension options as required above, Tenant's right to exercise its option shall nevertheless continue until fifteen (15) days after Landlord shall have given Tenant notice (the "Extension Notice") of Landlord's election to terminate such option, and Tenant may exercise such option or the right to terminate the Lease Term at any time until the expiration of said fifteen (15) day period. The terms and conditions of this Lease shall remain in effect unchanged during any such renewal terms, except that upon the termination of the last renewal term(s), there shall be no additional option to renew.

**EXHIBIT 1**

4.     Contingency Period.

Beginning on the Lease Date, Tenant have the right to: (i) conduct inspections and investigations of the Property reasonably required by Tenant, in Tenant's sole discretion, in order to determine the suitability of the Property for Tenant's purposes; and (ii) secure the lease execution (or such other forms of transfer as Tenant deems advisable) in order to secure leasehold (or ownership, if applicable) rights in certain parcels of land located near or adjacent to the Property (together, the "Tenant Contingency"). If Tenant fails to satisfy the Tenant Contingency for any reason Tenant shall have the right, at any time exercisable by delivering written notice to Landlord, to terminate this Lease, whereupon neither party shall have any further obligations hereunder except for any obligations that expressly survive termination of this Lease, and Landlord shall not be required to return to Tenant any Minimum Rent payments made by Tenant to Landlord in connection herewith. Tenant shall promptly notify Landlord when the Tenant Contingency is satisfied.

5.     Landlord's Covenants; Title Commitment.

5.1 Landlord's Covenants. Landlord hereby represents and warrants to Tenant that as of the Lease Date and the Lease Commencement Date, and except as otherwise disclosed to Tenant: (i) Landlord has good, indefeasible, and marketable fee simple title to the Property, full right and authority to make and execute this Lease and that, to the best of Landlord's knowledge, the Property are free and clear of said from all liens, restrictions, leases, encumbrances, laws, ordinances, governmental rules, regulations, title restrictions, zoning, or other matters (whether recorded or unrecorded) which would adversely restrict or prevent Tenant's ability to use the Property as intended by this Lease, except for any Permitted Exceptions (as defined below), and title to the Property shall be insurable under an ALTA Leasehold Owner's Policy, subject only to the Permitted Exceptions by any reputable title insurance company at regular rates, and without any so-called "creditor's rights" exception or exclusion; (ii) Landlord possesses full power and authority to deal with the Property in all respects and no other party has any right or option thereto or in connection therewith; (iii) the Property is zoned so as to permit Tenant to operate the improvements, if any (as defined below) thereon, and to Landlord's actual knowledge there are no easements, covenants, conditions, restrictions, rights-of-way, governmental rules, statutes, ordinances, moratoria, policies or plans which would prohibit or interfere with the construction or operation of the improvements, if any, upon the Property; (iv) there are no pending or, to Landlord's knowledge, threatened condemnation proceedings or other governmental, municipal, administrative or judicial proceedings affecting the Property; (v) there are no pending or, to Landlord's knowledge, threatened actions or legal proceedings affecting the Property; (vi) there are no unpaid special assessments for sewer, sidewalk, water, paving, gas, electrical or other improvements or other capital expenditures or improvements, matured or unmatured, affecting the Property; (vii) this Lease and the consummation of the transaction contemplated in this Lease are the valid and binding obligations of Landlord and do not constitute a default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, nor are they inconsistent with, any contract to which Landlord is party or by which it is bound, including, but not limited to, the Permitted Exceptions; (viii) there are no outstanding notices of, nor, to Landlord's knowledge, are there, any violations of any law, regulation, ordinance, order or other requirements of any Governmental Authority having jurisdiction over or affecting any part of the Property; (ix) Landlord is not obligated upon any contract, lease, or agreement, whether written or oral, with respect to the ownership, use, operation, or maintenance of the Property other than the Permitted Exceptions; and (x) Landlord shall notify Tenant immediately if at any time prior to the Lease Commencement Date Landlord receives notice that any of the foregoing representations and warranties in this Section 5.1 become untrue or incorrect.

5.2 Title Commitment.

(a) Tenant may, at Tenant's sole expense, cause the Title Company to deliver a commitment for a leasehold title policy for the Property and complete, legible copies of all documents referred to in a title commitment (collectively, the "Title Commitment"). Tenant shall notify Landlord of any objections to the requirements or exceptions to title as shown on the Title Commitment within thirty (30) days after Tenant's receipt of the Title Commitment. Landlord shall have thirty (30) days after receipt of such

**EXHIBIT 1**

notice to remove the objectionable requirements or exceptions from the Title Commitment, but shall have no obligation to do so or to incur any expense in connection therewith. If Landlord is unable or unwilling to remove such objectionable requirements or exceptions within such 30-day period, Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof within thirty (30) days after expiration of such 30-day period, in which event the parties shall have no further rights or liabilities under this Lease (except for any that expressly survive termination of this Lease).

(b)      If the Title Commitment is updated on or prior to the date that Tenant has caused the Title Policy to be issued, then Tenant shall have an additional period of fifteen (15) days from the date Tenant receives the updated Title Commitment and updated Survey, and any additional title documents related thereto, to object to any additional exceptions or requirements. Landlord shall have thirty (30) days after receipt of notice thereof from Tenant in which to remove any additional objectionable requirements or exceptions, but shall have no obligation to do so or to incur any expense in connection therewith. If Landlord is unable or unwilling to remove such objectionable requirements or exceptions within such 30-day period, Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof within thirty (30) days after expiration of such 30-day period, in which event the parties shall have no further rights or liabilities under this Lease (except for any that expressly survive termination of this Lease).

(c)      Landlord shall promptly execute and deliver such affidavits and documents as are customarily and reasonably required by the Title Company from a lessor in order to issue the initial Title Policy and any subsequent endorsements or subsequent Title Policy issued to reflect progress and/or completion of construction of the improvements, if any.

6.      **Minimum Rent.**

Beginning as of the Rent Commencement Date set forth in the Key Provisions Summary, and during the Lease Term, Tenant shall pay to Landlord the Minimum Rent set forth in the Key Provisions Summary. Minimum Monthly Rent shall be payable in advance not later than the first day of each calendar month of the Lease Term; provided, however, that if the Rent Commencement Date as set forth in the Key Provisions Summary falls on a day other than the first day of a calendar month, the Minimum Monthly Rent for such month shall be a pro-rated portion of the Minimum Monthly Rent based upon the number of days in the applicable month. All rent payments shall be mailed or delivered to Landlord's office at the address set forth in the Key Provisions Summary (or to such other address that Landlord may give thirty (30) days' prior written notice thereof to Tenant). The amount of Minimum Rent payable under this Lease shall be adjusted as of the first day of the sixth (6th) year of the Lease Term, and on the first day of each sixth (6th) year thereafter during the Lease Term (and any Renewal Term) by an amount equal to ten percent (10%) over the immediately preceding five (5) year period.

7.      **Taxes & Licenses.**

7.1      **Payment by Landlord: Reimbursement by Tenant.** Landlord shall pay and discharge, prior to delinquency, all real estate taxes and assessments, general and special, water taxes and all other impositions, ordinary and extraordinary of every kind and nature, which during the Lease Term may be levied or assessed against the Property, the improvements, if any, or Tenant's fixtures during the Lease Term ("Taxes"). Beginning on the Lease Commencement Date, Tenant shall reimburse Landlord for any such Taxes paid by Landlord (but not more frequently than twice per calendar year). Any sums payable to Landlord under this Section shall be paid by Tenant within thirty (30) days after receipt from Landlord of demand therefor, accompanied by copies of receipted Tax bills. Tenant shall not be required to pay, and Taxes shall not be deemed to include the following: (i) any "roll-back" or similar taxes which are imposed upon the Property due to Tenant's proposed use of the Property; (ii) any inheritance, estate, succession, transfer, gross receipts, franchise, corporation, net income or profit tax or capital levy imposed upon Landlord; (iii) except as

**EXHIBIT 1**

otherwise agreed to by Tenant, any special assessments which are levied or assessed by a special assessment district; or (iv) that portion of Taxes which is an increase in Taxes due to a sale, lease, or other transfer of the Property, or any portion thereof, including the Property, or due to the placement of any mortgage or other encumbrance on the Property, or any portion thereof, including the Property.

7.2  Personal Property Taxes.  Beginning on the Lease Commencement Date, Tenant shall pay, or cause to be paid, before delinquency, any and all taxes which are levied or assessed and/or which become payable during the Lease Term upon all or any part of Tenant's leasehold improvements, equipment, furniture, fixtures, and other personal property located in the Property. If statements for real property taxes are sent to Landlord rather than to Tenant, and if any or all of Tenant's leasehold improvements, equipment, furniture, fixtures, and other personal property shall be assessed and taxed with the real property, Tenant shall pay to Landlord its share of such taxes within thirty (30) days after delivery to Tenant by Landlord of (i) a statement in writing setting forth in reasonable detail the amount of such taxes applicable to Tenant's property; and (ii) a copy of the tax bill.

7.3  Licenses.  Beginning on the Lease Commencement Date, Tenant shall be liable for, and shall pay throughout the Lease Term, all license and excise fees and occupation taxes covering the business conducted on the Property. If any Governmental Authority or unit under any present or future law effective at any time during the Lease Term shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Property or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of the Property in lieu of ad valorem real estate taxes, such tax shall be paid by Tenant, either directly or through Landlord. It is understood and agreed, however, that Tenant shall not be liable to pay any municipal, county, state, or federal income, business, and occupation or franchise taxes of Landlord, or any municipal, county, state, or federal estate, succession, inheritance, or transfer taxes of Landlord.

### 8.  Permitted Use.

8.1  Tenant may use the Property only for the business or purpose as set forth in the Key Provisions Summary. Notwithstanding the foregoing, nothing contained in this Lease shall be deemed to impose upon Tenant, either directly, indirectly, constructively or implicitly, an obligation to open for business or remain open and operating for any period or in accordance with any operating schedule, procedure or method. Landlord acknowledges and agrees that the Property will be incorporated into Tenant's mixed-use redevelopment project (the "Redevelopment"). Accordingly, Landlord agrees that it will consent to certain easements, licenses, privileges and encroachments by Tenant and any tenant, subtenant, assignee, licensee, concessionaire or affiliate of Tenant to allow for another business or purpose on the Property in furtherance of the Redevelopment, so long as the primary business or purpose on the Property is the same as set forth in the Key Provisions Summary, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, except as expressly set forth in Section 15.1 of this Lease, Tenant shall not be permitted to construct or place on the Property any building, structure or improvement, including, but not limited to, a parking deck or raised parking facility.

### 9.  Compliance with Laws.

9.1  The term "Governmental Regulations" means all federal, state, county, or municipal laws, ordinances, rules, regulations, directives, orders, and/or requirements now in force or which may hereafter be in force. Beginning on the Lease Commencement Date, Tenant shall, at its sole cost and expense, comply promptly with Governmental Regulations applicable to Tenant's use of the Property. Tenant shall not be responsible for, and (except as otherwise set forth herein) Landlord shall retain full responsibility for, any violation of Governmental Regulations occurring prior to the Lease Commencement Date and for any and all violations of Governmental Regulations caused at any time by Landlord or by Landlord's affiliates, officers, employees, agents, contractors, or licensees

**EXHIBIT 1**

10.    Right of First Refusal.

Beginning on the Rent Commencement Date, Landlord hereby grants to Tenant the right to purchase all or any portion of the Property on the following terms and conditions (the "Right of First Refusal"):

10.1    If Landlord should at any time during the Term receive a bona fide offer to purchase all or any portion of the Property (the "Refusal Offer") from a third party and Landlord desires to accept such offer, Landlord shall deliver to Tenant a notice (the "Acquisition Notice") setting forth the name of the prospective purchaser and the terms and conditions of such Refusal Offer.

10.2    Tenant shall have five (5) days from receipt of the Acquisition Notice to exercise its Right of First Refusal by delivering notice thereof to Landlord. Delivery of such notice shall obligate Tenant to purchase the Property (or the applicable portion thereof) on the date which is thirty (30) days after receipt of the Acquisition Notice (or any earlier date requested by Tenant) and on the terms and conditions set forth in the Acquisition Notice. In the event Tenant shall not elect to exercise its Right of First Refusal or fails to timely deliver notice within the five (5) day period, Tenant shall conclusively be deemed to have waived its Right of First Refusal as to the transaction described in the Acquisition Notice in question and Landlord may thereupon proceed to sell the Property (or portion thereof) on the terms and conditions and to the party specified in the Acquisition Notice in question, and in the event the Property (or portion thereof) is sold as set forth in the Acquisition Notice in question, the Right of First Refusal shall be applicable to any future sales, and this Lease shall remain in full force and effect.

10.3    Tenant shall have no right to exercise the Right of First Refusal at any time when a Tenant Default exists hereunder, and no such Right of First Refusal shall be deemed exercised unless all of the provisions of Section 10.2 hereof shall have been satisfied. The period during which Tenant may exercise the Right of First Refusal shall not be extended by reason of Tenant's inability to exercise such Right of First Refusal as a result of the existence of a Tenant's Default hereunder.

11.    Maintenance & Liens.

11.1    Maintenance by Tenant. Except as otherwise provided in this Lease with respect to Landlord's obligations, Tenant shall, at all times during the Lease Term, and at its sole cost and expense, (i) keep and maintain the Property and the improvements, if any, in good order and repair and in a clean and safe condition, and (ii) make any additions or alterations to the Property or improvements, if any, that may be required by applicable Governmental Regulations. Beginning on the Lease Commencement Date, Landlord shall have no obligation to maintain any portion of the Property and all costs associated therewith shall be paid by Tenant.

11.2    Tenant Liens. Tenant will not permit the Property to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished to Tenant or claimed to have been furnished to Tenant in connection with work of any character performed or claimed to have been performed on the Property by or at the direction or sufferance of Tenant. If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Property, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

**EXHIBIT 1**

12.    Intentionally Omitted.

13.    Utilities.

To the extent not existing as of the Lease Commencement Date, Tenant shall, at its sole cost and expense, cause to be installed and maintained within the Property all facilities necessary to supply to the Property all water, storm sewer, sanitary sewer, gas, electricity, telephone and other utility facilities and drainage facilities required in furtherance of Tenant's use of the Property. Beginning as of the Lease Commencement Date, and during the Lease Term, Tenant shall be solely responsible for and shall promptly pay all charges and expenses for all utilities used or consumed on the Property and the improvements, if any. It is understood that the use by Tenant of the Property may require that the parties enter into contracts or agreements with local, county, state or other governmental agencies or bodies or with public utilities with reference to storm sewer, sanitary sewer, gas, water, electric, telephone or other utility lines or connections, stormwater management or easement agreements. Landlord agrees to execute such written contracts, agreements, easement agreements, and consents as are reasonably required for Tenant's use of the Property and Tenant agrees to indemnify and hold Landlord harmless in connection with such agreements during the Lease Term, except as a result of Landlord's negligence. Notwithstanding anything in this Section 14 to the contrary, Tenant shall be entitled, at no cost, to the use of any and all utility capacity allocable to the Property and heretofore reserved by or assigned to Landlord. Landlord agrees to execute all such written contracts, agreements, license agreements, and consents as are reasonably required for Tenant's use of such capacity. In addition, in the event any utility interruption that is caused by the negligence or willful misconduct of Landlord or Landlord's employees, contractors, subcontractors or agents, lasts for more than three (3) consecutive Business Days, and provided Tenant shall have given written notice of such interruption to Landlord, then to the extent that Tenant cannot and does not use the Property for the purposes allowed in this Lease due to such interruption, Rent shall abate during the period following the third business day of such interruption until such utility service is restored.

14.    Intentionally Omitted.

15.    Construction of Improvements.

15.1 Tenant Site Plan. As of the Lease Date, the Property consists of a surface parking lot. Tenant shall not construct any improvements on the Property without the prior written approval of Landlord, which approval may be withheld in Landlord's sole discretion; provided, however, Tenant shall have the right to construct improvements incidental to the operation of a surface parking lot on the Property (including, but not limited to, meters, signage, curbing, entrances and exits, booths, gates, security equipment, and lighting) without Landlord's approval.

15.2 Tenant Permits. Tenant shall be responsible for (or shall cause an applicable subtenant to obtain) all required building and other permits and approvals, whether governmental or otherwise (including any tap-in fees required for the Property), required for the operation of any commercial business on the Property. All permits shall be on terms and conditions and at a cost satisfactory to Tenant in its sole discretion. If, in Tenant's reasonable judgment, it is necessary for Landlord to join in any application for a building or other permit or approval, Landlord agrees to do so, but at no expense to Landlord and without assuming any liability with respect thereto.

16.    Ownership of Improvements.

16.1 Tenant shall own the improvements on the Property, if any, until the expiration or earlier termination of this Lease, and Tenant alone shall be entitled to deduct all depreciation on Tenant's income tax return for the improvements, if any. At the expiration of the Lease Term, the improvements, if

**EXHIBIT 1**

any, then located on the Property, without the payment of compensation or consideration of any kind to Tenant, shall become Landlord's sole property, free and clear of any and all claims of Tenant. At the expiration of the Lease Term, Tenant, if requested by Landlord, shall execute any and all documents necessary to evidence that title to the improvements, if any, is in Landlord and to extinguish and remove any cloud or potential cloud on the title to the Property and/or the improvements, if any, created by Tenant.

17.     Intentionally Omitted.

18.     Alterations.

Tenant, at its own expense, shall have the right to make any alterations to Property in its sole discretion, and at its sole cost and expense.

19.     Assignment and Subletting.

19.1  **Landlord's Consent.** Except as otherwise provided in this Section 19, Tenant shall not assign this Lease or sublet the whole or any part of the Property (collectively, "**Transfer**") without the prior written consent of Landlord, which shall not be unreasonably withheld or conditioned. If Tenant elects to initiate a Transfer of this Lease, Tenant shall provide Landlord with a written notice setting forth the reasonable details of such Transfer. If Landlord's consent is required for a Transfer, Landlord shall notify Tenant whether the proposed Transfer is approved or rejected not later than fifteen (15) Business Days ("**Transfer Deadline**") after receipt of written notice thereof from Tenant. If Landlord does not consent to a proposed Transfer, Landlord shall provide Tenant with a reasonably detailed written explanation as to the reasons for withholding such consent. Any Landlord response not received by the Transfer Deadline shall be deemed an approval by Landlord of such proposed Transfer.

19.2  **No Assignment.** The following events shall not be considered a Transfer under this Section 19: (i) a change in ownership of Tenant as a result of a merger, consolidation, reorganization, or joint venture; (ii) the sale of all of Tenant's assets; (iii) the sale, exchange, issuance, or other transfer of Tenant's stock on a national exchange or between Tenant's parent company, if any, and any subsidiary, affiliate, related entity, or other entity that controls, is controlled by, or is under common control with Tenant; (iv) the Transfer of this Lease to Tenant's parent entity, if any, and any subsidiary, affiliate, related entity, an entity that controls, is controlled by, or is under common control with Tenant, or an entity that purchases all or substantially all of Tenant's assets; and (v) a collateral assignment of Tenant's interest in this Lease to a lender as security for any indebtedness of Tenant to the lender.

19.3  Leasehold Mortgage.

(a)  Tenant shall at all times and from time to time have the right to encumber by mortgage, deed of trust, or security agreement (the "**Tenant Mortgage**") Tenant's leasehold estate in the Property, together with Tenant's rights and interests in all buildings, fixtures, equipment, and improvements situated thereon, and all rents, issues, profits, revenues, and other income to be derived by Tenant therefrom, to secure such loans from time to time made by any person, firm or corporation ("**Tenant Mortgagee**") to Tenant; provided, however, that such Tenant Mortgage shall in no event encumber Landlord's fee title and interest in the Property.

(b)  Landlord shall deliver notice of any default by Tenant under this Lease to Tenant Mortgagee provided Tenant Mortgagee shall have notified Landlord in writing of the existence of the Mortgage under this Lease and the address to which notices should be delivered, and no notice of default shall be deemed effective against a Tenant Mortgagee who has notified Landlord of the existence of its encumbrance until it is so delivered. Tenant Mortgagee shall have the right to correct or cure any such default

**EXHIBIT 1**

within the same period of time after receipt of such notice as is given to Tenant herein to correct or cure defaults. Landlord will accept Tenant Mortgagee's performance of any covenant, condition, or agreement on Tenant's part to be performed under this Lease with the same force and effect as though performed by Tenant if, at the time of such performance, Tenant Mortgagee delivers to Landlord evidence of its interest in this Lease. Notwithstanding any provisions of this Lease under which Landlord may declare a default and terminate or cancel this Lease or any of Tenant's rights or interests under this Lease, no notice of default given by Landlord to Tenant or other action by Landlord to declare a default (other than notice of a default that can be corrected or cured by the payment of money or of a default that is within Tenant Mortgagee's power to correct or cure within the time permitted under this Lease) shall be effective to terminate this Lease if and so long as Tenant Mortgagee shall promptly commence the enforcement of and diligently pursue all rights and remedies legally available to it to correct or cure all defaults that are within Tenant Mortgagee's power to correct or cure and, with respect to defaults that are not within Tenant Mortgagee's power to correct or cure, if Tenant Mortgagee shall promptly commence the enforcement of and diligently pursue all rights and remedies legally available to it to acquire the leasehold estate under this Lease, and upon acquisition thereof, performs all of the covenants and provisions on Tenant's part to be performed during the Lease Term.

(c) Tenant Mortgagee or any purchaser in foreclosure proceedings, including any business entity formed by Tenant Mortgagee or the holder of the note or other obligations secured by the Tenant Mortgage, may become the legal owner and holder of this Lease and the improvements, if any, equipment, fixtures and other property assigned as additional security for such Tenant Mortgage, by foreclosure of the Tenant Mortgage or as a result of assignment or conveyance in lieu of foreclosure.

(d) Tenant shall, promptly upon receipt of any notice of default under or acceleration of the maturity of the Tenant Mortgage, deliver a copy thereof to Landlord.

20. **Indemnification.**

20.1 **Mutual Indemnification.** Subject to the waiver of subrogation provisions in Section 21, Tenant agrees to indemnify and hold Landlord harmless from any and all losses, damages, liability, or expenses (including reasonable attorneys' fees) actually incurred by Landlord, arising from loss of life, personal injury and/or property damage, caused by or resulting from, in whole or in part, any negligent act or omission or intentional misconduct of Tenant, its agents, employees, or contractors, in connection with Tenant's use or occupancy of the Property. Subject to the waiver of subrogation provisions in Section 21, Landlord agrees to indemnify and hold Tenant harmless from any and all losses, damages, liability, or expenses (including reasonably attorneys' fees) actually incurred by Tenant, arising from loss of life, personal injury and/or property damage, caused by or resulting from, in whole or in part, any negligent act or omission or intentional misconduct of Landlord, its agents, employees, or contractors, in connection with any use or activities on the Property by such parties.

20.2 **Concurrent Negligence.** Notwithstanding the provisions of Section 20.1, in the event of the concurrent negligence or intentional misconduct of Tenant, its agents, employees, or contractors on the one hand and that of Landlord, its agents, employees, or contractors on the other hand, a party's (the "**Indemnifying Party**") obligation to indemnify the other as set forth in this Section 20, shall be limited to the extent of the Indemnifying Party's negligence and/or intentional misconduct, and that of its agents, employees or contractors, including the Indemnifying Party's proportionate share of reasonable costs, attorneys' fees, and expenses incurred in connection with any claim, action, or proceeding brought with respect to such injury or damage.

20.3 **Survival.** The obligations of Tenant and Landlord under this Section 20 shall survive the expiration or earlier termination of this Lease.

**EXHIBIT 1**

21. **Insurance.**

21.1 **Property Insurance.** Beginning on the Lease Commencement Date, Tenant shall maintain, or cause to be maintained, Commercial Property insurance ("CP Insurance") that covers the Property, the improvements, if any, and Tenant's betterments in and about the Property in such form and at such limits as Tenant in its reasonable discretion determines is necessary or advisable.

21.2 **Waiver of Subrogation (Property).** Tenant and Landlord hereby waive and release each other of and from any and all rights of recovery, claims, actions, or causes of action against each other, by way of subrogation or otherwise, including their respective employees, officers, directors, subsidiaries, affiliates, agents, representatives, and assigns, for any loss or damage that may occur to the Property, Landlord's personal property, the improvements, if any (including any alterations or additions thereto), and Tenant's personal property by reason of fire or other casualty, regardless of cause or origin. Landlord and Tenant shall obtain a waiver of subrogation from their respective insurers and shall endorse their CP Insurance policy to reflect the waiver of subrogation. The above waiver of subrogation applies whether or not there are any deductibles or self-insurance and in the absence of any CP Insurance.

21.3 **Liability Insurance.** Beginning on the Lease Commencement Date, Tenant shall maintain Commercial General Liability insurance ("CGL Insurance") in such form and at such limits as Tenant in its reasonable discretion determines is necessary or advisable. Landlord shall be named as an additional insured.

21.4 **Waiver of Subrogation (Liability Insurance).** Tenant and Landlord hereby waive and release each other of and from any and all rights of recovery, claims, actions, or causes of action against each other, including their respective employees, officers, directors, subsidiaries, affiliates, agents, or representatives to the extent covered by Liability Insurance. Each Liability Insurance policy must be endorsed to reflect the insurer's acceptance of this waiver of subrogation. The waiver of subrogation applies whether or not there are any deductibles or self-insured retentions and in the absence of any Liability Insurance.

21.5 **Additional Insureds.** With respect to CGL Insurance and Umbrella Liability Insurance, Tenant shall name Landlord as an additional insured with respect to Tenant's negligence for any claims arising out of Tenant's operations in or upon the Property.

21.6 **Intentionally Deleted.**

21.7 **Certificates of Insurance.** On the Lease Commencement Date, Tenant shall furnish Certificates of Insurance to Landlord evidencing all of the above-described insurance policies prior to or upon execution of this Lease and not more than annually thereafter upon request.

22. **Default by Tenant.**

22.1 **Failure to Perform.** The occurrence of any one or more of the following events shall constitute a default of this Lease by Tenant (a "Tenant Default"): (a) the failure by Tenant to make any payment of Rent, or any other payment required to be made by Tenant under this Lease, as and when due, where such failure continues for more than thirty (30) days after Tenant's receipt of written notice of non-payment from Landlord; and (b) the failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than as described in subsection (a) above, where such failure continues for more than thirty (30) days after Tenant's receipt of written notice of default from Landlord (provided, that if the cure of such Tenant Default reasonably requires more than thirty (30) days to complete, then Tenant shall not be in default if Tenant shall commence the cure of such Tenant Default within thirty (30) days of receipt of notice and diligently pursues such cure to completion).

**EXHIBIT 1**

22.2 <u>Remedies in Default</u>. On the occurrence of a Tenant Default and after the applicable notice and cure period, and subject to terms and conditions provided in this Lease, Landlord may, as Landlord's sole and exclusive remedies: (a) perform, on Tenant's behalf, any unperformed covenant or obligation under this Lease constituting such Tenant Default (after giving Tenant written notice of Landlord's intention to do so except in the case of emergency), in which event Tenant shall reimburse Landlord for all expenses reasonably incurred by Landlord in doing so, plus interest at the Default Rate, which expenses and interest shall be Additional Rent and shall be payable by Tenant within thirty (30) days after written demand therefor by Landlord, and/or (b) terminate this Lease and collect liquidated damages from Tenant in an amount equal to (i) the sum of all amounts due under this Lease to the date of termination, plus (ii) the aggregate Minimum Rent remaining over the unexpired portion of the Lease Term, plus the reasonable cost to Landlord for any repairs and other costs of re-letting (such as broker's commissions and the cost of advertising), all reduced to present value using a discount rate equal to the interest rate of a governmental security having a maturity closest to the then current expiration of the Lease Term, less (iii) the aggregate fair net rental value of the Property over the remaining portion of the Lease Term reduced to present value, plus (iv) Landlord's costs and expenses incurred in the enforcement of this Lease including reasonable attorneys' fees actually incurred.

22.3 <u>Lien Waiver</u>. LANDLORD HEREBY WAIVES AND DISCLAIMS ALL STATUTORY AND CONTRACTUAL LIEN RIGHTS IN TENANT'S FURNITURE, FIXTURES, TRADE FIXTURES, EQUIPMENT, MERCHANDISE, AND OTHER PROPERTY NOW OR HEREAFTER PLACED AT THE PROPERTY.

23. <u>Default by Landlord</u>.

23.1 <u>Failure to Perform</u>. Landlord's failure to perform or observe any of its obligations under this Lease after a period of thirty (30) days or the additional time, if any, that is reasonably necessary to promptly and diligently cure the failure after receiving notice from Tenant, is a "Landlord Default". The notice from Tenant shall give in reasonable detail the nature and extent of the failure and identify the Lease provisions containing the obligations. If Landlord commits a Landlord Default specifically with respect to the Property, Tenant, in addition to any remedies available under the law, may, without being obligated and without waiving the Landlord Default, cure the Landlord Default. Landlord shall pay Tenant, upon demand, all costs, expenses, and disbursements incurred by Tenant to cure the Landlord Default. If such payment is not rendered within thirty (30) days of demand, Tenant may deduct all such costs and expenses from the Minimum Rent next coming due. If the Landlord Default renders all or a portion of the Property untenantable for the Permitted Use for more than ninety (90) consecutive days or materially and adversely affects access to the Property, then Tenant may terminate this Lease upon written notice to Landlord after the expiration of any applicable cure period (in which event the parties shall have no further rights or liabilities under this Lease (except for any that expressly survive termination of this Lease)), or abate any and all rent payments owed to Landlord until the date that such Landlord Default is cured by Landlord, at which time Tenant shall resume making rental payments owed for the period after the date of cure. The provisions of this Section 23 shall survive the expiration or sooner termination of this Lease.

23.2 <u>Remedies</u>. It is understood and agreed that Tenant's exercise of any right or remedy due to a Landlord Default shall not be deemed a waiver of or to alter, affect, or prejudice any right or remedy which Tenant may have under this Lease or by law or in equity. Neither the payment of Minimum Rent or Additional Rent nor any other acts or omissions of Tenant at any time or times after the happening of any event authorizing the cancellation or termination of this Lease, or other remedy, shall operate as a waiver of any past or future violation, breach, or failure to keep or perform any covenant, agreement, term, or condition of this Lease or to deprive Tenant of its right to cancel or terminate this Lease, or pursue other available remedies, upon the written notice provided for in this Section at any time that cause for cancellation or

**EXHIBIT 1**

termination may exist, or be construed so as at any time to stop Tenant from promptly exercising any other option, right, or remedy that it may have under any term or provision of this Lease, at law, or in equity.

24.     Damage by Fire or Other Casualty.

    24.1 Tenant to Repair Improvements. Subject to Section 24.2, if during the Lease Term the improvements, if any, shall be damaged or destroyed by fire or other casualty, Tenant shall determine in its sole discretion whether it chooses to repair or restore the improvements, if any.

    24.2 Damage at the End of Lease. If, during the last five (5) years of the Initial Term or during any Renewal Term, the improvements, if any, shall be damaged by fire or other casualty, then Tenant shall have the option, to be exercised within sixty (60) days after such event, to either (i) repair or restore the improvements, if any, as provided above, or (ii) terminate this Lease by notice to Landlord, which termination shall be deemed to be effective as of the date of the casualty (in which event the parties shall have no further rights or liabilities under this Lease (except for any that expressly survive termination of this Lease)). If Tenant terminates this Lease pursuant to this Section 24.2, Tenant shall surrender possession of the Property to Landlord in its then current condition.

25.     Condemnation/Eminent Domain.

    25.1     Property and Improvements. If all or any portion of the Property, or the improvements, if any, shall be acquired for any public or quasi-public use through taking by condemnation, eminent domain or any like proceeding, or purchase in lieu thereof (a "Taking"), such that Tenant reasonably determines that the Property cannot, at reasonable cost, continue to be operated for its then current use, with sufficient parking for such use, then Tenant may terminate all or a portion of the Lease with prior notice to Landlord given within thirty (30) days prior to the actual physical taking and the Lease Term shall cease and terminate as to the portion so taken as of the date the condemning authority takes title or possession, whichever first occurs, and all rentals shall be paid up to that date.

    25.2     Continuation of Lease. If there is a Taking and this Lease is not terminated as provided in Section 25.1 above, then this Lease shall remain in full force and effect, but with an equitable reduction or abatement of Minimum Rent and Additional Rent.

    25.3 Apportionment of Award. If there occurs a Taking, whether whole or partial, Landlord and Tenant shall be entitled to receive and retain such separate awards and portions of lump sum awards as may be allocated to their respective interests in any condemnation proceedings, or as may be otherwise agreed, taking into consideration the fact that Landlord's interest in the Property is limited to the Property, as encumbered by this Lease, a reversionary interest in the Improvements, if any (exclusive of any of Tenant's or its subtenants' personal property) upon the expiration of the Lease Term, and the right to receive rent under this Lease. If the Property shall be restored as provided in this Section, Tenant shall first be entitled to recover the costs and expenses incurred in such restoration out of any such award. Thereafter, if the condemning authority does not make separate awards and the parties are unable to agree as to amounts that are to be allocated to the respective interests of Landlord and Tenant, then each party shall select an independent M.A.I. real estate appraiser (an "Appraiser"). Each Appraiser shall separately determine the amount of the condemnation award that is to be allocated to the interests of Landlord and Tenant. If the percentages of the total award each Appraiser allocates to Landlord and Tenant (a) are within ten percent (10%) of each other, the two (2) allocations shall be averaged and such average shall be the final allocation of the award, or (b) are not within ten percent (10%) of each other, the two Appraisers shall then select a third Appraiser who shall independently allocate the award between Landlord and Tenant, and the middle of such three (3) allocations shall be the final allocation of the award. Each party shall bear the cost of its Appraiser as well as one-half the cost of the third Appraiser.

EXHIBIT 1

25.4  Early Transfer of Possession by Tenant. Tenant may continue to occupy the Property and the improvements, if any, until the condemning authority takes physical possession. However, at any time following notice of intended Taking, or within the time limit specified for delivering possession, Tenant may, by written notice to Landlord, elect to deliver possession of the Property to Landlord before the actual Taking. Tenant's right to apportionment of or compensation from the award shall then accrue as of the date that Tenant so delivers possession.

26.  Intentionally Omitted.

27.  Environmental/Hazardous Substances.

27.1  Definitions.

(a)  Discharge. "Discharge" means the releasing, spilling, leaking, leaching, disposing, pumping, pouring, emitting, emptying, dumping, presence, use, handling, treatment, manufacture, transportation, generation, storage or sale of a Hazardous Substance.

(b)  Environmental Law or Laws. "Environmental Law" means each and every applicable federal, state, regional, county, or municipal environmental or health and safety statute, ordinance, rule, regulation, order, code, directive, or requirement relating to the environment, Hazardous Substances, or health and safety, including without limitation the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §9601 et seq., the Federal Water Pollution and Control Act, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., and the Tank Laws (as defined below), now or hereafter existing, together with all successor statutes, ordinances, rules, regulations, orders, directives, or requirements now or hereafter existing.

(c)  Governmental Authority. "Governmental Authority" means the federal, state, regional, county, or municipal government, or any department, agency, bureau, or other similar type body obtaining authority therefrom or created pursuant to any applicable statute, ordinance, rule, regulation, order, code, directive, or requirement thereof, now or hereafter existing.

(d)  Hazardous Substances. "Hazardous Substance" means any substance, material, waste, toxic substance, hazardous substance, hazardous waste, solid waste, pollutant, irritant, or contaminant, including without limitation petroleum, petroleum byproducts or derivatives, asbestos, polychlorinated biphenyls, mold or other bacterial matter, all as defined, listed, or referred to in any Environmental Law. The term Hazardous Substance shall not include a Hazardous Substance used in Tenant's customary business operations in quantities allowable under applicable Environmental Law.

(e)  Remediate or Remediation. "Remediate" or "Remediation" means all necessary actions to investigate and clean up or respond to any known, suspected, or threatened Discharge, including without limitation: environmental investigation, monitoring, and sampling; installation, maintenance, and removal of monitoring wells; removal, treatment, neutralization, or containment of any Hazardous Substance; storage of excavated materials; and installation, maintenance, storage, and removal of machinery and equipment used in connection with a Remediation.

(f)  Tank Laws. "Tank Laws" means all federal, state, regional, county, or municipal statutes, ordinances, rules, or regulations relating to underground storage tanks, including, without limitation, the Federal Underground Storage Law, Subtitle I of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6991 et seq., together with any amendments thereto, regulations promulgated thereunder, all substitutions thereof, and any successor legislation and regulations.

{01502443 -7}                                                                                           Page 13

**EXHIBIT 1**

(g) Underground Storage Tanks. "Underground Storage Tanks" shall have the meaning ascribed to such term under the Tank Laws, and shall also include unregulated underground storage tanks used to store Hazardous Substances.

### 27.2 Environmental Compliance.

(a) Studies. If Tenant undertakes any environmental investigation of the Property, then a copy of the investigation report shall be provided to Landlord upon request, and Landlord and Tenant stipulate that documentation of the existence of an environmental condition or violation in such report shall be evidence of the environmental condition of the Property. In no event, however, shall the absence of information about any environmental condition or violation in such an environmental investigation or report be construed as evidence that any later-detected environmental condition or violation first arose after the Lease Commencement Date.

(b) Landlord's Representation. As of the date of this Lease, Landlord represents and warrants to Tenant that to the best of its knowledge the Property is in full compliance with all Environmental Laws.

(c) Tenant's Compliance. Tenant, its agents, employees, and contractors shall not, without Landlord's prior written consent, keep any Hazardous Substances on or about the Property in violation of Environmental Laws. In addition, Tenant shall, at its expense, comply with applicable Environmental Laws with respect to the Property; provided, however, that Tenant shall only be responsible for Remediating a Discharge at the Property in the most cost effective manner possible under the circumstances and only to the extent that the Discharge was caused by Tenant, its agents, employees, or contractors.

(d) Landlord's Compliance. Landlord shall, at its expense: (i) comply with applicable Environmental Laws with respect to the Property and, to the extent now or hereafter owned by or under the control of Landlord; and (ii) without unreasonably interfering with the ongoing business operations of Tenant or any subtenant(s), Remediate any Discharge at the Property and, to the extent now or hereafter owned by or under control of Landlord, except to the extent any such Discharge was caused by Tenant, its agents, employees, or contractors. Landlord shall not have the right to charge Tenant for or to allocate to Tenant in any manner whatsoever any costs Landlord may incur in connection with Landlord's obligations under this Section 27.2(d). Nothing in this Lease shall be deemed to waive Landlord's statutory obligations concerning the Remediation of a Discharge.

(e) Information, Burden, Notice. At no expense to Tenant, Landlord shall promptly provide all information in Landlord's actual possession requested by Tenant or any applicable Governmental Authority with respect to Tenant's obligations under this Section 27, and shall promptly sign such affidavits, submissions, and other documents requested by Tenant or any applicable Governmental Authority. If there is a dispute between Landlord and Tenant with respect to liability for a Discharge at the Property, Tenant shall have the burden of proof with respect to proving that Tenant did not discharge the Hazardous Substances. To the extent either party has any notice thereof, such party shall notify the other party in advance of all meetings with any Governmental Authority with respect to a Discharge at the Property. Both Landlord and Tenant shall have the right to attend and participate in all such meetings.

27.3 Indemnification & Survival. Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all claims, liabilities, losses, damages, penalties and fines (civil and criminal) and costs, including, without limitation, reasonable attorney, engineering, and other professional or expert fees, which Landlord may actually incur, arising out of or resulting from: (i) a Discharge by Tenant, its agents, employees, or contractors, at the Property; or (ii) a breach by Tenant of Tenant's obligations under

**EXHIBIT 1**

this Section 27. Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all claims, liabilities, losses, damages, penalties and fines (civil and criminal) and costs, including without limitation, strict liabilities and reasonable attorney, engineering, and other professional or expert fees, which Tenant may actually incur, arising out of or resulting from: (i) a Discharge at the Property during the Term of the Lease other than a Discharge caused by Tenant, its agents, employees, or contractors; and (ii) a breach by Landlord of Landlord's obligations under this Section 27; and (iii) a breach by Landlord of its representations above in this section. This Section 27 shall survive the expiration or earlier termination of this Lease. Either party's failure to abide by the terms of this Section 27 shall be restrainable, or enforceable, as the case may be, by injunction.

28.    **Landlord Encumbrances.**

Landlord agrees that at no time during the Lease Term shall the Property or this Lease be subject to the lien of any mortgages, deeds of trust or other security interest(s) unless Landlord obtains Tenant's prior written consent, which consent may be withheld by Tenant in its reasonable discretion. In the event Tenant does so consent, Tenant shall be provided a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") from Landlord's mortgagee providing generally that the mortgagee, trustee, or any purchaser at the foreclosure of the mortgage or deed of trust will not disturb Tenant's possession of the Property and that Tenant will attorn to such mortgagee, trustee, or purchaser at foreclosure as Landlord under the terms and conditions of this Lease upon receiving written notice that such party has succeeded to the interest of Landlord under this Lease. In confirmation of such subordination, Tenant shall join with any such mortgagee or trustee and execute promptly (and, in any event, within thirty (30) Business Days after receipt of a written request therefor) an SNDA.

29.    **Estoppel Certificate.**

Landlord (and Tenant, in the event Tenant consents to an encumbrance as described in Section 28 above) agree that they will from time to time upon request from each other, within thirty (30) days after notice from the other, execute and deliver to such persons as the requesting party shall request, a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates which rent and other charges payable under this Lease have been paid, stating the commencement and termination dates of the current term of this Lease and stating whatever options to extend there may be in this Lease, stating that Landlord or Tenant, as applicable, is not in default under this Lease to the best of such party's knowledge (or if Landlord or Tenant, as applicable, have alleged a default, stating the nature of such alleged default), and further stating such other matters relating to this Lease as the requesting party shall reasonably require.

30.    **Access to Property**

Landlord, its agents, servants, or employees may enter the Property at reasonable times with reasonable advance notice to Tenant (or an authorized employee of Tenant at the Property), and at any time if an emergency, to do the following: inspect the Property and show the Property to prospective lenders or purchasers and, during the one hundred twenty (120) days immediately prior to the expiration of this Lease, to prospective tenants, but only if all such showings are accompanied by a representative of Tenant if so requested by Tenant; or post for sale or for lease signs; provided, however, that all such entries shall cause the least practical interference to Tenant's business and Tenant's use of the Property. If Landlord's entry materially and substantially interferes with the conduct of Tenant's business and/or causes damage to Tenant's property, then in such event the rent and any sums due and payable as Additional Rent, shall abate in proportion to the extent of the interference and Landlord shall be liable for any damage to Tenant's property.

**EXHIBIT 1**

31.     **Holding Over.**

If Tenant holds over without Landlord's written consent, Tenant shall pay Minimum Monthly Rent and Additional Rent equal to one hundred twenty percent (120%) of the then applicable Minimum Monthly Rent and Additional Rent. Possession by Tenant after the expiration of this Lease shall not be construed to extend the Lease Term. The remedy set forth in this Section shall be in addition to all other remedies that may be allowed under Ohio law for a holdover by Tenant.

32.     **Quiet Enjoyment.**

During the Lease Term, Landlord covenants and agrees, provided Tenant pays all Minimum Rent and Additional Rent and performs the terms and conditions of this Lease as and when required, to take all necessary steps to secure to Tenant and to maintain for the benefit of Tenant the quiet and peaceful possession and enjoyment of the Property and all rights appurtenant thereto, without disturbance, hindrance, or molestation by Landlord or any other person claiming title to the Property or any part thereof, and Landlord warrants and forever agrees to defend Tenant's interest under this Lease against the claims of any and all persons.

33.     **Brokerage Commissions.**

Landlord and Tenant warrant and represent that they have not dealt with any real estate broker or salesman in connection with this Lease except the Broker(s) set forth in the Key Provisions Summary, and Tenant shall be solely responsible for the payment of any fees or commissions due. Landlord and Tenant further represent they have dealt with no other person that would create any liability for the payment of a commission by the other party. The party who breaches this warranty shall defend, hold harmless, and indemnify the non-breaching party from any claims or liability arising from the breach.

34.     **Notice.**

34.1   **Written Notice; Delivery Methods.** Each party giving or making any notice, request, demand, consent, approval, or other communication (each, a "**Notice**" (but sometimes "**notice**")) pursuant to this Lease shall: (i) give the Notice in writing; (ii) cause the Notice to be signed by an authorized representative of the sending party; and (iii) use one of the following methods of delivery, each of which for purposes of this Lease is a writing: (a) personal delivery; (b) Registered or Certified Mail, in each case, return receipt requested and postage prepaid; (c) nationally recognized overnight courier, with all fees prepaid; or (d) facsimile with confirmation of receipt, electronic or verbal (but only if a party's fax number is included in its notice address in the Key Provisions Summary)

34.2   **Addresses.** Each party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "**Addressee**") at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 34.

34.3   **Effectiveness of a Notice.** Except as provided elsewhere in this Lease, a Notice is effective only if the party giving the Notice has complied with Sections 34.1 and 34.2 and if the Addressee has received the Notice (e.g., a notice sent to the Property is not a valid notice). A Notice is deemed to have been received as follows: (i) if a Notice is delivered in person, or sent by Registered or Certified Mail, or nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt; (ii) if a Notice is sent by facsimile, upon receipt by the party giving the Notice of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the Addressee's facsimile number; and (iii) if the Addressee rejects or otherwise refuses to accept

**EXHIBIT 1**

the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then upon the rejection, refusal, or inability to deliver the Notice. In addition, if a Notice is sent by facsimile, the party sending the Notice shall also send a confirmation copy of the Notice by one of the methods set forth in Section 34(i) above.

34.4 Delivery Time of Notice. Notwithstanding the foregoing, if any Notice is received after 5:00 p.m. on a Business Day where the Addressee is located, or on a day that is not a Business Day where the Addressee is located, then the Notice is deemed received at 9:00 a.m. on the next Business Day where the Addressee is located. Each party's attorney is authorized to give any Notice pursuant to this Lease on behalf of such attorney's client.

35. Force Majeure.

35.1 Definition. "*Force Majeure* Event" means any act or event, whether foreseen or unforeseen, that meets all three of the following tests: (a) the act or event prevents a party (the "Non-Performing Party"), in whole or in part, from (i) performing its obligations under this Lease, or (ii) satisfying any conditions to the obligations of the other party (the "Performing Party") under this Lease; (b) the act or event is beyond the reasonable control of and not the fault of the Non-Performing Party; and (c) the Non-Performing Party has been unable to avoid or overcome the act or event by the exercise of due diligence. In furtherance of the definition of *Force Majeure* Event and not in limitation of that definition, each of the following acts or events is an example of an act or event that could be a *Force Majeure* Event if the act or event meets each of the above requirements of this Section 35.1: accident, fire, act of God, act of a public enemy, injunction, riot, strike, lockout, insurrection, war, terrorist attack, court order, requisition or order of governmental body or authority, and inability to procure labor or materials from normally available sources. Notwithstanding the preceding definition of a *Force Majeure* Event, a *Force Majeure* Event excludes economic hardship, changes in market conditions, and insufficiency of funds.

35.2 Suspension of Performance. If a *Force Majeure* Event occurs, the Non-Performing Party is excused from (i) whatever performance is prevented by the *Force Majeure* Event to the extent prevented, and (ii) satisfying whatever conditions precedent to the Performing Party's obligations that cannot be satisfied, but only to the extent they cannot be satisfied due to the *Force Majeure* Event. Notwithstanding the preceding sentence, a *Force Majeure* Event does not excuse any obligation by either the Performing Party or the Non-Performing Party to make any payment required under this Lease.

35.3 Resumption of Performance. When a *Force Majeure* Event no longer prevents the Non-Performing Party from (i) resuming performance of its obligations under this Lease, or (ii) satisfying the conditions precedent to the Performing Party's obligations, it shall immediately give the Performing Party written notice to that effect and shall resume performance under this Lease no later than two working days after the notice is delivered.

35.4 Exclusive Remedy/Termination. The relief offered by this *Force Majeure* provision is the exclusive remedy available to the Non-Performing Party with respect to a *Force Majeure* Event. In addition, the liability of either party for an event that arose before the occurrence of the *Force Majeure* Event is not excused as a result of such occurrence. If the Suspension of Performance continues for more than sixty (60) consecutive days, the Performing Party is entitled to terminate this Lease by giving notice of termination to the Non-Performing Party pursuant to the notice provisions of this Lease (in which event the parties shall have no further rights or liabilities under this Lease (except for any that expressly survive termination of this Lease)).

**EXHIBIT 1**

36.    Additional Terms.

36.1  Default Rate of Interest. The "Default Rate" of interest shall be the lesser of ten percent (10%) per annum or the maximum rate per annum allowed by applicable law;

36.2  Successors or Assigns. The terms, conditions, covenants, and agreements of this Lease extend to and are binding upon Landlord, Tenant, and their respective heirs, administrators, executors, legal representatives, and permitted successors, subtenants, and assigns, if any, and upon any person or entity coming into ownership or possession of any interest in the Property by operation of law or otherwise.

36.3  Severability. If any term, covenant, or condition of this Lease or the application thereof to any person or circumstance is, to any extent, invalid, illegal, or unenforceable, the remainder of this Lease, or the application of such term, covenant, or condition to parties or circumstances other than those to which it is held invalid, illegal, or unenforceable, is not affected thereby and each term, covenant, and condition of this Lease remains valid and enforceable to the fullest extent permitted by law, but only if the essential terms and conditions of this Lease for each party remain valid, binding, and enforceable.

36.4  Memorandum of Lease. Neither Landlord nor Tenant shall permit, allow or cause this Lease, or any amendment to this Lease, to be recorded in any public registry or office of register of deeds; provided, however, at the request of either party, Landlord and Tenant agree to execute a recordable memorandum of this Lease setting forth the names and addresses of the parties, a reference to this Lease with its date of execution, specific legal descriptions of the Property, the actual Lease Commencement Date, the term of the Lease and any Renewal Term(s) provided for, and all other information that may be required by statute, which memorandum may be recorded by Tenant at Tenant's expense or by Landlord at Landlord's expense in the appropriate public records of the jurisdiction in which the Property are situated.

36.5  Waiver. The parties may waive any provision of this Lease only by a writing executed by the party or parties against whom the waiver is sought to be enforced. No failure or delay in exercising any right or remedy or in requiring the satisfaction of any condition under this Lease, and no act, omission or course of dealing between the parties, operates as a waiver or estoppel of any right, remedy, or condition. A waiver once given is not to be construed as a waiver on any future occasion or against any other person or entity.

36.6  Amendment. The parties may amend this Lease only by a written agreement of the parties that identifies itself as an amendment to this Lease.

36.7  Headings/Captions. The descriptive headings/captions of the sections and subsections of this Lease are for convenience only, do not constitute a part of this Lease, and do not affect this Lease's construction or interpretation. The words "herein", "hereof", and "hereto" when used in this Agreement refer to this Agreement in its entirety and not solely to any specific sentence, paragraph, or section.

36.8  Choice of Law. The laws of the state, commonwealth, or jurisdiction where the Property are located (without giving effect to its conflict of laws principles) govern all matters arising out of or relating to this Lease and the transactions it contemplates, including, without limitation, its interpretation, construction, performance, and enforcement.

36.9  Intentionally Deleted.

36.10 Authority to Execute. Tenant represents and warrants that this Lease has been duly authorized, executed and delivered by and on behalf of Tenant and constitutes the valid, binding, and enforceable agreement of Tenant in accordance with the terms of this Lease. Landlord represents and warrants

**EXHIBIT 1**

that this Lease has been duly authorized, executed, and delivered by and on behalf of Landlord, and constitutes the valid, binding and enforceable agreement of Landlord in accordance with the terms of this Lease.

36.11  No Construction Against Drafting Party. Landlord and Tenant acknowledge that each of them and their respective counsel have had an opportunity to review this Lease and that this Lease shall not be construed for or against either party merely because such party prepared or drafted this Lease or any particular provision thereof.

36.12  Counterparts. The parties may execute this Lease in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile is as effective as executing and delivering this Lease in the presence of the other parties to this Lease. This Lease is effective upon delivery of one executed counterpart from each party to the other parties. In proving this Lease, a party must produce or account only for the executed counterpart of the party to be charged. Any party delivering an executed counterpart of this Lease by facsimile shall also deliver a manually executed counterpart of this Lease, but the failure to do so does not affect the validity, enforceability, or binding effect of this Lease.

36.13  Merger/Prior Agreements. THIS LEASE CONSTITUTES THE FINAL AGREEMENT BETWEEN THE PARTIES; IT IS THE COMPLETE AND EXCLUSIVE EXPRESSION OF THE PARTIES' AGREEMENT ON THE MATTERS CONTAINED IN THIS LEASE. ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS AND AGREEMENTS BETWEEN THE PARTIES ON THE MATTERS CONTAINED IN THIS LEASE ARE EXPRESSLY MERGED INTO AND SUPERSEDED BY THIS LEASE. THE PROVISIONS OF THIS LEASE MAY NOT BE EXPLAINED, SUPPLEMENTED, OR QUALIFIED THROUGH EVIDENCE OF TRADE USAGE OR A PRIOR COURSE OF DEALINGS. IN ENTERING INTO THIS LEASE, THE PARTIES HAVE NOT RELIED UPON ANY STATEMENT, REPRESENTATION, WARRANTY, OR AGREEMENT OF THE OTHER PARTY EXCEPT FOR THOSE EXPRESSLY CONTAINED IN THIS LEASE. THERE IS NO CONDITION PRECEDENT TO THE EFFECTIVENESS OF THIS LEASE OTHER THAN THOSE EXPRESSLY STATED IN THIS LEASE.

36.14  Acceptance. The submission of this Lease to Landlord by Tenant or to Tenant by Landlord does not constitute an offer to lease. This Lease shall become effective only upon the execution and delivery thereof by both Landlord and Tenant.

36.15  Consent. Except where otherwise expressly provided for in this Lease, any consent or approval required under this Lease shall not be unreasonably withheld, delayed, conditioned, denied, or otherwise refused in any manner.

36.16  Business Days. "Business Day" (or "business day") means, as to any party, any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close in the state, commonwealth, or jurisdiction where the Property are located. If the last day of any time period under this Lease, or the last day for performance of any obligation, or for giving any notice, or for taking any other action under this Lease falls on a day that is not a Business Day, then the last day of such time period shall be extended to the first day thereafter that is a Business Day.

36.17  Attorneys' Fees. In the event of any litigation related to this Lease, whether to enforce its terms, recover for default, or otherwise, if either party receives a judgment, settlement, or award in its favor (the "Receiving Party") against the other party (the "Paying Party") in such litigation, the Paying Party will pay upon demand all of the Receiving Party's costs, charges, and expenses (including but not

**EXHIBIT 1**

limited to reasonable attorneys' fees, court costs, and expert witness fees) arising out of such litigation (including the costs of any appeal related thereto); provided, however, that if prior to commencement of a trial in the litigation the Paying Party offers to pay an amount equal to or in excess of such judgment, settlement, or award, the Receiving Party shall not be entitled to any such costs, charges, expenses, or attorneys' fees.

36.18   Confidentiality. Landlord and Tenant agree to hold the terms of this Lease in strict confidence, and will not disclose same to any person other than to (i) Landlord's directors, officers, employees, and partners, and (ii) those brokers, consultants, lenders, or other third parties working with Landlord in connection with this Lease and who need to know such information for the purpose of consummating this transaction or a future related transaction. This confidentiality obligation will not be applicable to disclosure of information required by applicable Governmental Regulations. Landlord and Tenant acknowledge and stipulate that Tenant may suffer irreparable harm in the event of a breach of this confidentiality agreement, for which Tenant has no adequate remedy at law. Therefore, in addition to all other remedies available pursuant to the terms of this Lease or at law, Landlord and Tenant shall each have the right to obtain immediate injunctive or other equitable relief upon a breach of this confidentiality agreement by Landlord, without the necessity of giving any notice of such default or opportunity to cure the same.

36.19   Third-Party Beneficiaries. This Lease does not and is not intended to confer any rights or remedies upon any person or legal entity other than the signatories.

36.20   Lease Payments. Tenant shall make all payments of Minimum Rent for the period between the Rent Commencement Date and the date of the full execution of this Lease (the "Effective Date") to Landlord within ten (10) Business Days after the Effective Date.

[SIGNATURES ON FOLLOWING PAGE]

**EXHIBIT 1**

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the Lease Date.

Tenant:

FAIRMOUNT PROPERTIES LLC,
an Ohio limited liability company

By: _Rudy Ruttenberg_

Print Name: _Randy Ruttenberg_

Title: _Member_

Date: _3/28/14_

Landlord:

_may B. mandalari_ as POA for

_Aida Mandalari_

AIDA MANDALARI, an individual

Date: _4-18-14_

**EXHIBIT 1**

<u>EXHIBIT A</u>

SITE PLAN OF PROPERTY



(01503443-7)

**EXHIBIT 1**

## EXHIBIT B

### LEASE COMMENCEMENT DATE AGREEMENT

THIS LEASE COMMENCEMENT DATE AGREEMENT (this "Agreement") is executed as of the _____ day of _____ 20__ by and between AIDA MANDALARI ("Landlord"), and _____ ("Tenant") pursuant to the terms of that certain lease between Landlord and Tenant dated _____ ("Lease") for certain premises located in _____, _____, _____, as more particularly described in the Lease ("Property").

IN CONSIDERATION of the premises and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, as a supplement to the Lease, Landlord and Tenant mutually covenant and agree as follows:

1.   The Lease Date is _____.

2.   The Lease Commencement Date is _____.

3.   The Rent Commencement Date is _____.

4.   The Expiration Date of the Initial Term of the Lease is _____, subject to _____ Renewal Terms of _____ years each.

5.   The Minimum Annual Rent payable by Tenant during the Initial Term of the Lease is $_____.

7.   Tenant's Pro-Rata Share is _____.

8.   All terms with an initial capital letter and not otherwise defined herein shall have the meaning ascribed to such term in the Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Landlord:                                    Tenant:

By: _____                          By: _____

Print Name: _____                  Print Name: _____

Title: _____                       Title: _____

**EXHIBIT 1**

**EXHIBIT C**

**LEGAL DESCRIPTIONS**

**EXHIBIT 1**

# BEBS, LTD
# LEGAL DESCRIPTION

**EXHIBIT 1**

 **First American**

ISSUED BY
**First American Title Insurance Company**

**Exhibit A**

File No: NCS-942445-CLE

File No.: NCS-942445-CLE

The Land referred to herein below is situated in the County of Portage, State of Ohio, and is described as follows:

Parcel #1:

Being located in Franklin Township Lot 25 now City of Kent, known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village of Franklin (now City of Kent) and bounded and described as follows: Beginning at an iron bolt on the East line of Franklin Ave. and at the Northwest corner of Alley No. Eight (8);

Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe;

Thence South 89 deg. 17' East 77.12 feet to an iron pipe;

Thence South 0 deg. 46' West 44.97 feet to an iron pipe line on the North line of Alley Number Eight (8);

Thence North 89 deg. 14' West 91.54 feet to the place of beginning and containing 0.086 acres of land. Surveyed by Marvin F. Stevens, Reg. Sur. No. 260.

Parcel #2:

Known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, and the North half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village (now City) of Kent as surveyed by Samuel D. Harris, Esq.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**Copyright 2006-2016 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

# FRANKLIN LOT, LLC
# LEGAL DESCRIPTION

**EXHIBIT 1**

 **First American**

Exhibit A

ISSUED BY
**First American Title Insurance Company**

File No: NCS-942449-CLE

File No.: NCS-942449-CLE

The Land referred to herein below is situated in the County of Portage, State of Ohio, and is described as follows:

Situated in the City of Kent, County of Portage and State of Ohio and being part of Original Lot 25 in Franklin Township and known as being part of Lot 6 and all of Lot 7 of the Original Plat of the City of Kent as recorded in Deed Book Vol. 25, Pg. 132 in the Portage County records and further described as follows:

Beginning at an iron pipe set in the East line of Franklin Avenue (66' R/W at the Northwest corner of land owned by the Board of Portage County Commissioners and being N 16° 45' E 106.00 feet from the intersection of said road line with the North line of College Street (80' R/W);

Thence N 16° 45' E 41.70 feet along the East line of Franklin Avenue to an iron rod set in the South line of a 20 feet wide alley;

Thence N 88° 58' 22" E 127.53 feet along the South side of said alley to an iron rod set at the intersection of said alley line with the West line of a 20 feet wide alley;

Thence S 1° 02' 11" E 52.24 feet along the West line of said alley to an iron rod set at the Northeast corner of the Board of Portage County Commissioners land;

Thence N 85° 55' 26" W 140.82 feet along the North line of the Board of Portage County Commissioners land to the beginning.

Containing 0.142 of an acre of land, be the same more or less as surveyed in September, 2014 by Edward J. Collier, registered surveyor No. 7141.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**Copyright 2006-2016 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 9 of 9 | | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|---|

**EXHIBIT 1**

## EXHIBIT D

Seller's Description and Itemization of the Properties pursuant to Section 1(ii)

**EXHIBIT 1**



**First American**

## Commitment

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942445-CLE

## COMMITMENT FOR TITLE INSURANCE
### Issued By
### *FIRST AMERICAN TITLE INSURANCE COMPANY*
### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company,* a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

*First American Title Insurance Company*

Denino J. Gilmore
President

Jeffrey S. Robinson
Secretary

**INSURANCE FRAUD WARNING:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF FRAUD.

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**Copyright 2006-2016 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 1 of 10 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |

**EXHIBIT 1**

## COMMITMENT CONDITIONS

**1. DEFINITIONS**

(a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.

(b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

(c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.

(d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

(e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

(f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

(g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.

(h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:

(a) the Notice;

(b) the Commitment to Issue Policy;

(c) the Commitment Conditions;

(d) Schedule A;

(e) Schedule B, Part I—Requirements;

(f) Schedule B, Part II—Exceptions; and

(g) a counter-signature by the Company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**

The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**

(a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

(i) comply with the Schedule B, Part I—Requirements;

(ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or

(iii) acquire the Title or create the Mortgage covered by this Commitment.

(b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

(c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

(d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.

(e) The Company shall not be liable for the content of the Transaction Identification Data, if any.

(f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.

(g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 2 of 10 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

## EXHIBIT 1

6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
   (b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.
   (c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
   (d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
   (e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
   (f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
   The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8. **PRO-FORMA POLICY**
   The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **ARBITRATION**
   The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

 **First American**

**Schedule A**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942445-CLE

**Transaction Identification Data for reference only:**
Issuing Agent: First American Title Insurance Company National Commercial Services
Commitment No.: NCS-942445-CLE

Issuing Office: Skylight Tower, 1660 West 2nd Street, Suite 700, Cleveland, OH 44113
Issuing Office File No.: NCS-942445-CLE

Property Address: 227-229 Franklin Avenue, Kent, OH 44240
Revision No.:

### SCHEDULE A

1. Commitment Date: January 18, 2019 7:59 AM

2. Policy to be Issued:

    (a)  ☒ ALTA® Owner's Policy of Title Insurance (6-17-06)
    Proposed Insured: College Town Kent, LLC
    Proposed Policy Amount: $1,000.00

    (b)  ☒ ALTA® Loan Policy of Title Insurance (6-17-06)
    Proposed Insured: None
    Proposed Policy Amount: $0.00

3. The estate or interest in the Land described or referred to in this Commitment is

    **Fee Simple**

4. The Title is, at the Commitment Date, vested in: BEBS, LTD., an Ohio limited liability company by Quit-Claim Deed recorded as Document No. 200404628.

5. The Land is described as follows:

    **See Exhibit "A" attached hereto and made a part hereof**

**INSURANCE FRAUD WARNING:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF FRAUD.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**Copyright 2006-2016 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 4 of 10 | | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
| --- | --- | --- | --- |

**EXHIBIT 1**



**First American**

**Schedule BI & BII**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942445-CLE

### SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Receipt of an Owner's Affidavit acceptable to the Company if standard exceptions are to be deleted from the Policy or Policies to be issued.

5. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

6. Receipt and review of an acceptable survey of the Land if the standard survey exception is to be deleted, and if certain endorsements are requested. The Company reserves the right to make additional exceptions and/or requirements following the review of said survey.

7. Submit to the Company the proper authority documents authorizing the transfer of interest of the parties and/or entities involved in this transaction.

8. A completed DTE 100 Form, or DTE 100EX Form if applicable, signed by the Grantee, must be presented with any deed or 99-year lease to be recorded for the purpose of paying the transfer tax or being exempted therefrom. An acceptable supporting affidavit must be presented with a DTE 100EX Form.

9. Approval of the County Auditor/Engineer of the legal description prior to deed transfer.

10. The Company may make additional exceptions and/or requirements upon (a) its review of the documents creating the estate or interest to be insured; (b) its review of other documentation pertinent to this transaction; and (c) ascertaining other details of the transaction.

11. The following will be required with respect to a Limited Liability Company:

    A. A copy of the operating agreement and any amendments thereto as well as a Certificate of Full Force and Effect or comparable state certificate issued by the Secretary of State of the limited liability company's state of domicile must be provided by the Company.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**





EXHIBIT

A

Parcel #1:
Known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in deed Vol. 25, Page 132, in the Village of Franklin (now city of Kent) and bounded and described as follows:  Beginning at an iron bolt on the East line of Franklin Ave., and at the northwest corner of Alley No. Eight (8); Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe; Thence South 89 deg. 17' East 77.12 feet to an iron pipe; Thence South 0 deg. 46' West 44.97 feet to an iron pipe on the north line of Alley Number Eight (8); Thence North 89 deg. 14' West 91.54 feet to the place of beginning and containing 0.086 acres of land.  Surveyed by Marvin F. Stevens, Reg. Sur. No. 260.

Parcel #2:
Known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, and the north half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village (now City) of Kent as surveyed by Samuel D. Harris, Esq.

Parcel #3:
And being known as a part of Lots No. 19 and 20 of Normal View Allotment Addition to the City of Kent as recorded in Plat Book 4, Page 36, Portage County Plat Records, and being more particularly described as follows:  Commencing at an iron pin at the southeast corner of Lot No. 18 in said allotment on Crain Avenue and owned by R. and J. Rhodes and running thence easterly for a distance of 45 feet; Thence northerly 116 feet to the southerly line of Crain Avenue; Thence Westerly along said south line of Crain Avenue a distance of 59 feet; Thence southerly along the easterly line of said Lot No. 18, 133 feet to the point of beginning.  17.025.40.00.003

17 024.33 00 099
TAX MAP DEPT.
LEGAL DESCRIPTION
☑ SUFFICIENT ☐ DEFICIENT
☑ NO DIVISION OF LAND

024
025

2-23/2004

TRANSFERRED 2 0 0
Sec. 318.54(F-2)
Sec. 319.202

FEB 23 2004

Janet Esposito
PORTAGE COUNTY AUDITOR

**EXHIBIT 1**

B.  Other requirements may be imposed by the Company following its review of the documentation required herein.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 6 of 10 | | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |

**EXHIBIT 1**



**First American**

ALTA Commitment for Title Insurance
ISSUED BY

**Schedule BI & BII (Cont.)**

**First American Title Insurance Company**

File No: NCS-942445-CLE

### SCHEDULE B, PART II

#### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.  Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or by making inquiry of persons in possession of the Land.

3.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title including discrepancies, conflicts in boundary lines, shortage in area, or any other facts that would be disclosed by an accurate and complete land survey of the Land, and that are not shown in the Public Records.

4.  Any lien or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the Public Records.

5.  Rights of parties in possession of all or any part of the Land, including, but not limited to, easements, claims of easements or encumbrances that are not shown in the Public Records.

6.  The following exception will appear in any loan Policy to be issued pursuant to this commitment:  Oil and gas leases, pipeline agreements, or any other instrument related to the production or sale of oil or natural gas which may arise subsequent to the Date of Policy, pursuant to Ohio Revised Code Section 1509.31(D).

7.  Coal, oil, natural gas, or other mineral interests and all rights incident thereto now or previously conveyed, transferred, leased, excepted or reserved.

8.  Taxes or assessments approved, levied or enacted by the State, County, Municipality, Township or similar taxing authority, but not yet certified to the tax duplicate of the County in which the Land is situated, including but not limited to any retroactive increases in taxes or assessments resulting from any retroactive increase in the valuation of the Land by the State, County, Municipality, Township, or other taxing authority.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

9. Taxes and Assessments for the year 2018:

Assessed in the name of:BEBS Ltd an Ohio LLC

Parcel No.: 17-025-40-00-023-000

First half taxes in the amount of $375.67 , including current assessments, if any, is due and payable.

Last half taxes in the amount of $375.67 , including current assessments, if any, is not yet due.

Total due to bring taxes current, including current tax due, assessments, delinquencies, penalties and interest, if any, is $0.00.

Exemption amount: $0.00
Land: $10,400.00
Improvements: $0.00
Total: $10,400.00

Taxes and Assessments for the year 2019  and subsequent years are a lien, not yet due or payable


Note: Collection closes for first half on February 19, 2019.

10. Taxes and Assessments for the year 2018:

Assessed in the name of:BEBS Ltd an Ohio LLC

Parcel No.: 17-025-40-00-024-000

First half taxes in the amount of $201.20 , including current assessments, if any, is due and payable.

Last half taxes in the amount of $201.20 , including current assessments, if any, is not yet due.

Total due to bring taxes current, including current tax due, assessments, delinquencies, penalties and interest, if any, is $0.00.

Exemption amount: $0.00
Land: $5,570.00
Improvements: $0.00
Total: $5,570.00

Taxes and Assessments for the year 2019  and subsequent years are a lien, not yet due or payable


Note: Collection closes for first half on February 19, 2019.

11. Taxes and Assessments for the year 2018:

Assessed in the name of:BEBS Ltd an Ohio LLC

Parcel No.: 17-025-40-00-025-000

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

First half taxes in the amount of $2,765.14 , including current assessments, if any, is due and payable.

Last half taxes in the amount of $2,765.14 , including current assessments, if any, is not yet due.

Total due to bring taxes current, including current tax due, assessments, delinquencies, penalties and interest, if any, is $0.00.

Exemption amount: $0.00
Land: $18,270.00
Improvements: $58,280.00
Total: $76,550.00

Taxes and Assessments for the year 2019  and subsequent years are a lien, not yet due or payable

Note: Collection closes for first half on February 19, 2019.

12. Mortgage from BEBS, LTD to Portage Community Bank, to secure $120,000.00, filed for record June 6, 2012 in/as Instrument No. 201210095 of Portage County Records, covering premises described in Schedule A, together with any and all terms, conditions and restrictions contained therein.

The effect of a document entitled "Satisfaction of Mortgage", recorded September 13, 2018 as Instrument No. 201815331 of Official Records.

Note: The Company will require satisfactory proof of full payment of the debt secured by said mortgage or deed of trust prior to removing this exception or insuring the contemplated transaction.

13. Notwithstanding the reference to acreage or square footage in the description set forth in Schedule A hereof, this commitment/policy does not insure nor guarantee the acreage or quantity of land set forth therein.

14. Rights of the public and public utilities in and to that portion of the land lying within the bounds of any publicly dedicated street(s).

15. Any claim that the Title is subject to a trust or lien created under The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or under similar state laws.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 9 of 10 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
| --- | --- | --- |

**EXHIBIT 1**

 *First American*

ISSUED BY
**First American Title Insurance Company**

**Exhibit A**

File No: NCS-942445-CLE

File No.: NCS-942445-CLE

The Land referred to herein below is situated in the County of Portage, State of Ohio, and is described as follows:

Parcel #1:

Being located in Franklin Township Lot 25 now City of Kent, known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village of Franklin (now City of Kent) and bounded and described as follows: Beginning at an iron bolt on the East line of Franklin Ave. and at the Northwest corner of Alley No. Eight (8);

Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe;

Thence South 89 deg. 17' East 77.12 feet to an iron pipe;

Thence South 0 deg. 46' West 44.97 feet to an iron pipe line on the North line of Alley Number Eight (8);

Thence North 89 deg. 14' West 91.54 feet to the place of beginning and containing 0.086 acres of land. Surveyed by Marvin F. Stevens, Reg. Sur. No. 260.

Parcel #2:

Known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, and the North half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village (now City) of Kent as surveyed by Samuel D. Harris, Esq.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 10 of 10 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

**EXHIBIT 1**



LINDA FANKHAUSER
PORTAGE : RECORDER

2 00404628 ≈ 23 ≈

RECEIVED FOR RECORD
AT 14.21.10
FEE 36.00

## INDEXED

FOR RECORDERS OFFICE USE ONLY — DO NOT WRITE ABOVE THIS LINE

# QUIT-CLAIM DEED

(Ohio Statutory Form: R.C. 5302.11)

KIMBERLY S. THOMAS, A MARRIED WOMAN, AND DEBORAH L. WHITWORTH, A MARRIED

WOMAN (together, the "Grantors"), for ~~valuable consideration paid,~~ *its membership interest in the LLC* quitclaim to BEBS, LTD., AN

OHIO LIMITED LIABILITY COMPANY (hereafter, "Grantee"), with a tax mailing address c/o Kimberly

S. Thomas, 414 Crain Avenue, Kent, Ohio 44240, the real property situated in the City of Kent,

County of Portage, State of Ohio, as more fully described on Exhibit A, attached hereto and

incorporated herein by reference.

PARCELS 1 & 2: A.K.A. 225-227 & 229 Franklin Avenue, Kent, OH 44240

Permanent Parcel Numbers:  17-025-40-00-023
                           17-025-40-00-024
                           17-025-40-00-025

PARCEL 3: A.K.A. 452 Crain Avenue, Kent, OH 44240

Permanent Parcel Numbers:  17-024-33-00-079

Prior Instrument Reference: Volume 0157, Page 293 et. seq., Portage County Records.

KIMBERLY S. THOMAS , GREGORY L. THOMAS, husband of KIMBERLY S. THOMAS, DEBORAH L.
WHITWORTH and DAVID A. WHITWORTH, husband of DEBORAH L. WHITWORTH, hereby release
all right and expectancy of dower in the above-described and herein granted real property.

**EXHIBIT 1**

Executed as of the 1st day of February, 2004.

_Kimberly S. Thomas_
Kimberly S. Thomas

*Gregory L. Thomas, husband of Kimberly S. Thomas, executes this instrument for release of dower purposes only.*

_Gregory L. Thomas_
Gregory L. Thomas

STATE OF OHIO        }
                    } ss:

COUNTY OF PORTAGE  }

The foregoing instrument was acknowledged before me this 9 day of February, 2004 by Kimberly S. Thomas and Gregory L. Thomas.

Notary Public, Maine
KARIN L. RYDBERG
My Commission Expires January 4, 2008

_Deborah L. Whitworth_
Deborah L. Whitworth

*David A. Whitworth, husband of Deborah L. Whitworth, executes this instrument for release of dower purposes only:*

_David A. Whitworth_
David A. Whitworth

STATE OF MISSOURI    }
                    } ss:

COUNTY OF Cumberland  }

The foregoing instrument was acknowledged before me this 9 day of February, 2004 by Deborah L. Whitworth and David A. Whitworth.

Notary Public, Maine
KARIN L. RYDBERG
Notary Public, Maine
My Commission Expires January 4, 2008

*This instrument prepared by:*
    Gary T. Gardner, Esq.
    Brouse McDowell
    106 South Main Street
    500 First National Tower
    Akron, Ohio 44308-1471
    565091.1

**QUIT-CLAIM DEED**

KIMBERLY S. THOMAS, A MARRIED WOMAN, AND DEBORAH L. WHITWORTH, A MARRIED WOMAN,

TO

BBBS, LTD., AN OHIO LIMITED LIABILITY COMPANY

BROUSE McDOWELL
A Legal Professional Association
106 South Main Street,
500 First National Tower
Akron, Ohio 44308
330-535-5711

**EXHIBIT 1**



Page 1 of 1

SEE CORRECTION
1/17/2019

Please Review — Thank you!

**EXHIBIT**

**A**

Parcel #1; BEING LOCATED IN FRANKLIN TOWNSHIP LOT 25 NOW CITY OF KENT, Known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in deed Vol. 25, Page 132, in the Village of Franklin (now city of Kent) and bounded and described as follows: Beginning at an iron bolt on the East line of Franklin Ave., and at the northwest corner of Alley No. Eight (8); Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe; Thence South 89 deg. 17' East 77.12 feet to an iron pipe; Thence South 0 deg. 46' West 44.97 feet to an iron pipe on the north line of Alley Number Eight (8); Thence North 89 deg. 14' West 91.54 feet to the place of beginning and containing 0.086 acres of land. Surveyed by Marvin F. Stevens, Reg. Sur. No. 260.

Parcel #2;
Known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, and the north half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village (now City) of Kent as surveyed by Samuel D. Harris, Esq.

Parcel #3;
And being known as a part of Lots No. 19 and 20 of Normal View Allotment Addition to the City of Kent as recorded in Plat Book 4, Page 36, Portage County Plat Records, and being more particularly described as follows: Commencing at an iron pin at the southeast corner of Lot No. 18 in said allotment on Crain Avenue and owned by R. and J. Rhodes and running thence easterly for a distance of 45 feet; Thence northerly 116 feet to the southerly line of Crain Avenue; Thence Westerly along said south line of Crain Avenue a distance of 59 feet; Thence southerly along the easterly line of said Lot No. 18, 133 feet to the point of beginning.

17.025 40 00 003
024
025
17 024 33 00 099
TAX MAP DEPT.
2-23-2004
LEGAL DESCRIPTION
☑ SUFFICIENT ☐ DEFICIENT
☑ NO DIVISION OF LAND

TRANSFERRED
Sec.319.54(F-2)
Sec.319.202

FEB 2 3 2004

Janet Esposito
PORTAGE COUNTY AUDITOR

Instrument Number: 200404628  Seq: 3

**EXHIBIT 1**

*Beth*

BONNIE M. HOWE
PORTAGE CO. RECORDER

201210095          12 JUN -b

**INDEXED**

RECEIVED FOR RECORD
AT __13:39:44__
FEE __156.00__

Return To: Portage Community Bank, 1311 E. Main Street, Ravenna, OH 44266

## OPEN-END MORTGAGE
(With Future Advance Clause)

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is May 1, 2012. The parties and their addresses are:

**MORTGAGOR:**
  BEBS, LTD.
  An Ohio Limited Liability Company
  2188 CHATFIELD DR.
  CLEVELAND HTS, OH 44106

**LENDER:**
  **PORTAGE COMMUNITY BANK**
  Organized and existing under the laws of Ohio
  1311 E. Main Street
  Ravenna, OH 44266

**1. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor does hereby grant, bargain, convey and mortgage to Lender, the following described property:

SEE ATTACHED LEGAL DESCRIPTION

| | | |
|---|---|---|
| BEBS, LTD.<br>Ohio **Mortgage**<br>OH/4XXXBLAMA00000000000625015<br>N | Wolters Kluwer Financial<br>Services ©1996, 2012<br>Bankers Systems™ | Initials ____<br>Page 1 |

The property is located in Portage County at 225-229 Franklin Ave., Kent, Ohio 44240.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**2. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, dated May 1, 2012, from Mortgagor to Lender, with a loan amount of $120,000.00 and maturing on November 1, 2022.

**B. Future Advances.** All future advances from Lender to Mortgagor under the Specific Debts executed by Mortgagor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Mortgagor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

**C. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

---

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ®1996, 2012
Bankers Systems™

Initials _____

Page 2

**3. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**4. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**5. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

   **A.** To make all payments when due and to perform or comply with all covenants.

   **B.** To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   **C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**6. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**7. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

---

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____

Page 3

**8. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

A. A beneficial interest in Mortgagor is sold or transferred.

B. There is a change in either the identity or number of members of a partnership or similar entity.

C. There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**9. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

A. **Power.** Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

B. **Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

C. **Name and Place of Business.** Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**10. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary.

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 4

Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender will give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**11. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**12. ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

---

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____

Page 5

A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender. Unless otherwise prohibited or prescribed by state law, Mortgagor agrees that Lender may take actual possession of the Property without the necessity of commencing any legal action or proceeding. Mortgagor agrees that actual possession of the Property is deemed to occur when Lender notifies Mortgagor of Mortgagor's default and demands that Mortgagor and Mortgagor's tenants pay all Rents due or to become due directly to Lender. Immediately after Lender gives Mortgagor the notice of default, Mortgagor agrees that either Lender or Mortgagor may immediately notify the tenants and demand that all future Rents be paid directly to Lender. As long as this Assignment is in effect,

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ®1996, 2012
Bankers Systems™

Initials _____
Page 6

Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance. Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

**13. DEFAULT.** Mortgagor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Mortgagor fails to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

**C. Business Termination.** Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

---

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 7

**D. Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**14. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015    Wolters Kluwer Financial       Initials _____
N                                Services ®1996, 2012                   Page 8
                                 Bankers Systems™

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**15. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for Lender to inspect and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include (unless prohibited by law) reasonable attorneys' fees, court costs, and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**16. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which

---

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ®1996, 2012
Bankers Systems™

Initials _____
Page 9

has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____

Page 10

Property and no such tank, dump or well will be added unless Lender first consents in writing.

**G.** Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

**H.** Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

**I.** Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender.  The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

**J.** Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

**K.** As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

**L.** Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property.  Any claims and defenses to the contrary are hereby waived.

---

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 11

**17. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**18. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals shall include a standard "mortgage clause" (or "lender loss payable clause") endorsement that names Lender as "mortgagee" and "loss payee". If required by Lender, all insurance policies and renewals will also include an "additional insured" endorsement that names Lender as an "additional insured". If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 12

Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**19. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

**20. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement and homestead exemption rights relating to the Property. Mortgagor does hereby remise, release, and forever quitclaim all their right and title of dower in the Property to Lender.

**21. APPLICABLE LAW.** This Security Instrument is governed by the laws of Ohio, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**22. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**23. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ®1996, 2012
Bankers Systems™

Initials _____
Page 13

Description: Portage,OH Document - Year.DocID 2012.1 EXHIBIT 14 of 18
Order: 4 Comment:

Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**24. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**25. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**26. WAIVER OF JURY TRIAL. All of the parties to this Security Instrument knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Security Instrument or any other documents relating to the Secured Debts or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 14

**CONFESSION OF JUDGMENT.** If Mortgagor defaults, Mortgagor authorizes any attorney to appear in a court of record and confess judgment against Mortgagor in favor of Lender. The confession of judgment may be without process and for any amount due on the Secured Debts including collection costs and reasonable attorneys' fees. This is in addition to other remedies.

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 15

**SIGNATURES.** By signing, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

**WARNING: BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

MORTGAGOR:

BEBS, LTD.

By _____ Date 5·1·12
KIMBERLY V. THOMAS, Member

---

BEBS, LTD.
Ohio **Mortgage**
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 16

**ACKNOWLEDGMENT.**
(Business or Entity)

_____ OF _____, _____ OF _____ ss.
This instrument was acknowledged before me this _13t_ day of
_May_, _2012_ by KIMBERLY V. THOMAS - Member of BEBS,
LTD, a Limited Liability Company on behalf of the Limited Liability Company.
My commission expires:

_____
(Notary Public)

David T. Barksdale
Notary Public-State of Ohio
My Commission Expires on March 11, 2014

Bennett Land # _901739-R_
Title Agency

This instrument was prepared by Portage Community Bank, 1311 E. Main Street,
Ravenna, OH 44266

BEBS, LTD.
Ohio Mortgage
OH/4XXXBLAMA00000000000625015
N

Wolters Kluwer Financial
Services ©1996, 2012
Bankers Systems™

Initials _____
Page 17

EXHIBIT A

PARCEL ONE:
Situated in the City of Kent, County of Portage and State of Ohio: And known as being a part of Lots Eight (8) and Nine (9) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132 in the Village of Franklin (now City of Kent) and bounded and described as follows: Beginning at an iron bolt on the East line of Franklin Ave., and at the northwest corner of Alley No. Eight (8);  Thence North 18 deg. 46' East along Franklin Ave., 47.26 feet to an iron pipe;  Thence South 89 deg. 17' East, 77.12 feet to an iron pipe;  Thence South 0 deg. 46' West, 44.97 feet to an iron pipe on the north line of Alley Number Eight (8);  Thence North 89 deg. 14' West, 91.54 feet to the place of beginning and containing 0.086 acres of land.  Surveyed by Marvin F. Stevens, Registered Surveyor No. 260.

PARCEL TWO:
Situated in the City of Kent, County of Portage and State of Ohio: And known as being the whole of Lot No. Ten (10) in Block Number Two (2) of the original plat recorded in Deed Volume 25, Page 132, and the north half of Lot No. Nine (9) in said Block Number Two (2) of the original plat recorded in Deed Volume 25, Page 131 in the Village of Franklin (now City of Kent) as surveyed by Samuel D. Harris, Esq.

KT

Doc ID: 005171910001 Type: MTGR
Recorded: 09/13/2018 at 05:38:03 AM
Fee Amt: $32.00 Page 1 of 1
Portage County Ohio
Lori Calcei County Recorder
File 201815331

# SATISFACTION OF MORTGAGE

This is to certify that the conditions of a certain mortgage bearing date of May 01, 2012 given by BBBS, LTD to secure the payment of $ 120,000.00 mortgage, recorded as instrument number 201210095 of Portage County Records has been fully complied with and is hereby satisfied and discharged.

STATE OF OHIO

COUNTY OF PORTAGE

Portage Community Bank

Dominic Bellino, Vice President

Douglas L. Blay, Vice President

THIS INSTRUMENT PREPARED BY PORTAGE COMMUNITY BANK

Before me, a Notary Public, in and for said County, personally appeared the above named *Dominic Bellino and Douglas L. Blay* on behalf of Portage Community Bank and acknowledged that *they* did sign the foregoing instrument and that the same is *their* free act and deed, this 29th day of August, 2018

Notary Public



EXHIBIT 1





**First American**

**Commitment**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942449-CLE

## COMMITMENT FOR TITLE INSURANCE
### Issued By
### *FIRST AMERICAN TITLE INSURANCE COMPANY*
### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, **First American Title Insurance Company**, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

*First American Title Insurance Company*

Donna J. Gilmore
President

Jeffrey S. Robinson
Secretary

**INSURANCE FRAUD WARNING:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF FRAUD.

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 1 of 9 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |

### EXHIBIT 1

## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy..
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I—Requirements;
   (f) Schedule B, Part II—Exceptions; and
   (g) a counter-signature by the Company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

5. **LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
      (i) comply with the Schedule B, Part I—Requirements;
      (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
      (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

**6. LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

(a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7. IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8. PRO-FORMA POLICY**

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9. ARBITRATION**

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 3 of 9 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

**EXHIBIT 1**



**First American**

**Schedule A**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942449-CLE

**Transaction Identification Data for reference only:**
Issuing Agent: First American Title Insurance Company National Commercial Services
Commitment No.: NCS-942449-CLE

Issuing Office: Skylight Tower, 1660 West 2nd Street, Suite 700, Cleveland, OH 44113
Issuing Office File No.: NCS-942449-CLE

Property Address: 225 Franklin Avenue, approx. 0.1435 acres, Kent, OH
Revision No.:

### SCHEDULE A

1.  Commitment Date: January 18, 2019 at 7:59 AM

2.  Policy to be Issued:

    (a)  ☒ ALTA® Owner's Policy of Title Insurance (6-17-06)
         Proposed Insured: College Town Kent, LLC
         Proposed Policy Amount: $1,000.00

    (b)  ☒ ALTA® Loan Policy of Title Insurance (6-17-06)
         Proposed Insured: None
         Proposed Policy Amount: $0.00

3.  The estate or interest in the Land described or referred to in this Commitment is

    **Fee Simple**

4.  The Title is, at the Commitment Date, vested in: FRANKLIN LOT, LLC by Quit-Claim Deed recorded as Document No. 201415377.

5.  The Land is described as follows:

    **See Exhibit "A" attached hereto and made a part hereof**

**INSURANCE FRAUD WARNING:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF FRAUD.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 4 of 9 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

**EXHIBIT 1**



*First American*

# Schedule BI & BII

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: NCS-942449-CLE

### SCHEDULE B, PART I

#### Requirements

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Receipt of an Owner's Affidavit acceptable to the Company if standard exceptions are to be deleted from the Policy or Policies to be issued.

5. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

6. Receipt and review of an acceptable survey of the Land if the standard survey exception is to be deleted, and if certain endorsements are requested. The Company reserves the right to make additional exceptions and/or requirements following the review of said survey.

7. Submit to the Company the proper authority documents authorizing the transfer of interest of the parties and/or entities involved in this transaction.

8. A completed DTE 100 Form, or DTE 100EX Form if applicable, signed by the Grantee, must be presented with any deed or 99-year lease to be recorded for the purpose of paying the transfer tax or being exempted therefrom. An acceptable supporting affidavit must be presented with a DTE 100EX Form.

9. Approval of the County Auditor/Engineer of the legal description prior to deed transfer.

10. The Company may make additional exceptions and/or requirements upon (a) its review of the documents creating the estate or interest to be insured; (b) its review of other documentation pertinent to this transaction; and (c) ascertaining other details of the transaction.

11. The following will be required with respect to a Limited Liability Company:

    A. A copy of the operating agreement and any amendments thereto as well as a Certificate of Full Force and Effect or comparable state certificate issued by the Secretary of State of the limited liability company's state of domicile must be provided by the Company.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**

B.   Other requirements may be imposed by the Company following its review of the documentation required herein.

12.   We find no outstanding voluntary liens of record affecting subject property. Disclosure should be made concerning the existence of any unrecorded lien or other indebtedness which could give rise to any possible security interest in the subject property.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 6 of 9 | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

**EXHIBIT 1**



**First American**

ALTA Commitment for Title Insurance

ISSUED BY

## Schedule BI & BII (Cont.)

**First American Title Insurance Company**

File No: NCS-942449-CLE

### SCHEDULE B, PART II

#### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or by making inquiry of persons in possession of the Land.

3. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title including discrepancies, conflicts in boundary lines, shortage in area, or any other facts that would be disclosed by an accurate and complete land survey of the Land, and that are not shown in the Public Records.

4. Any lien or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the Public Records.

5. Rights of parties in possession of all or any part of the Land, including, but not limited to, easements, claims of easements or encumbrances that are not shown in the Public Records.

6. The following exception will appear in any loan Policy to be issued pursuant to this commitment: Oil and gas leases, pipeline agreements, or any other instrument related to the production or sale of oil or natural gas which may arise subsequent to the Date of Policy, pursuant to Ohio Revised Code Section 1509.31(D).

7. Coal, oil, natural gas, or other mineral interests and all rights incident thereto now or previously conveyed, transferred, leased, excepted or reserved.

8. Taxes or assessments approved, levied or enacted by the State, County, Municipality, Township or similar taxing authority, but not yet certified to the tax duplicate of the County in which the Land is situated, including but not limited to any retroactive increases in taxes or assessments resulting from any retroactive increase in the valuation of the Land by the State, County, Municipality, Township, or other taxing authority.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 7 of 9 | ALTA Commitment for Title Insurance (B-1-16) Ohio (Effective 6-1-17) |
|---|---|---|

**EXHIBIT 1**

9.  Taxes and Assessments for the year 2018:

    Assessed in the name of:Franklin Lot LLC

    Parcel No.: 17-025-40-00-026-000

    First half taxes in the amount of $742.30 , including current assessments, if any, is due and payable.

    Last half taxes in the amount of $742.30 , including current assessments, if any, is not yet due.

    Total due to bring taxes current, including current tax due, assessments, delinquencies, penalties and interest, if any, is $0.00.

    Exemption amount: $0.00
    Land: $19,500.00
    Improvements: $1,050.00
    Total: $20,550.00

    Taxes and Assessments for the year 2019  and subsequent years are a lien, not yet due or payable


    Note: Collection closes for first half on February 19, 2019.

10. Short Form Lease by and between Dominick S. Mandalari and Aida I. Mandalari, husband and wife, Lessor, and United States Postal Service, Lessee, dated March 01, 1979, filed for record March 23, 1979, in Volume 94, Page 929 of Portage County Records.

    Defects, liens, encumbrances or other matters affecting the leasehold estate, whether or not shown by the public records are not shown herein.

11. Notwithstanding the reference to acreage or square footage in the description set forth in Schedule A hereof, this commitment/policy does not insure nor guarantee the acreage or quantity of land set forth therein.

12. Existing unrecorded leases, if any, and rights of all parties claiming thereunder.

13. We find no outstanding voluntary liens of record affecting subject property. An inquiry should be made concerning the existence of any unrecorded lien or other indebtedness which could give rise to any security interest in the subject property.

This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT 1**



**First American**

**Exhibit A**

ISSUED BY
**First American Title Insurance Company**

File No: NCS-942449-CLE

---

File No.: NCS-942449-CLE

The Land referred to herein below is situated in the County of Portage, State of Ohio, and is described as follows:

Situated in the City of Kent, County of Portage and State of Ohio and being part of Original Lot 25 in Franklin Township and known as being part of Lot 6 and all of Lot 7 of the Original Plat of the City of Kent as recorded in Deed Book Vol. 25, Pg. 132 in the Portage County records and further described as follows:

Beginning at an iron pipe set in the East line of Franklin Avenue (66' R/W at the Northwest corner of land owned by the Board of Portage County Commissioners and being N 16° 45' E 106.00 feet from the intersection of said road line with the North line of College Street (80' R/W);

Thence N 16° 45' E 41.70 feet along the East line of Franklin Avenue to an iron rod set in the South line of a 20 feet wide alley;

Thence N 88° 58' 22" E 127.53 feet along the South side of said alley to an iron rod set at the intersection of said alley line with the West line of a 20 feet wide alley;

Thence S 1° 02' 11" E 52.24 feet along the West line of said alley to an iron rod set at the Northeast corner of the Board of Portage County Commissioners land;

Thence N 85° 55' 26" W 140.82 feet along the North line of the Board of Portage County Commissioners land to the beginning.

Containing 0.142 of an acre of land, be the same more or less as surveyed in September, 2014 by Edward J. Collier, registered surveyor No. 7141.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030039 (6-5-17) | Page 9 of 9 | | ALTA Commitment for Title Insurance (8-1-16) Ohio (Effective 6-1-17) |
|---|---|---|---|

**EXHIBIT 1**

U.S. POSTAL SERVICE
SHORT FORM LEASE

E. W. Crawford, RM&AA:mtr

THE UNDERSIGNED, hereinafter called the Lessor, hereby leases to the United States Postal Service, hereinafter called the Postal Service, the premises hereinafter described for postal purposes, pursuant to the terms and Conditions described herein and contained in General Conditions in Short Form Lease, Form 7417-A, attached hereto.

### I. LOCATION. The premises are located at:

| (Address) | (City) | (County) | (State and ZIP Code) |
|---|---|---|---|
| 229 Franklin Avenue | KENT | PORTAGE | OHIO   44240 |

upon ~~XXXXXXXXXXXXXXXXXXXXX~~ ~~XXXXXXXXXX~~ which property contains or will contain areas and spaces, improvements and appurtenances as follows:

Legal Description Attached.

| AREA | DIMENSIONS | NET SQ. FT. | AREA | DIMENSIONS | NET SQ. FT. |
|---|---|---|---|---|---|
| FIRST FLOOR | | | DRIVEWAY | | |
| PLATFORM | | | PARKING & MANEUVERING | | |
| STORAGE OF VEHICLES (No. of Units) | | | OTHER (Describe) | | |
| | | | Parking Lot | 42' x 147' | 6,174 |

2. TERMS (in each case two (2) of the following paragraphs, "A", "B" and "C" must be deleted)

A  Month-to-Month. This is a month-to-month tenancy for an indefinite period beginning _____, 19___, and may be terminated at any time by either party giving to the other a thirty days' written notice, any such notice given by Lessor to be directed to the Contracting Officer.

B  Fixed Term. To have and to hold said premises with their appurtenances for a term of _____ ( ) months beginning _____, 19___, and ending _____, 19___.
(1) The Postal Service may terminate this agreement at any time by giving thirty days' written notice to the Lessor.
(2) This agreement may be renewed, at the option of the Postal Service, providing that 30 days' written notice is given before the end of the fixed term, for the following separate and consecutive terms and at the following monthly rentals:

| NO. MONTHS | AT (PER MONTH RENTAL) | NO. MONTHS | AT (PER MONTH RENTAL) | NO. MONTHS | AT (PER MONTH RENTAL) |
|---|---|---|---|---|---|
| (a) DELETED | | (b) DELETED | | (c) DELETED | |

C  Automatic Renewal. To have and to hold the said premises with their appurtenances for a term of one year beginning September 1, 19 79. Thereafter this agreement shall renew itself from year to year unless thirty days before the end of any annual term the Lessor gives written notice of termination, delivered to the Contracting Officer. The Postal Service may terminate this agreement at any time by giving thirty days' written notice to the Lessor.

3. RENTAL. The Postal Service shall pay the Lessor monthly rental of $ 245.00 _____ payable at the end of each month. Rent for part of a month shall be prorated. Rent checks shall be made payable to: Dominick S. Mandalari
1137 Norwood, Kent, OH   44240

4. Lessor, as part of the rental consideration, shall furnish the following utilities, services and equipment:
Vehicle Parking Lot

5. OTHER PROVISIONS. The following additional provisions, modifications, riders, layouts and/or forms were agreed upon prior to execution and made a part hereof:
None.

6. The undersigned has completed and attached hereto Form 7319-B, Representations and Certifications.

EXECUTED BY LESSOR _____ 3/1 , 19 79

By: (Signatures) _____

ACCEPTANCE BY POSTAL SERVICE
MAR 8  1979 , 19___

By: _____

Dominick S. Mandalari (H) Aida I. Mandalari

(Print Name & Title) 278 (W)

Identifying No.: 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   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

Title: MULLER SADBAN CONTRACTING OFFICER
(Contracting Officer)

Address: 1137 Norwood

Address: U. S. POSTAL SERVICE FACILITY ___ JF 133

Kent, OH   44240   (216) 678-9483

PO: FLARD FEDERAL BUILDING, ___ 315
200 WEST BROADWAY

(City, State and ZIP Code)   (Telephone)

LOUISVILLE, KY   40202

PS Form 7417
Dec. 1974

EXHIBIT 1

LEGAL DESCRIPTION OF PROPERTY LEASED

Give, Grant, Bargain, Sell and Convey unto the said Grantee , his do
heirs and assigns, the following described premises, situated in the    City        of
Kent            , County of    Portage      and State of Ohio:
Parcel No. 1:   Being a part of Lot 25 in Franklin Township and being a part of
Lot Six (6) in Block 2 in the Original Plat of the City of Kent, and bounded and
described as follows:  Beginning at an iron pipe at the northwest corner of Lot 6,
Block 2 in said Original Plat; thence E. 74° 15' E. along north line of land now as
by Helen A. Each 47.50 feet to an iron pipe; thence N. 86° 18' W. 48.70 feet to
an iron pipe  on the east line of Franklin Street; thence N. 16° 43' E. along the
street line 10 feet to the place of beginning.

Parcel No. 2:   And known as being Lot No. Seven in Block No. Two (2) of the
recorded plat of the Village of Franklin, also part of Lots Nos. 1, 2 and 6 in
Block No. 2 in  the recorded town plat of Franklin and is bounded as follows:
Beginning at  the southwest corner of Lot No. Seven (7) in Block No. 2; thence
east on the south line of said Lot No. 7, one hundred and thirty-two (132) feet
and five (5) inches to the southeast corner of said Lot No. 7;  thence south on
the east lines of said Lots Nos. 6 and 1, forty-three (43) feet and seven (7)
inches to a post; thence in a northerly or northwesterly direction one hundred
and forty-one (141) feet and six (6) inches to the place of beginning, this
being the premises L.B. Reed purchased of Lucian W. Crittendon and Elenor
his wife.

EXCEPTING therefrom the following described parcel: Situated in the City of Kent,
County of Portage and State of Ohio and being a part of Franklin Township lot
No. 25 and being a part of Lots Nos. 1, 2 and 6 in Block 2 in the engineers plat
of The City of Kent and bounded and described as follows:  Beginning at an iron
pipe on the east line of Lot No. 1, Block 2 in said original plat, 12 feet
S. 1° 08' E. from the Northeast corner of Lot No. 1; thence N. 74° 15' W.
96.65 feet to an iron pipe; thence S. 86° 18' E. along the north line of land
owned by Paul H. Carpenter 91.85 feet to an iron pin on the east line of Lot 6,
Block 2 of said original Plat; thence S. 1° 08' E. along the east line of Lot
No. 1 and 6 in Block 2, being the west line of a 20 ft. alley, to place  of
beginning.

22295

RECEIVED FOR RECORD
March 22, 19 79
at 11:20 o'clock A. M.
Recorded March 23 1979
in Portage County Records
of _____
Vol. 94 Page 929-936.
HELEN M. FREDERICK
PORTAGE COUNTY RECORDER
Fee 11.00

INDEXED

Dominick McIntire
1139 Norwood
Kent, Oh. 44240

VOL 0094 PAGE 0930

**EXHIBIT 1**

## GENERAL CONDITIONS TO SHORT FORM LEASE

1. **LESSOR'S SUCCESSORS.** The terms and provisions of this lease and the conditions herein shall bind the Lessor, and his heirs, executors, administrators, successors, and assigns.

2. **APPLICABLE CODES AND ORDINANCES.** The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the rented space is situated and, at his own expense, to obtain all necessary permits and related items.

3. **OFFICIALS NOT TO BENEFIT.** No member of or delegate to Congress, or resident Commissioner shall be admitted to any share or part of this rental contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this rental contract if made with a corporation for its general benefit.

4. **COVENANT AGAINST CONTINGENT FEES.** The Lessor warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessor for the purpose of securing business. For breach or violation of this warranty the Postal Service shall have the right to annul this lease without liability or in its discretion to deduct from the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee. (Licensed real estate agents or brokers having listings on property for rent, in accordance with general business practice, and who have not obtained such licenses for the sole purpose of effecting this lease, may be considered as bona fide employees or agencies within the exception contained in this clause.)

5. **ALTERATIONS.** The Postal Service may make alterations, attach fixtures or signs and erect structures in or upon the premises, all of which shall be the property of the Postal Service and, if the Lessor requests, within 30 days before termination of the Lease, the Postal Service will repair promptly or provide the Lessor payment in lieu thereof for any damage caused by its removal of such property.

6. **EXAMINATION OF RECORDS.** (NOTE: This provision is applicable if this Lease was negotiated without advertising.)

a. The Lessor agrees that the Postmaster General or any of his duly authorized representatives shall, until the expiration of 1 year after final payment under this Lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Lessor involving transactions related to this Lease.

b. The Lessor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Postmaster General or his representatives shall, until the expiration of 3 years after final payment under this Lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract. The term "subcontract" excludes (1) purchase orders not exceeding $2,500, and (2) subcontracts for public utility services at rates established for uniform applicability to the general public.

7. **RECORDING.** This agreement shall be recorded at the expense of the Lessor, upon the request of the Postal Service Contracting Officer, said expense shall include all required fees.

PS Form 7417-A (Page 1)
Apr. 1976

8. **MAINTENANCE, FITNESS FOR USE.** The Lessor shall, except as otherwise specified and except for damage resulting from the act or negligence of Postal Service agents or employees, maintain the demised premises in good repair and tenantable condition. If the leased premises or any part thereof become unfit for use for the purposes for which leased, the Lessor shall put the same in satisfactory condition, as determined by the Postal Service, for the purposes for which leased. If he fails to make repairs or otherwise restore the premises to tenantable condition within a reasonable time after receipt of notice from the Contracting Officer, the Postal Service shall have the right to perform the work, by contract or otherwise, and withhold the cost thereof from payments due or to become due under this contract. In addition, for any period the premises or any part thereof are unfit for the purposes for which leased, the rental shall be abated in proportion to the area determined by the Postal Service to have been rendered unavailable by reason of such condition. Unfitness for use does not include subsequent unsuitability arising from such matters as design, size or location of the building.

During the continuance of the lease, the interior of the building, including but not limited to, the walls and ceilings, shall be repainted at least once every five (5) years unless required more often because of damage from fire or other casualty, or unless the five year period is specifically extended in writing by the Contracting Officer.

The Lessor shall designate on Form 7426 emergency maintenance repairmen for electrical, plumbing, heating, ventilating and air conditioning emergencies or other emergencies (windows, doors, locks, etc.) that may be called in the event of an emergency situation involving maintenance of the property and/or equipment when the Lessor or his designated agent cannot be contacted within a reasonable time.

9. **DESTRUCTION OF PREMISES.** Notwithstanding the provisions of Claue 8, if the premises be destroyed by fire or other casualty, this lease shall immediately terminate.

10. **NOTICE OF REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES.** The Lessor is cautioned as follows: By signing the offer, the Lessor will be deemed to have signed and agreed to the provisions of the "Certification of Nonsegregated Facilities" included in this solicitation. The certification provides that the Lessor does not maintain or provide for his employees facilities which are segregated on a basis of race, creed, color, or national origin, whether such facilities are segregated by directive or on a de facto basis. The certification also provides that he will not maintain such segregated facilities. Failure of a Lessor to agree to the Certification of Nonsegregated Facilities will render him offer ineligible for acceptance if the payments thereunder exceed $10,000 and the contract is not otherwise exempt from the provisions of the Equal Opportunity clause.

11. **EQUAL OPPORTUNITY.** (The following clause is applicable unless this contract is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).)

During the performance of this contract, the Lessor agrees as follows:

(a) The Lessor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Lessor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex or national origin. Such action shall include, but not be

**EXHIBIT 1**

limited to, the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this Equal Opportunity clause.

(b) The Lessor will, in all solicitations or advertisements for employees placed by or on behalf of the Lessor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(c) The Lessor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Lessor's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Lessor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Lessor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Lessor's noncompliance with the Equal Opportunity clause of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Lessor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Lessor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Lessor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance: Provided, however, That in the event the Lessor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Lessor may request the United States to enter into such litigation to protect the interests of the United States.

12. OVERTIME. (a) The Lessor shall not require or permit any laborer or mechanic in any workweek in which he is employed on any work under this Agreement to work in excess of 8 hours in any calendar day or in excess of 40 hours in such workweek on work subject to the provisions of the Contract Work Hours and Safety Standards Act (40 U.S.C. 327-333) unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all such hours worked in excess of 8 hours in any calendar day or in excess of 40 hours in such workweek, whichever is the greater number of overtime hours. The "basic rate of pay", as used in this clause, shall be the amount paid per hour, exclusive of the

Lessor's contribution or cost for fringe benefits and any cash payment made in lieu of providing fringe benefits, or the basic hourly rate contained in the wage determination (if applicable), whichever is greater.

(b) In the event of any violation of the provisions of paragraph (a), the Lessor shall be liable to any affected employee for any amounts due, and to the Postal Service for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic employed in violation of the provisions of paragraph (a) in the sum of $10 for each calendar day on which such employee was required or permitted to be employed on such work in excess of 8 hours or in excess of the standard workweek of 40 hours without payment of the overtime wages required by paragraph (a).

(c) The Contracting Officer may withhold from the Lessor, from any moneys payable under the lease, such sums as may administratively be determined to be necessary to satisfy any liabilities of the Lessor for unpaid wages and liquidated damages.

13. HEALTH AND SAFETY STANDARDS. (a) To the extent this agreement is for construction, alteration, and/or repair, including painting and decorating, the Lessor shall not require any laborer or mechanic employed in the performance of this agreement to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety as determined under standards promulgated by the Secretary of Labor under the authority of 40 U.S.C. 333 (see 29 CFR Part 1518).

(b) In the event it is determined that the Lessor has failed to comply with this provision regarding health and safety standards, the Postal Service, in its discretion, may cancel this agreement, contract for the balance of the work on term, and charge to the Lessor the additional cost, if any, incurred thereby.

14. SUBCONTRACT PROVISIONS. The Lessor agrees to insert the Overtime clause, the Health and Safety Clause and this Subcontract Provisions clause in all subcontracts hereunder and to require their inclusion in all subcontracts of lower tier. The term "Lessor" as used in these clauses in any subcontract shall be deemed to refer to the subcontractor.

15. ASSIGNMENT OF CLAIMS. (a) If this agreement provides for payments aggregating $1,000 or more, claims for moneys due or to become due the Lessor from the Postal Service under this Lease may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this Lease and not already paid, and shall not be made to more than one party except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed with (i) the Contracting Officer, (ii) the surety or sureties upon the bond or bonds, if any, in connection with this lease, and (iii) the disbursing officer, if any, designated in this lease to make payment, and the Contracting Officer has acknowledged the assignment in writing.

(b) Assignment of this lease or any interest in this lease other than in accordance with the provisions of this clause shall be grounds for annulment of the lease at the option of the Postal Service.

16. MORTGAGEE'S AGREEMENT. If there is now, or will be, a mortgage on the premises, the Lessor shall, if requested to do so, furnish a mortgagee's subordination agreement on Form 7450.

**EXHIBIT 1**

17. EQUIPMENT, UTILITIES AND SERVICES. Unless otherwise specified herein, the Lessor shall furnish suitable flag staff, proper post office sign and a ten-pound multi-purpose fire extinguisher for all class fires, as well as other equipment as may be specified. He shall keep all such furnished items in good condition, except that the Postal Service shall be responsible for re-charging and shall pressure testing the fire extinguisher with the Lessor remaining responsible for repair and replacement.

18. SUBLEASE. The Postal Service may sublet all or any part of the premises or assign this lease but shall not be relieved from any obligation under this lease by reason of any subletting or assignment.

19. LESSOR OBLIGATIONS. The Lessor's obligations in regard to the services provided in the Short Form Lease are further defined as follows:

(a) If fuel is furnished—Lessor shall furnish heating system of sufficient size and capacity to provide uniform temperature in all portions of the demised premises in accordance with contractual requirements, and if not specifically specified in the contractual requirements, to furnish a heating system of sufficient size and capacity to provide uniform temperature of 70 degrees F. in all portions of the demised premises, together with all fuel and filters required for proper operation of the system during the continuance of the lease.

(b) If heat is furnished—Lessor agrees to maintain uniform temperature in all portions of the demised premises in accordance with contractual requirements during the continuance of the lease, and to furnish necessary filters. Unless otherwise specified in the contractual requirements, uniform temperature of 70 degrees F. shall be provided in all portions of the demised premises during the continuance of the lease.

(c) If neither fuel nor heat is furnished—Lessor shall furnish heating system of sufficient size and capacity to provide uniform temperature in all portions of the demised premises in accordance with contractual requirements, and if not specifically specified in the contractual requirements, to furnish a heating system of sufficient size and capacity to provide uniform temperature of 70 degrees F, in all portions of the demised premises, together with all filters required for proper operation of the system during the continuance of the lease.

(d) If light is furnished—Lessor agrees to provide and install light fixtures in accordance with contractual requirements and during the continuance of the lease shall provide and install all needed replacement parts including, but not limited to, necessary fluorescent tubes and incandescent lamps, as well as paying all lighting bills.

(e) If light is not furnished and fluorescent lights are used—Lessor agrees to provide and install light fixtures in accordance with contractual requirements and to provide and replace during the continuance of the lease all replacement ballasts as needed.

(f) If power is furnished—Lessor agrees to furnish and pay for all power during continuance of the lease.

(g) If water is furnished—Lessor agrees to furnish and pay for all water during continuance of the lease.

(h) If sewerage service is furnished—Lessor agrees to furnish and pay for sewerage service during continuance of the lease.

(i) If air conditioning equipment is furnished—Lessor agrees to furnish air conditioning equipment in accordance with contractual requirements, servicing of said equipment, including, but not limited to, the replacement of necessary refrigerant and filters as required for proper operation of the equipment.

(j) If air conditioning is furnished—Lessor agrees to furnish air conditioning equipment in accordance with contractual requirements, servicing of said equipment, including, but not limited to, the replacement of necessary filters and refrigerant as required for proper operation of the equipment, together with power, water and other services for its operation.

20. PAYMENT FOR LABOR AND MATERIAL. If the Successful Bidder is required to furnish a Labor and Material Payment Bond, Form 7414-E, in connection with this Agreement to Lease, he agrees to post at the job site in a prominent place, a photostat or certified copy of Form 7414-E, where it can easily be seen by all persons who have furnished, or have been requested to furnish labor, material, or both, used or reasonably required for use in the performance of this Agreement to Lease.

21. CLEAN AIR AND WATER (JULY 1975) (Applicable only if (i) offer exceeds $100,000, or (ii) the offer is for an indefinite quantity and it indicates that orders for estimated quantities will exceed $100,000 in any year, or (iii) a facility to be used is listed on the EPA List of Violating Facilities due to a criminal conviction, or (iv) the contract is not otherwise exempt.)
The Contractor agrees as follows:

(a) To comply with all the requirements of Section 114 of the Clean Air Act, as amended (42 U.S.C. 1857, et seq., as amended by Public Law 91-604) and Section 308 of the Federal Water Pollution Control Act (33 U.S.C. 1251, as amended by Public Law 92-500), respectively, and all regulations and guidelines issued thereunder.

(b) That no portion of the work required by this contract will be performed in a facility listed on the Environmental Protection Agency (EPA) List of Violating Facilities on the date when this contract was awarded, unless and until the EPA removes the name of such facility from such listing.

(c) To notify promptly the Contracting Officer of receipt of any communication from the EPA indicating that any facility proposed for or in use under this contract is under consideration to be listed on the EPA List of Violating Facilities.

(d) To insert the substance (i) of any Clean Air and Water Certification contained in this solicitation and (ii) of the provisions of this clause into every nonexempt subcontract, including this paragraph, and to take such steps as the Postal Service may direct as a means of enforcing these provisions.

(e) That in the event the Contractor fails to comply with all the above requirements, his right to perform may be canceled, terminated for default, or suspended for such failure, in whole or in part.

(Environmental Protection Agency regulations implementing the provisions for listing prescribed by the referenced statutes may be found at 40 CFR Part 15.)

**EXHIBIT 1**

| | | PAGE | OF |
| **U. S. POSTAL SERVICE**<br>**REPRESENTATIONS AND CERTIFICATIONS** | | 1 | 2 |

NAME AND ADDRESS OF OFFEROR (No., Street, City, State, and ZIP Code)

DOMINICK S & AIDA I. MANDACARI
1137 NORWOOD RRNT, OH 44240

USPS SOLICITATION NO.

DATE OF OFFER
3/1/79

THE OFFEROR MAKES THE FOLLOWING REPRESENTATIONS AND CERTIFICATIONS AS A PART OF THE OFFER IDENTIFIED ABOVE. [Check and/or complete all applicable boxes or items. The term "offer" means bid where the procurement is advertised; and proposal where the procurement is negotiated.]

**1. SMALL BUSINESS CONCERN/MINORITY ENTERPRISE.**
He ☐ is, ☒ is not, a small business concern and he ☐ is, ☒ is not, a minority enterprise. (For the purpose of this offer (1) a "small business concern" is a concern, including its affiliates, which is independently owned and operated, (2) ... and (3) a "minority enterprise" is a concern of which 50% is owned ... is owned or controlled by members of a minority group (i.e., Black Americans, Spanish-speaking Americans Puerto Ricans, and American Indians, American Eskimos, and American Aleuts. ...

**2. TYPE OF ORGANIZATION**
He operates as an ☒ individual, ☐ partnership, ☐ joint venture, ☐ corporation, ☐ a nonprofit organization incorporated in the State of OHIO

**3. REGULAR DEALER/MANUFACTURER** (Check only for supply contracts where the offer exceeds $10,000.)
He is a ☐ regular dealer in, ☐ manufacturer of, the supplies offered.

**4. PARENT COMPANY AND EMPLOYER IDENTIFICATION NUMBER**
(a) Is the offeror owned or controlled by a parent company as described below? ☐ Yes ☒ No. (For the purpose of this offer, a parent company ...
(b) If the answer to (a) above is "Yes," offeror shall in set in the space below the name and main office address of the parent company.

NAME OF PARENT COMPANY | MAIN OFFICE ADDRESS (No., Street, City, State and ZIP Code)

(c) Offeror shall insert in the applicable space below, if he has no parent company, his own Employer's Identification Number (E.I. No.) (Federal Social Security Number used in Employer's business) ...

| EMPLOYER IDENTIFICATION NUMBER OF: | PARENT COMPANY | OFFEROR 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<br>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 |

**5. BUY AMERICAN CERTIFICATE**
The offeror hereby certifies that each end product, except any end products he has listed below, is a domestic source end product (as defined in the clause entitled "Buy American Act") ...

| EXCLUDED END PRODUCTS | COUNTRY OF ORIGIN |

**6. EQUAL OPPORTUNITY** (Check only if offer exceeds $10,000 in amount.)
He ☐ has, ☐ has not, participated in a previous contract or subcontract subject to the Equal Opportunity clause herein, the clause originally contained in Section 301 of Executive Order No. 11925, or the clause contained in Section 201 of Executive Order No. 11114; the ☐ has, ☐ has not, filed all required compliance reports; and representations indicating submission of required compliance reports, signed by proposed subcontractors, will be obtained prior to subcontract awards. (The above representation need not be submitted in connection with contracts which are exempt from the Equal Opportunity clause.)

**7. EQUAL OPPORTUNITY AFFIRMATIVE ACTION PROGRAM** (Check only if offer exceeds $50,000 and offeror has 50 employees or more.)
The offeror represents that (1) he ☐ has developed and has on file, ☐ has not developed and does not have on file, at each establishment affirmative action programs as required by the rules and regulations of the Secretary of Labor (41 CFR 60-1 and 60-2), or (2) he ☐ has not previously had contracts subject to the written affirmative action program requirement of the rules and regulations of the Secretary of Labor. (The above representation need not be submitted in connection with contracts which are exempt from the Equal Opportunity clause.)

PS Form 7319-B
May 1975

Legibility poor on original instrument
HELEN M. FREDERICK
Portage County Recorder

VOL 0094 PG 0934

22295

**EXHIBIT 1**

PAGE 2 OF 2

**8. CONTINGENT FEE**

(a) He ☐ has, ☑ has not, employed or retained any company or person (other than a full time bona fide employee working solely for the offeror to solicit or secure this contract, and (b) he ☐ has, ☑ has not, paid or agreed to pay any company or person (other than a full time bona fide employee working solely for the offeror) any fee, commission, percentage or brokerage fee, contingent upon or resulting from the award of this contract. If the offeror responds in the affirmative, he shall furnish, in duplicate, a completed Form 7319, *Contractor's Statement of Contingent or Other Fees*, and sign for information as may be requested by the Contracting Officer. (If offeror has previously furnished a completed Form 7319 to the offeror fixing this solicitation, he may accompany his offer with a signed statement (a) indicating when such completed form was previously furnished, (b) identifying by number the previous solicitation or contract, if any, in connection with which such form was submitted, and (c) representing that the statement in such form is applicable to this offer. *[For interpretation of the representation, including the term "bona fide employee," see Postal Contracting Manual, subparagraph 1-503.1.]*

**9. CLEAN AIR AND WATER CERTIFICATION**

*(Applicable only if (i) the offer exceeds $100,000, or (ii) the offer is for an indefinite quantity and it indicates that orders for estimated quantities will exceed $100,000 in any year, or (iii) a facility to be used is listed on the EPA List of Violating Facilities due to a criminal conviction, or (iv) the contract is not otherwise exempt.)*

The offeror (1) certifies that any facility to be utilized in the performance of this proposed contract ☐ is, ☐ is not, listed on the Environmental Protection Agency *List of Violating Facilities* as of the date of this offer, and (2) agrees to notify the Contracting Officer promptly if any communication is received from the Environmental Protection Agency prior to contract award indicating that any such facility is under consideration for inclusion on the List.

**10. INDEPENDENT PRICE DETERMINATION**

(a) By submission of this offer, each offeror certifies, and in the case of a joint offer, each party thereto certifies as to his own organization, that in connection with this procurement:

(1) The prices of this offer have been arrived at independently, without consultation, communication, or agreement, for the purpose of restricting competition, as to any matter relating to such prices with any other offeror or with any competitor;

(2) Unless otherwise required by law, the prices set forth in this offer have not been knowingly disclosed by the offeror and will not knowingly be disclosed by the offeror, prior to opening, in the case of a bid, or prior to award, in the case of a proposal, directly or indirectly to any other offeror or to any competitor; and

(3) No attempt has been made or will be made by the offeror to induce any other person or firm to submit or not to submit an offer for the purpose of restricting competition.

(b) Each person signing this offer certifies that:

(1) He is the person in the offeror's organization responsible within that organization for the decision as to the prices being offered herein and that he has not participated, and will not participate, in any action contrary to (a) (1) through (a) (3) above; or

(2) (i) He is not the person in the offeror's organization responsible within that organization for the decision as to the prices being offered herein but that he has been authorized in writing to act as agent for the persons responsible for such decision in certifying that such persons have not participated, and will not participate, in any action contrary to (a) (1) through (a) (3) above, and as their agent does hereby so certify; and (ii) he has not participated, and will not participate, in any action contrary to (a) (1) through (a) (3) above.

(c) This certification is not applicable to a foreign offeror submitting an offer for a contract which requires performance or delivery outside the United States, its possessions, and Puerto Rico.

(d) An offer will not be considered for award where (a) (1), (a) (2), or (b) above, has been deleted or modified. Where (a) (3) above, has been deleted or modified, the offer will not be considered for award unless the offeror furnishes with the offer a signed statement which sets forth in detail the circumstances of the disclosure and the head of procuring activity determines that such disclosure was not made for the purpose of restricting competition.

**11. CERTIFICATION OF NONSEGREGATED FACILITIES**

*(Applicable to (1) contracts, (2) subcontracts, and (3) agreements with applicants who are themselves performing federally assisted construction contracts, exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause. An offer will not be considered for award where this certification is applicable and it has been deleted or modified.)*

By the submission of this offer, the offeror, applicant, or subcontractor certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies further that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The offeror, applicant or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that he will retain such certifications in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
CERTIFICATIONS OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

*NOTE –OFFERS MUST SET FORTH FULL, ACCURATE, AND COMPLETE INFORMATION AS REQUIRED BY THIS SOLICITATION (INCLUDING ATTACHMENTS). THE PENALTY FOR MAKING FALSE STATEMENTS IN OFFERS IS PRESCRIBED IN 18 U.S.C. 1001.*

*USGPO: 1976 — 650-493/2484 Region 5-1

22295

VOL 0094 FOLI935

**EXHIBIT 1**

FORM OF ACKNOWLEDGMENT FOR HUSBAND AND WIFE

State of _OHio_  ⎫
                 ⎬ SS:
County of _Portage_ ⎭

Personally appeared before me, a Notary Public in and for the County and State aforesaid, _____
_Dominick S. Mandalari_ who is known to me to be
the same person who executed the foregoing lease, and who acknowledged that he signed, sealed, and delivered
the same as his free and voluntary act for the uses and purposes therein set forth.

And on the same day also voluntarily appeared before me _Ann M. _____ ,
wife of the said _Dominick S. Mandalari_ to me well known as the person
signing said lease, and in the absence of _____
said _Ann_ declared that she had of her own free will signed and sealed
the foregoing lease for the purposes therein contained and set forth, including the release of homestead and dower
therein, of which she had full knowledge, without compulsion or undue influence of her said husband.

Witness my hand and notarial seal, in the County and State aforesaid, this _____ day of
_March_ , 19 _79_ .

_Susan L. Barone_

(Notarial Seal)                                    SUSAN L. BARONE, Notary Public
                                                   Portage County, Ohio
                                                   My Commission Expires June 5, 1980

My commission expires _6/05/80_

THIS LEASE PREPARED BY:
C. N. Crawford, Realty Mgmt.& Acquisition
U. S. Postal Service               Analyst
Main Post Office
Columbus, OH    43216

PS Form 7449-C
Dec. 1974
GPO 889-889

VOL0094 PG0936
22295

**EXHIBIT 1**



*Plat and Description of the Town of Franklin.*

laid out on Lot No 24 and 25 in the Township of Franklin in Portage County and State of Ohio

*Plat of the Town of Franklin.*

**EXHIBIT 1**



EXHIBIT 1

*Env. X*

BONNIE M. HOWE
PORTAGE CO. RECORDER

2 0 1 4 1 5 3 7 7     14 OCT

RECEIVED FOR RECORD
AT __13 : 53 : 48__
FEE __44.00__

**INDEXED**

TRANSFERRED 50
Sec. 319.54(F-2)
Sec. 319.202

OCT 09 2014

*Janet Esposito*
Portage County Auditor

# Quit-Claim Deed
### Ohio Revised Code §5302.11

    **KNOW ALL MEN BY THESE PRESENTS THAT BRUNO R. MANDALARI** and **PAMELA J. MANDALARI,** husband and wife, **NANCY DENE MANDALARI,** a single individual, **MARY BETH MANDALARI,** and **CURTIS STRAUBHAAR,** husband and wife, and **DOMINICK MANDALARI, JR.** and **SHERYL A. MANDALARI,** husband and wife, the Grantors, for valuable consideration thereunto given, and for the sum of Ten Dollars ($10.00) received to their full satisfaction of **FRANKLIN LOT, LLC,** the Grantee, whose tax mailing address will be 1202 Shady Lakes Drive, Kent, Ohio 44240.

    **GIVE, GRANT, BARGAIN, REMISE, RELEASE AND FOREVER QUIT-CLAIM** unto the said Grantee, its successors and assigns, all right, title and interest as said Grantors have in and to the following described premises, situated in the City of Kent, County of Portage, and State of Ohio:

    See attached Exhibit A

    **TO HAVE AND TO HOLD** the above premises, with the appurtenances thereunto belonging, unto the said Grantee, and its successors and assigns forever.

    **AND FOR VALUABLE CONSIDERATION, BRUNO R. MANDALARI, PAMELA J. MANDALARI, DOMINICK MANDALARI, JR., SHERYL A. MANDALARI, MARY BETH MANDALARI,** and **CURTIS STRAUBHAAR,** do hereby remise, release and forever quit-claim unto the said Grantee, their heirs and assigns, all their right and expectancy of Dower in the above-described premises.

    **IN WITNESS WHEREOF,** the Grantors have hereunto set their hands the __10th__ day of September, 2014.

**EXHIBIT 1**

GRANTORS:

BRUNO R. MANDALARI

PAMELA J. MANDALARI

NANCY DENE MANDALARI

MARY BETH MANDALARI

CURTS STRAUBHAAR

DOMINICK MANDALARI, JR.

SHERYL A. MANDALARI

**EXHIBIT 1**

# Exhibit A

Situated in the City of Kent, County of Portage and State of Ohio and being part of Original Lot 25 in Franklin Township and known as being part of Lot 6 and all of Lot 7 of the Original Plat of the City of Kent as recorded in deed book vol. 25, pg. 132 in the Portage County records and further described as follows:

Beginning at an iron pipe set in the east line of Franklin Avenue (66' R/W) at the northwest corner of land owned by the Board of Portage County Commissioners and being N 16° 45' E 106.00 feet from the intersection of said road line with the north line of College Street (80' R/W);

Thence N 16° 45' E 41.70 feet along the east line of Franklin Avenue to an iron rod set in the south line of a 20 feet wide alley;

Thence N 88° 58' 22" E 127.53 feet along the south side of said alley to an iron rod set at the intersection of said alley line with the west line of a 20 feet wide alley;

Thence S 1° 02' 11" E 52.24 feet along the west line of said alley to an iron rod set at the northeast corner of the Board of Portage County Commissioners land;

Thence N 85° 55' 26" W 140.82 feet along the north line of the Board of Portage County Commissioners land to the beginning.

Containing 0.142 of an acre of land, be the same more or less but subject to all legal highways as surveyed in September, 2014 by Edward J. Collier, registered surveyor No. 7141.

17-025-40-00-026.000

TAX MAP DEPT. 10/9/2014
LEGAL DESCRIPTION
☑ SUFFICIENT ☐ DEFICIENT
☑ NO DIVISION OF LAND
( P-17474 )

0.142 Ac.
BY SURVEY

EXHIBIT 1

STATE OF OHIO     )
                     ) ss.

PORTAGE COUNTY    )

      THE FOREGOING INSTRUMENT WAS ACKNOWLEDGED AND EXECUTED BEFORE ME, on the _10TH_ day of September, 2014 BRUNO R. MANDALARI, PAMELA J. MANDALARI, NANCY DENE MANDALARI, MARY BETH MANDALARI, CURTIS STRAUBHAAR, DOMINICK MANDALARI, JR. and SHERYL A. MANDALARI, who, under penalty of perjury in violation of section 2921.11 of the Revised Code, represented to me to be the Grantor named above.

AMANDA M. HARNER
NOTARY PUBLIC-STATE OF OHIO
RESIDENT OF SUMMIT COUNTY
MY COMMISSION EXPIRES _____

NOTARY PUBLIC

This Instrument Prepared By:

Robert J. Paoloni
Paoloni & Lewis
250 South Water Street
Kent, Ohio 44240
(330) 678-0242

**EXHIBIT 1**

# EXHIBIT E

Seller's Description and Itemization of the Project Opportunities pursuant to Section 1(iii)

**EXHIBIT 1**

# PROJECT OPPORTUNITIES

The proposed building is an approximately 42,000 sf multifamily structure with 58 individual rental units. By leveraging our experience with multifamily design in downtown Kent, the 227 Franklin Building will be the premier apartment destination upon completion. The updated micro unit configurations take lessons learned from Avant220 and expand upon the nature of living BIG while residing small. The 1 and 2 bedroom configurations diversify the target market and provide top of the line layouts with fantastic light and views for young professionals and visiting professors. An appropriately sized and well-appointed lobby promotes community engagement and provides additional study and living area for all residents. The servicing area is enclosed in the southeast corner of the building and includes all Base building MEP rooms as well as trash and recycling bins. A key differentiator of the Franklin Building is the private outdoor gathering space. Located to the north of the building is a private landscape/hardscape area that further elevates the amenity package. Based on location, views, light infiltrating, design and indoor/outdoor living spaces, the 227 franklin Building represents best practices from past experience with a fresh look to the future.

EXHIBIT 1

## EXHIBIT F

Seller's Disclosure of Seller's liabilities and obligations pursuant to Section 1(iii)

NAME                DESCRIPTION            AMOUNT

EXHIBIT 1

# LIABILITIES AND OBLIGATIONS

1. Dimit Architects Fee to date
2. Krill Construction PreCon Fee (only payable if project proceeds with another CM)
3. PSI Geotechnical Subsurface Analysis
4. Riverstone – Site Survey
5. Riverstone - ALTA Survey
6. Riverstone – Full Civil Services
7. All ground lease payments commencing December 1, 2018 of $5,541.67

**EXHIBIT 1**

# EXHIBIT G

Form of Assignment and Amendment of Leases

**EXHIBIT 1**

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASES
## AND OTHER INTERESTS

THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASES AND OTHER INTERESTS ("Assignment") is entered into effective as of _____, 2018 between **FAIRMOUNT PROPERTIES, LLC**, an Ohio limited liability company, ("Assignor") and **COLLEGE TOWN KENT, LLC**, an Ohio limited liability company ( "Assignee").

### RECITALS

A.   The Assignor, as tenant, entered into certain ground leases and amendments thereto (collectively, "Leases") for certain real property and structures (collectively, "Properties") as follows:

    i.   Ground Lease between BEBS, LTD, as landlord, for an initial term of 30 years, with 4 options to renew for an additional 5 years each as provided in said Ground Lease for the property known as parcels 17-025-40-00-023-000, 17-025-40-00-024-000 and 17-025-40-00-025-000, located at 227-229 Franklin Avenue, Kent, Ohio (a true and accurate copy of the Ground Lease is attached hereto and made a part hereof as Exhibit A); and

    ii.   Ground Lease between Franklin Lot, LLC, successor to Aida Mandalari, as landlord, for an initial term of 30 years, with 6 options to renew for an additional 5 years each as provided in said Ground Lease for the property known as parcel 17-025-40-00-026-000 and consisting of approximately 0.1435 acres, located at 225 Franklin Avenue, Kent, Ohio (a true and accurate copy of the Ground Lease is attached hereto and made a part hereof as Exhibit B).

B.   Assignor and Assignee further agree to the transfer of Assignor's opportunity and work in potential development of the Properties, including, all work product in redevelopment of the Properties, permits, licenses, project plans, designs, entitlements and intellectual property relating thereto. ("Project Opportunities").

C.   Assignor desires to assign all of Assignor's right, title, and interest under the Leases and Project Opportunities to Assignee, and Assignee is willing to assume all of Assignor's liabilities and obligations concerning the Properties and arising under the Leases and to release Assignor from all obligations and liabilities arising therefrom.

1

**EXHIBIT 1**

**NOW, THEREFORE,** for valuable consideration paid, receipt of which is hereby acknowledged, effective the date first written above, the parties agree as follows:

1.0     Assignment of Leases. Assignor assigns to Assignee all of Assignor's rights, titles and interests in the Leases, together with all rights, obligations and liabilities arising under or by virtue of the Leases and the Properties.

2.0     Acceptance and Assumption of Leases, Assignee accepts this Assignment and assumes responsibility under such Leases and agrees to perform all of the obligations and duties of Assignor arising or accruing under the Leases or the use of the Properties.

3.0     Landlords' Consent. This Assignment is conditioned upon the respective Landlords under the Leases consenting to such assignments, including a release of Assignor of all obligations under said Leases, and assumptions pursuant to the Assignment and Assumption provision in the respective leases.

4.0     Assumption of Project Opportunities. Assignor assigns to Assignee all of Assignor's rights, titles and interests in the Project Opportunities, together with all rights, obligations and liabilities arising under or by virtue of the Project Opportunities.

5.0     Acceptance and Assumption Project Opportunities, Assignee accepts this Assignment and assumes responsibility under such Project Opportunities and agrees to perform all of the obligations and duties of Assignor arising or accruing under the Project Opportunities.

6.0     Purchase Price. The Purchase Price for this Assignment shall be Six Hundred Fifteen Thousand Dollars ($615,000.00). The Purchase Price shall be paid from Assignee to Assignor within five (5) business days of receipt of approval from the respective landlords of the assignment and assumptions of the Leases.

7.0     Indemnification and Hold Harmless, Assignee on behalf of itself and its personal representatives, agents, successors and assigns (the "Indemnifying Parties") shall release, indemnify and hold harmless, Assignor and Assignor's personal representatives, agents, employees, heirs, successors and assigns (the "Indemnified Parties") from and against all loss, damage, cost and expense (including reasonable attorneys' fees), known or unknown, foreseen or unforeseen, that has been or may be claimed against, imposed upon or incurred by the Indemnified Parties in any way relating to or from the Leases and Project Opportunities, including, but not limited to, Assignor's failure to perform any of the obligations under the Leases or Project Opportunities and for any obligations accrued after the effective date of this Assignment.

8.0     Other Actions. Each of the parties hereto covenants and agrees to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment.

9.0     Entire Agreement. This Assignment constitutes the sole and entire agreement of the parties to this Assignment with respect to the subject matter contained herein and therein, and

**EXHIBIT 1**

supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

      10.0   Successors and Assigns. This Assignment will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

      11.0   Authority. The undersigned entities and individuals executing this Assignment on behalf of such entities have full authority to enter into this Assignment and to perform the obligations required herein.

      12.0   Governing Law. This Assignment will be governed by the laws of the State of Ohio.

      13.0   Counterparts and Facsimiles. This Assignment may be executed in multiple counterparts as long as each party executes at least one counterpart. A party's execution of this Assignment may be evidenced, and a party's delivery of this Assignment may be effected, by facsimile or other electronic means.

*[Remainder of Page Intentionally Left Blank – Signature and Notary Pages Follow]*

**EXHIBIT 1**

Signed effective as of the date first written above.

                                **ASSIGNOR:**
                                **FAIRMOUNT PROPERTIES, LLC**

_____    By: _____

_____    Its: _____

STATE OF _____)
                       ) SS
COUNTY OF _____)

      BEFORE ME, a notary public in and for said county and state, personally appeared the above-named _____, as _____ of Fairmount Properties, LLC, who acknowledged that he did sign the foregoing instrument on behalf of the company and that the same is his free act and deed and the free act and deed of the company.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____ this \_\_\_\_\_ day of _____, 2018.

                         _____
                         Notary Public

**EXHIBIT 1**

ASSIGNEE:
**COLLEGE TOWN KENT, LLC**

_____

By: _____

_____

Its: _____

STATE OF OHIO      )
                   ) SS
COUNTY OF SUMMIT    )

       BEFORE ME, a notary public in and for said county and state, personally appeared the above-named _____ as _____ of College Town Kent, LLC who acknowledged that he/she did sign the foregoing instrument on behalf of said municipal corporation and that the same is his/her free act and deed and the free act and deed of said municipal corporation.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, Ohio this _____ day of _____, 2018.

CL2:487407_v1

_____
Notary Public

5

**EXHIBIT 1**

# EXHIBIT H

Form of Estoppel Certificate

**EXHIBIT 1**

## LEASE ESTOPPEL CERTIFICATE

**Landlord:** [name address]    **Certificate Date:** ~~November~~ January _____ , 2019~~8~~

**Tenant:** Fairmount Properties, LLC, an Ohio Limited Liability Company
1138 W. 9th St., Cleveland, OH 44113

**Tenant Tradename:** N/A

**Proposed Assignee** College Town Kent, LLC, a Pennsylvania Limited Liability Company
12 Grandview Circle, Third Floor, Canonsburg, PA 15317-8533

**Lease:** Dated [date] and any amendments, revisions or assignments thereof, or other document revising or modifying the provisions of the Lease executed by the Landlord and Tenant, all of which are and more fully described in **Exhibit A** attached hereto (collectively, the "Lease").

**Leased Premises:** Portage County, OH    Parcels [describe] as more fully described in the Lease~~[describe]~~, Kent,

**Lease Term:** Commencing on [lease begin date] and terminating on [lease end date]

**Monthly Rent:** $[amount]    **Security Deposit:** $[amount]

The Landlord and Tenant hereby ratify and affirm the Lease and certify to the Proposed Assignee as follows:

1. The term of the Lease commenced, and will terminate, as noted above, and is valid, presently in effect, and unmodified except as noted in the documents described in **Exhibit 1A,** and contains all of the understandings and agreements between Landlord and Tenant with respect to the Leased Premises.

2. The Tenant is in full and complete possession of the Leased Premises and has commenced full occupancy and use of the Leased Premises, such possession having been delivered by the Landlord and having been accepted by the Tenant. Neither Landlord nor Tenant has ~~not~~ assigned, transferred, or pledged its interest under the Lease, or subleased any portion of the Leased Premises. Landlord owns the entire fee simple interest in the real estate described in the Lease, to the exclusion of all others, has maintained its said ownership interest and has not conveyed any ownership or possessory interest in the said real estate nor granted any options, rights of first refusal, or other similar rights to others.

3. The Lease calls for monthly rental as noted above and the Tenant has been making monthly installments of rent from the commencement date through the date of this Certificate. Tenant has no claim, charge, defense or offset against any rents payable under the Lease

c:\users\uis2\appdata\local\microsoft\windows\inetcache\content.outlook\o0s8wpjs\estoppel cert 1st draft 11-14-18 with jpl comments 1-11-19.docx\*\jpl\e\kent-west-end\estoppel cert 1st draft 11-14-18 with jpl comments 1-11-19.docx\*\jpl\e\kent\college-town\kent-west-end\estoppel cert 1st draft 11-14-18.docx

**EXHIBIT 1** 1 of 3

4.  No advance rental or other payment has been made in connection with the Lease, except rental for the current month. There is no "free rent" or other concession under the remaining term of the Lease and the rent has been paid to and including the month that this Certificate is signed. The Landlord has not rebated, reduced or waived any amounts due from Tenant under the Lease, either orally or in writing, nor has Landlord provided financing for, made loans or advances to, or invested in the business that Tenant may own. No rent under the Lease has been paid more than thirty (30) calendar days in advance of its due date.

5.  A security, rent or other deposit (the "Security Deposit"), in the amount noted above, if any, is being held by Landlord. It is not subject to any set-off or reduction or to any increase for interest or other credit due to Tenant. Tenant hereby relinquishes any right to the Security Deposit and authorizes Landlord to continue to hold it for the benefit of the Proposed Assignee and to apply and pay it over to the Proposed Assignee in accordance with the terms of the Lease.

6.  All obligations and conditions under the Lease to be performed to date by Landlord or Tenant have been satisfied, free of defenses and set-offs including construction work on the Leased Premises and any improvements required by the terms of the Lease to be made by the Landlord have been completed. Any allowances, payments, credits or abatements required to be given or paid by Landlord to Tenant have been given or paid in full.

7.  There is no existing default on the part of the Landlord or the Tenant in any of the terms or conditions of the Lease and no event has occurred which, with the passing of time or giving of notice or both, would constitute an event of default.

8.  The Lease does **not** contain any option to purchase and does not convey any rights of first refusal or similar rights or options, however, it does provide Tenant with an option to renew or extend the Lease for an additional term or terms.

9.  Other than as noted herein, Tenant has no interest in the Leased Premises, or the real estate upon which the Leased Premises are located, other than as a Tenant, and has no agreement of, or right to, purchase, no equity interest or any other interest than as noted in the Lease or herein.

10. Neither Landlord nor Tenant has any knowledge of any contamination of the Leased Premises, or the real estate upon which the Leased Premises are located, by hazardous materials, as defined by exiting environmental laws and Tenant does not use, nor has Tenant disposed of, hazardous materials in violation of existing environmental laws on the Leased Premises or the real estate upon which the Leased Premises are located.

11. There are no voluntary, or, to the best of Landlord's and Tenant's knowledge, involuntary, actions pending against the Tenant or Landlord under the bankruptcy laws of the United States or any state thereof.

12.     The foregoing representations are true and will remain true as of effective date of the
        assignment of the Lease to the Proposed Assignee.

        This certification is made with knowledge that the Proposed Assignee is relying upon the
representations made in this Certificate and shall inure to the benefit of the Proposed Assignee
Purchaser (???) identified above and its respective successors and assigns, and shall be binding
upon the undersigned and their successors and assigns.

ATTEST:                                    Fairmount Properties, LLC


By:_____                 By:_____
    Name:                                      Name:
    Title:                                     Title:

                                           Date:_____, 201____

ATTEST:                                    LANDLORD_____


By:_____                 By:_____
    Name:                                      Name:
    Title:                                     Title:

                                           Date:_____, 201____


## EXHIBIT 1A

### TO TENANT ESTOPPEL CERTIFICATE
### FOR PROPERTY AT


describe lease

describe assignment to Franklin Lot, LLC

## EXHIBIT I

All Documents sent via link: https://we.tl/t-EDpLXeArsH on 12/12/18 and Acknowledgment of Receipt of Same by Buyer's Counsel on 12/17/18

**EXHIBIT 1**

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "**First Amendment**") is made and entered into as of this /2ˢᵗday of August, 2019 (the "**Effective Date**"), by and between **FAIRMONT PROPERTIES, LLC,** an Ohio limited liability company ("**Seller**"), and **COLLEGE TOWN KENT, LLC,** an Ohio limited liability company ("**Purchaser**").

### RECITALS:

A.      Seller and Purchaser entered into a certain Purchase and Sale Agreement dated December 31, 2018 (the "**Agreement**") for the purchase by Purchaser of certain Property owned by Seller located in Kent, Ohio, as is more fully described on Exhibits A and B attached to the Agreement.

B.      Seller and Purchaser have agreed to amend the Purchase Price as set forth herein, and to otherwise confirm the Due Diligence contingency in the Agreement as more particularly set forth herein.

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree that the Agreement shall be, and hereby is, amended and modified as set forth herein.

1.      The recitals of this First Amendment are incorporated herein and made a part hereof.

2.      The Purchase Price is hereby increased to Six Hundred Eighty Thousand Five Hundred and Twenty-Four and 58/100 Dollars ($680,524.58).

3.      Purchaser's execution of this First Amendment shall be deemed to be Purchaser's delivery of the written notice pursuant to Section 5(a)(1) of the Agreement that the Due Diligence contingency has been satisfied.

4.      The terms and conditions of the Agreement, as amended, are incorporated herein and made a part hereof by reference as though fully rewritten herein. Except as modified by this First Amendment, the terms and conditions of the Agreement, shall remain in full force and effect and shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. In the event of a conflict between the terms of the Agreement and the terms of this First Amendment, the terms of this First Amendment shall control. This First Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this First Amendment via electronic transmission shall be effective as delivery of a manually executed counterpart of this First Amendment. Capitalized terms not otherwise defined in this First Amendment shall have the meaning ascribed to them in the Agreement.

*[Signature page follows]*

**EXHIBIT 2**

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the day and year first above written.

**SELLER:**

**FAIRMOUNT PROPERTIES, LLC,**
an Ohio limited liability company

By: _R.A. Rutt_
Name: _Randy Ruttenberg_
Its: _Authorized Manager_

**PURCHASER:**

**COLLEGE TOWN KENT, LLC,**
an Ohio limited liability company

By: _____
Name: _____
Its: _____

*Signature Page of First Amendment to Purchase and Sale Agreement*

2
**EXHIBIT 2**

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the day and year first above written.

**SELLER:**

**FAIRMONT PROPERTIES, LLC,**
an Ohio limited liability company

By:_____
Name: _____
Its: _____

**PURCHASER:**

**COLLEGE TOWN KENT, LLC,**
an Ohio limited liability company

By: _____
Name: Edward B. Dunlap
Its: Managing Member

*Signature Page of First Amendment to Purchase and Sale Agreement*

2

**EXHIBIT 2**

## EXHIBIT A

Being located in Franklin Township Lot 25 now City of Kent, known as being Lots Eight (8), Nine (9) and Ten (10) in Block Number Two (2) of the original plat recorded in Deed Vol. 25, Page 132, in the Village of Franklin (now City of Kent).

**EXHIBIT 2**

## EXHIBIT B

Situated in the City of Kent, County of Portage and State of Ohio and being part of Original Lot 25 in Franklin Township and known as being part of Lot 6 and all of Lot 7 of the Original Plat of the City of Kent as recorded in Deed Book Vol. 25, Page 132 in the Portage County Records and further described as follows:

Beginning at an iron pipe set in the East line of Franklin Avenue (66' R/W at the Northwest corner of land owned by the Board of Portage County Commissioners and being North 16° 45' East 106.00 feet from the intersection of said road line with the North line of College Street (80' R/W);

Thence North 16° 45' East 41.70 feet along the East line of Franklin Avenue to an iron rod set in the South line of a 20 feet wide alley;

Thence North 88° 58' 22" East 127.53 feet along the South side of said alley to an iron rod set at the intersection of said alley line with the West line of a 20 feet wide alley;

Thence South 1° 02' 11" East 52.24 feet along the West line of said alley to an iron rod set at the Northeast corner of the Board of Portage County Commissioners land;

Thence North 85° 55' 26" West 140.82 feet along the North line of the Board of Portage County Commissioners land to the beginning.

Containing 0.142 of an acre of land, be the same more or less as surveyed in September, 2014 by Edward J. Collier, registered surveyor No. 7141.

# IN THE COMMON PLEAS COURT
## PORTAGE COUNTY, OHIO

|  |  |
|---|---|
| FAIRMOUNT PROPERTIES, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>COLLEGE TOWN KENT, LLC,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2020-cv-00018<br><br>Judge Becky L. Doherty |

## <u>CONSENT TO MOVE OR PLEAD</u>

On January 9, 2020, Plaintiff Fairmount Properties, LLC filed its Complaint. Defendant College Town Kent, LLC ("Defendant") was served with the Complaint on January 15, 2020 and its responsive pleading is currently due on February 12, 2019. The parties hereby stipulate and agree that Defendant may have an additional 14 days, up to and including **February 26, 2020**, to move or plead in response to Plaintiff's Complaint. No prior extensions have been granted.

Respectfully submitted,

| | |
|---|---|
| /s/ *Chad D. Cooper* | */s/ Tyler Tarney* |
| Chad D. Cooper (0074322) | Tyler Tarney     (0089082) |
| Ashtyn N. Saltz (0089548) | Joseph Merical     (0098263) |
| **ULMER & BERNE LLP** | **GORDON REES SCULLY MANSUKHANI LLP** |
| 1660 West 2nd Street, Suite 1100 | 41 South High Street, Suite 2495 |
| Cleveland, OH 44113 | Columbus, Ohio 43215 |
| T: (216) 583-7000/F: (216) 583-7379 | T: (614) 340-5558/F: (614) 360-2130 |
| ccooper@ulmer.com | ttarney@grsm.com |
| asaltz@ulmer.com | jmerical@grsm.com |
| *Attorney for Plaintiff Fairmount Properties, LLC* | *Attorneys for Defendant College Town Kent, LLC* |

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served on February 11, 2020 via electronic mail and/or regular U.S. mail, postage prepaid, on the following:

Chad D. Cooper (0074322)
Ashtyn N. Saltz (0089548)
**ULMER & BERNE LLP**
1660 West 2nd Street, Suite 1100
Cleveland, OH 44113
T: (216) 583-7000/F: (216) 583-7379
ccooper@ulmer.com
asaltz@ulmer.com
*Attorneys for Plaintiff Fairmount Properties, LLC*

                                        */s/ Tyler Tarney*
                                        Tyler Tarney          (0089082)

2